# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

LOU GARDEN PRICE, SR.,       )
                                    )
         Plaintiff,      )
                                    )    C.A. No. 05-871-SLR
     v.                     )
                                    )
CORRECTIONAL MEDICAL,    )
SERVICES, DCC WARDEN     )    Jury Trial Requested
TOM CARROLL, C.O. LIEUTENANT   )
TAYLOR, CAROLE KOZAK,    )
MARK FORBES, ROBERT DURNAN,  )
CHRIS MALANEY, and BETTY BURRIS, )
                                    )
        Defendants.    )

## STATE DEFENDANTS TOM CARROLL, BETTY BURRIS, RAMON TAYLOR, MARK FORBES AND ROBERT DURNAN'S OPENING BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

**DEPARTMENT OF JUSTICE
STATE OF DELAWARE**

*/s/ Erika Y. Tross*
Ralph K. Durstein (#912)
Erika Y. Tross (#4506)
Deputy Attorney General
820 N. French Street, 6th Floor
Wilmington, DE  19801
(302) 577-8400
    Attorney for State Defendants

Dated: November 8, 2007

# TABLE OF CONTENTS

Table of Citations ……………………………………………………............... iii

Nature and Stage of the Proceedings …………………………………………… 1

Summary of the Argument ……………………………………………………… 4

Statement of the Facts ……………………………………………………... 6

Argument ……………………………………………………………….. 13

    I.     State Defendants Are Immune From Liability In Their Official Capacities Pursuant To The Eleventh Amendment. ………………… 14

    II.    Price's Failure to Exhaust All Available Administrative Remedies Prior To Filing His Lawsuit Is Fatal To His Claims Under The Prison Litigation Reform Act. ……………………………………………….. 16

    III.   State Defendants Carroll And Burris Cannot Be Held Liable For Price's Claims Based Solely On Their Supervisory Responsibilities. .. 19

    IV.   State Defendants Ramon Taylor, Carroll and Burris Cannot Be Held Liable Where They Had No Personal Involvement In The Handcuffing And Transport Of Price Or In The Medical Care He Received At DCC. …………………………………………………… 20

    V.    The Facts Of This Case Do Not Support Price's Bald And Unsubstantiated Allegations Of Excessive Force, Failure to Protect And Deliberate Indifference. ……………………………………….. 22

        A.    State Defendants Durnan and Forbes did not commit excessive force on Price when he was handcuffed during the transport from Pennsylvania to Delaware. ……………………. 23

        B.    State Defendants Durnan and Forbes did not fail to protect Price. …………………………………………………………. 26

        C.    The State Defendants provided Price access to medical attention and treatment and were not deliberately indifferent to his medical needs. ……………………………………… 28

VI.     The Record In This Case, And Price's Statements To The Court, Reveal That There Is No Causal Link Between Price's Alleged Hand Damage And The Handcuffs Used During The Transport To Delaware. ………………………………………………………...... 29

VII.    State Defendants Are Immune From Liability In Their Individual Capacities Pursuant To The Doctrine Of Qualified Immunity. ……… 30

        A.    The facts clearly demonstrate that the State Defendants' conduct did not violate Price's constitutional rights. ………… 32

        B.    Price's rights were not clearly established such that the State Defendants understood that their conduct violated his rights. .. 32

Conclusion ……………………………………………………………………… 34

<u>**TABLE OF CITATIONS**</u>

<u>Cases</u>

*Anderson v. Creighton*,
    483 U.S. 635, 640 (1987) …………………………………………………...    31

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242, 248 (1986) …………………………………………………...    13, 22

*Brookins v. Williams*,
    402 F.Supp.2d 508, 512 (D. Del. 2005) ……………………………………    21

*Carter v. Exxon Company USA*,
    177 F.3d 197, 202 (3d Cir. 1999) …………………………………………...    13

*Celetox Corp. v. Catrett*,
    477 U.S. 317, 322-23 (1986) ………………………………………………...    22

*Durmer v. O'Carroll*,
    91 F.2d 64, 67 (3d Cir. 1993) ………………………………………………    28

*Edelman v. Jordan*
    415 U.S. 651, 662-63 (1974) ………………………………………………    14-15

*Gay v. Petsock*
    917 F.2d 768, 771 (3d Cir. 1990) …………………………………………...    21

*Grant v. City of Pittsburgh*
    98 F.3d 116, 121 (3d Cir. 1996) ……………………………………………    32

*Hafer v. Melo*,
    502 U.S. 21 (1991) …………………………………………………………    15

*Hamilton v. Leavy*,
    117 F.3d 742, 746 (3d Cir. 1997) …………………………………………...    26-27

*Harlow v. Fitzgerald*,
    457 U.S. 800, 818 (1982) …………………………………………………...    30

*Pennsylvania v. Porter*,
    659 F.2d 306, 336 (3d Cir. 1981) …………………………………………...    21

*Porter v. Nussle*
    534 U.S. 516, 524 (2002) …………………………………………………...    16-17

*Rode v. Dellarciprete,*
    845 F.2d 1195, 1207 (3d Cir. 1988) …………………………………………... 19, 21

*Rouse v. Plantier,*
    182 F.3d 192, 197 (3d Cir. 1999) …………………………………………... 28

*Saucier v. Katz*
    533 U.S. 194, 200 (2001) …………………………………………………... 31

*Sample v. Diecks*
    885 F.2d 1099, 1116-17 (3d Cir. 1989) ……………………………………. 19

*Seminole Tribe of Florida v. Florida,*
    517 U.S. 44 (1996) ………………………………………………………. 15

*Scott v. Harris,*
    -- U.S. --, 127 S.Ct. 1769 (2007) ……………………………………………… 22, 31

*Vick v. Haller,*
    512 A.2d 249 (1986) ……………………………………………………….. 31

*Will v. Michigan Dept. of State Police,*
    491 U.S. 58, 71 (1989) …………………………………………………... 15

*Wilson v. Reinhart,*
    2003 WL 21756393 (D. Del. July 29, 2003) ………………………………. 23

*Wilson v. Seiter,*
    501 U.S. 294, 298 (1991) …………………………………………………... 23

*Woodford v. Ngo*
    -- U.S. --, 126 S.Ct. 2378, 2387 (2006) ……………………………………… 17

## **Statutes, Rules and Other Authority**

42 *U.S.C.* § 1983 …………………………………………………………… *passim*

42 *U.S.C.* § 1997e(a) …………………………………………………. 16-17

Federal Rule of Civil Procedure 56(c) ……………………………………... 13

U.S. Constitution, Eleventh Amendment …………………………………... 14

## NATURE AND STAGE OF THE PROCEEDINGS

On December 15, 2005, Plaintiff Lou Garden Price, Sr. ("Price" or "Plaintiff") filed a complaint against Lt. Taylor, Warden Tom Carroll, Deputy Warden Betty Burris, Unknown Department of Justice detectives, Nurse Carole, Nurse Kera and Correctional Medical Services alleging that he had carpal tunnel surgery while in the custody of the Pennsylvania Department of Correction ("PA DOC") that had "only damaged [him] further" (the "Original Complaint"). (D.I. 2 at "Statement of Claim"). Price also alleged in his Original Complaint that during his transport from PA DOC to the Delaware Correctional Center ("DCC") a Lt. Taylor "neglected to take precautions while cuffing [him] during the trip placing [him] under extreme pain and duress ...." (*Id.*). Price further alleged that he was denied medical care when he arrived at DCC. In the Original Complaint Price did not request any monetary damages. Rather, Price requested: 1) an EMG, 2) for PA DOC to redo his carpal tunnel surgery, and 3) the full names of all of the defendants. The Court granted Price leave to proceed in forma pauperis on January 4, 2006. (D.I. 5).

Less than two months after he filed the Original Complaint, Price filed an Amended Complaint stating that DCC had taken him to have an EMG performed on his right hand (the "First Amended Complaint", filed 2/6/06). (D.I. 11). Following the First Amended Complaint, the Court issued a Memorandum Order dismissing CMS as a defendant and permitting Price to file a second amended complaint within 45 days of the Order. (D.I. 12).

In accordance with the Court's Order, Price filed a second amendment to his Complaint on April 12, 2006 (the "Second Amended Complaint", and

1

together with the Original Complaint and the First Amended Complaint, the "Complaints"). (D.I. 13). By the Second Amended Complaint, Price alleged for the first time that he was handcuffed tightly during his transport from PA DOC to DCC, in violation of his constitutional rights. Price also claimed that he was denied medical care once he arrived at DCC. In the Second Amended Complaint Price requested monetary damages for the first time. In addition, Price sought to add as defendants Major Holman, "Profaci" and Chris Malaney.

On June 6, 2006, the Court issued a Memorandum Order reviewing and screening the Second Amended Complaint. (D.I. 15). In the Order the Court dismissed Major Holman and Profaci as defendants. Moreover the Court directed Price to serve all remaining defendants. Thereafter Price served the Defendants, including Lieutenant Ramon Taylor, with the Complaints.

On September 21, 2006, State Defendants Carroll, Burris and Ramon Taylor filed a timely Answer to Plaintiff's Complaints denying the allegations and any liability for Price's claims. (D.I. 29). Approximately seven months later, on April 30, 2007, Price amended his Complaints to replace the names of the two unknown state detectives with Mark Forbes and Robert Durnan. (D.I. 62). State Defendants Forbes and Durnan filed a timely answer to Price's Complaints on September 27, 2007. (D.I. 101).

The Court issued a scheduling order governing deadlines in the case on August 8, 2007. (D.I. 89). By the terms of the Scheduling Order discovery closed on October 8, 2007 and all case dispositive motions are due by November 8, 2007. (*Id.*). On November 8, 2007, State Defendants Tom Carroll, Betty Burris, Ramon Taylor, Mark Forbes and Robert Durnan (the "State Defendants") filed a Motion for Summary

Judgment.   This is State Defendants' Opening Brief in Support of their Motion for Summary Judgment.

## SUMMARY OF THE ARGUMENT

I.     The State Defendants are not considered "persons" for purposes of 42 U.S.C. § 1983.  As a result, the Eleventh Amendment and the doctrine of sovereign immunity protect the State Defendants from liability for Price's claims.  Therefore this Court lacks jurisdiction over the State Defendants in their official capacities and Price cannot maintain his claims against State Defendants in their official capacities.

II.     The events in Price's lawsuit occurred while he was in the custody of the Delaware Department of Correction.  As an incarcerated individual challenging conditions of confinement, Price, in accordance with the Prison Litigation Reform Act, was required to exhaust all administrative remedies available to him prior to filing his lawsuit.  In this case Price failed to follow every step of DCC's grievance procedure.  Therefore Price did not exhaust all available administrative remedies and he is prevented from pursuing his claims.

III.     Price's claims against State Defendants Carroll and Burris are based solely on their supervisory responsibilities.  Because Price cannot maintain an action under 42 U.S.C. § 1983 against these State Defendants solely on the theory of respondeat superior, and because these State Defendants were not deliberately indifferent to Price's plight, the claims against State Defendants Carroll and Burris should be dismissed.

IV.    A Plaintiff filing a lawsuit pursuant to 42 U.S.C. § 1983 is required to show that the defendant had personal involvement in the alleged wrongs.  In this case, the record is clear that State Defendants Ramon Taylor, Carroll and Burris had no personal involvement in the incidents alleged in Price's Complaints.  Therefore, Price cannot maintain an action against these State Defendants and summary judgment is appropriate.

V.    The record reveals that there are no genuine issues of material fact as to the allegations in Price's Complaints.  Price cannot prove that State Defendants Forbes and Durnan used excessive force in handcuffing him.  Moreover Price cannot prove that State Defendants Forbes and Durnan failed to protect him.  Because the evidence shows that the State Defendants did not violate Price's constitutional rights, no fair minded jury could find in favor of Price on any of his claims and the State Defendants are entitled to summary judgment as a matter of law.

VI.    Price's medical records and testimony reveal that Price's hand damage, if any, is the result of his carpal tunnel syndrome and surgery.  Price cannot establish a causal connection between the handcuffs used on him on September 21, 2005 and his alleged hand damage.  Therefore his claims should be dismissed.

VII.    The State Defendants properly performed their duties without violating Price's clearly established constitutional rights.  Therefore the State Defendants are protected from liability in their individual capacities for Price's claims by the doctrine of qualified immunity.

## STATEMENT OF THE FACTS

Plaintiff Lou Garden Price, Sr. ("Price" or "Plaintiff") is an inmate currently serving two life sentences at the Delaware Correctional Center ("DCC") in Smyrna, Delaware. Price has an extensive history with the correctional system not only in Delaware, but also in Pennsylvania. In April 2001 Price was arrested in Pennsylvania and incarcerated in the Pennsylvania Department of Correction ("PA DOC"). (Exhibit A - Price Deposition at 9:17-19). Some time thereafter, Price was transferred to the custody of the Delaware Department of Correction ("DDOC") for trial and sentencing on a murder he committed in Delaware. Price's incarceration in Delaware started at the Howard R. Young Correctional Institution ("HRYCI"). In February 2004, DDOC transferred Price from HRYCI to DCC. (*Id.* at 13:22-23). Shortly thereafter, in July 2004, after his trial and sentencing, Price was transferred from DCC back to PA DOC to finish serving his sentence in Pennsylvania. (*Id.* at 13:16 – 14:12). Thus Price was initially incarcerated in PA DOC, transferred to Delaware, and then back to PA DOC within the span of a few years. (*Id.* at 14:10-13). Clearly Price was familiar with the transfer between PA DOC and Delaware. (*Id.* at 73:1-5).

Between February and July 2005, while serving his sentence in PA DOC, Price learned that he would be paroled in Pennsylvania and transferred back to Delaware to continue serving his life sentences. (*Id.* at 72:2-14). This transfer took place on September 21, 2005. (*Id.* at 163:4-6).

### Carpal Tunnel Diagnosis & Surgery

Prior to his transfer to Delaware, while still in the custody of the PA DOC, doctors diagnosed Price with carpal tunnel syndrome in his right wrist. (*Id.* at 26:20-23).

Carpal tunnel syndrome is a "common painful disorder of the wrist and hand, induced by compression on the median nerve between the inelastic carpal ligament and other structures within the carpal tunnel." *Mosby's Medical Dictionary* 317 (7th ed. 2006). After the diagnosis of carpal tunnel, doctors treated Price with pain killers and physical therapy exercises. (Price Dep. at 28:21 – 29:11). Price followed the exercises but his pain continued. (*Id.* at 30:23 – 31:3). Price informed the doctors that the treatment was not working and, shortly thereafter, Price's doctors decided to treat his condition with surgery. (*Id.* at 31:12-14).

On August 25, 2005 – less than one month prior to his transfer to Delaware – Price underwent carpal tunnel release on his right wrist. (Price Dep. at 31:15-18; Exhibit B). Carpal tunnel release is "a surgical procedure for treating carpal tunnel syndrome." *Mosby's Medical Dictionary* at 316. After the surgery medical staff at PA DOC wanted Price to remain in the infirmary. (Price Dep. at 33:16-18). Price, however, was more concerned about losing his cell. Thus, Price "talked [his] way out of" staying in the infirmary so that he could return to his cell because "it was baseball season … and a lot of things going on during baseball season." (*Id.* at 33:19-22).

After the surgery Price was in a great deal of pain. (*Id.* at 34:5-9). Doctors told Price that the pain could go on for months. (*Id.* at 34:9-12).

<u>Price's Post-Operative Condition</u>

Given his pain and his familiarity with the ride between Pennsylvania and Delaware, Price claims that he was leery about the transfer back to Delaware. Despite his anxiety, Price admits that he never told a doctor about his concerns.

> Q (DAG):   I know you said that you had talked to Dr.
> Yucha about holding you longer. Did you discuss

> with him the fact that you were going to be
> transferred and were going to have handcuffs on
> possibly?
>
> A (Price):     Well, I dread it, the transfer, because I
> remember being transferred from Pennsylvania to
> Delaware and being transferred back over there. So
> I know what it was like, anyway. You know what
> it's like as far as that long ride.
> …
>
> A:     You know what I mean? I probably didn't discuss
> certain -- you know, every little element, because,
> you know, you could put yourself in some shoes. It
> doesn't really mean, you know, you know what to
> do with them. And you know what it's going to feel
> like once you're in them. It's just -- you know?
>
> Q:     So do you recall mentioning to him about the
> handcuffs?
>
> A:     I mentioned -- no.

(Price Dep. at 72:21 – 73:19).

Price's surgeon conducted a consultation with Price at the PA DOC prison on September 14, 2005. (Exhibit C). During the consult, Price told the surgeon that he was in pain. (Price Dep. at 48:2-3). He also informed the surgeon about his transfer to Delaware. (*Id.* at 48:2-6). With this knowledge, the surgeon noted that no medical hold on Price was required and that Price could be transferred to Delaware. (*Id.* at 51:12-14; Exhibits B and C). The surgeon also informed Price that he could resume his normal activities. (*Id.*). Despite being fully aware that Price would be transferred to Delaware, the doctor's notes do not state that Price could not be handcuffed on the ride. (*Id.*). Further, the doctor never told Price that he could not be handcuffed. (Price Dep. at 48:7-15; 52:17-19).

<u>The September 21 Transfer</u>

One week after the consultation, on September 21, 2005, Lt. Scott Taylor and State Defendants Durnan and Forbes arrived at the PA DOC facility at Camp Hill to

transfer Price to Delaware.  Lt. Scott Taylor and State Defendants Durnan and Forbes did not know about Price's carpal tunnel surgery prior to arriving at Camp Hill.  The transporting officers were, however, given a temporary transfer information sheet on Price.  (Exhibit D).  The temporary transfer information sheet explicitly stated that Price had verified problem areas of alcohol, drugs, assault, escape and psych issues.  (*Id.*).  The recommendation from PA DOC was for "tight security."  (*Id.*).

Upon arriving at PA DOC, Price claims that Taylor, Durnan and Forbes spoke with a PA DOC officer who told the transporting officers about Price's surgery.  (Price Dep. at 98:1-14).  Price concedes, however, that the PA DOC officer did not tell the transporting officers not to use handcuffs or other restraints on Price.  (*Id.* at 99:1-6).

After Taylor, Durnan and Forbes spoke with the PA DOC officer the men entered the holding cell where Price was located to secure him for the transport.  Taylor explained the restraints to Price.  (*Id.* at 78:1-6).  Taylor placed the handcuffs on Price (Original Complaint, D.I. 2 at "Statement of Claim") and double locked the handcuffs.  (Price Dep. at 88:10-14).  According to Price, Taylor also secured Price with the other restraints with the assistance of State Defendant Durnan.  (*Id.* at 79:2-14).

Price claims that while the officers secured him, he informed them about his recent surgery and his discomfort.  (*Id.* at 80:1-4).  He also claims that he told the officers that the stun belt was enough.  (*Id.* at 80:4-5).  Price concedes, however, that the restraints used on September 21 were the same restraints used by Delaware officers in his other transports between Pennsylvania and Delaware – there were no new or old restraints.  (*Id.* at 84:6-8).  The only difference was he "had got the surgery."  (*Id.* at 84:8).

Once the officers secured Price they escorted him from the holding area to the car. Price states that on his way out of the PA DOC facility a nurse was standing by the door. Price never told the nurse that his handcuffs were tight.  (*Id.* at 90:14-16).  Further, Price never told the nurse that he was in pain.  (*Id.*).

> Q (DAG):     Did you see a nurse after you were handcuffed?
> A (Price):     After I was handcuffed?
> Q:     Yes.
> A:     I believe that the – going out the door, the lady that gave them my medical file and the meds was the nurse, because no officer – nobody else is going to handle medication.
> Q:     Did you tell the nurse anything about the handcuffs?
> A:     I didn't tell the nurse anything.  I probably said 'bye' to her or something.  I don't know.

(*Id.* at 90:7-17).

### Arrival at DCC

Once Price and the transporting officers arrived at DCC, the transporting officers removed the handcuffs from Price's wrists.  (Price Dep. at 102:8-12).  Within 30 minutes of his arrival, Price was seen and examined by a nurse.  (*Id.* at 102:24 – 103:2).  Price claims that he noticed "ligatures" and marks on his wrists and alerted the nurse to the marks on his wrist.  (*Id.* at 104:4-12).  The intake sheet from that day, however, specifically notes that Price has no bruising.  (Exhibit E).  Further the intake sheet notes that Price does not need housing in the infirmary for a pre-booking injury.  (*Id.*).  Price signed the intake sheet confirming that he had no bruising and did not need care for a pre-booking injury.  (*Id.*).

Despite his claims that he was in pain on September 21, Price waited four days before filing a sick call slip.  (Exhibit F).  In the September 25, 2005 sick call slip Price

states in pertinent part, "Pain from carpal tunnel surgery, (need brace from my property)." (*Id.*).  Price never makes a single allegation in his first sick call slip that the officers handcuffed him too tightly or that the handcuffs caused him pain.

On September 27, 2005 – six days after his transport from PA DOC to DCC – Price filed his first grievance.  For the first time since his arrival at DCC, Price wrote that he was handcuffed too tightly.  (Exhibit G).  The next day, September 28, 2005, Price filed a second grievance.  In this grievance Price also claimed, in part, that he was handcuffed too tightly.  (Exhibit H).  Both grievances were denied.  (Exhibits G and H).  Despite receiving the denials, Price never appealed the denials to the Resident Grievance Committee.

Approximately three months after his arrival at DCC, Price filed his Original Complaint.  (D.I. 2).  In the Original Complaint Price never mentions that he was handcuffed too tightly on the trip from PA DOC to DCC.  (*See* D.I. 2 at "Statement of Claim").  In fact, Price never mentions in his filings that he was handcuffed too tightly until April 12, 2006, when he filed his Second Amended Complaint.  Notably, the Second Amended Complaint is also the first time that Price asks for monetary damages.

<u>Price's "Permanent" Damage</u>

In December 2005, Price received an EMG from CN*MRI.  (Exhibit I).  The results of the EMG indicate that Price has a "bilateral median neuropathy at the wrist" which is "electrophysiologically **<u>moderate</u>**".  (*Id.*, emphasis added).  No where in the EMG report does it mention that Price has permanent hand damage.  Further, no where in Price's medical records does it state that he has permanent hand damage.  Price's claim of permanent hand damage is based solely on a conversation he allegedly had with Sherel

Ott, who is a nurse practitioner, not an orthopedist. Price claims that Nurse Practitioner Ott informed him that he had permanent hand damage. (Price Dep. at 128:17-21). Moreover, even though Price claims permanent hand damage, he admits that neither Nurse Practitioner Ott nor anyone else told him that the alleged damage was a result of the handcuffs used on September 21. (*Id.* at 131:8-11).

Despite his claims of permanent damage, Price continues to play basketball and is able to do push ups. (*Id.* at 40:23 – 41:14; *See also*, Exhibit J). Moreover Price, who is right handed, admits that he is an author and hand writes his manuscripts and has re-written a manuscript by hand since his current incarceration at DCC. (*Id.* at 11:16 – 12:8). He also admits to writing at least 20 grievances and more letters than he can count. (*Id.* at 14:15 – 15:4). Interestingly, almost all the documents submitted by Price in this lawsuit were written by Price by hand, including a 20 page Second Amended Complaint (D.I. 13), a 45 page response to the medical defendants' motion to dismiss (D.I. 51), a 36 page Motion for Summary Judgment (D.I. 71, 72), and countless other motions, responses to motions, and letters.

**ARGUMENT**

Federal Rule 56(c) permits a Court to grant summary judgment, "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). To obtain summary judgment the moving party must demonstrate that he has met the standards of Rule 56(c). *Carter v. Exxon Company USA*, 177 F.3d 197, 202 (3d Cir. 1999). "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (emphasis in original). Thus, only disputes that affect the outcome of a lawsuit properly preclude the grant of summary judgment. *Id.*

"At the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. In deciding a motion for summary judgment, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Id.* at 252.

The record in this case clearly demonstrates that Price cannot prove that the State Defendants violated his constitutional rights. First, the State Defendants are immune from liability for Price's claims in both their official and individual capacities. Second, Price failed to exhaust the administrative remedies available to him prior to filing his lawsuit. Third, Price cannot prevail on his claims against State Defendants Carroll and

13

Burris based solely on the theory of respondeat superior.  Fourth, Price cannot maintain an action under 42 U.S.C. § 1983 against the State Defendants where they played no affirmative role in the alleged deprivation of his rights.  Fifth, Price's bald and unsubstantiated allegations are not supported by the record and no fair minded jury could return a verdict for him.  Finally, Price cannot establish a causal connection between his alleged injuries and the way he was handcuffed on September 21.  For all of the foregoing reasons, this Court should grant State Defendants' Motion for Summary Judgment and dismiss Price's Complaints.

I.    **State Defendants Are Immune From Liability In Their Official Capacities Pursuant To The Eleventh Amendment.**

Price seeks to hold the State Defendants liable in their official capacities for the alleged violation of his constitutional rights.  To the extent he seeks to hold the State Defendants liable in their official capacities he is prevented from doing so as the State Defendants are immune from liability under the Eleventh Amendment.

The Eleventh Amendment states, "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State or by Citizens or Subjects of any Foreign State."  U.S. CONST. amend. XI.  Although the Eleventh Amendment does not, by its explicit terms, bar suits against a State by its own citizens, the United States Supreme Court has held that "an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State." *Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974).  Further, where a State is not a named party in an action a suit may still be barred by the Eleventh Amendment where "'the action is in

essence one for the recovery of money from the state,'" because "'the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit even though individual officials are nominal defendants.'" *Id.* (quoting *Ford Motor Co. v. Department of Treasury*, 323 U.S. 459, 464 (1945)).

The Eleventh Amendment stands "for the constitutional principle that State sovereign immunity limit[s] the federal courts' jurisdiction under Article III." *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 64 (1996). The United States Congress, however, can waive a state's sovereign immunity, and therefore, its Eleventh Amendment immunity, through the Fourteenth Amendment. *Id.* But, only a clear indication of Congress's intent to waive a state's immunity will produce this result. *Id.*

Title 42, section 1983 of the United States Code – the section under which Price brings his lawsuit – does not display a clear intent by Congress to waive a state's sovereign immunity. In fact, Congress's intent appears to be to the contrary as the statute facially allows suits only to be brought against persons. 42 *U.S.C.* § 1983. The State of Delaware is not considered a "person" as contemplated by 42 U.S.C. § 1983. *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989). Therefore the Eleventh Amendment and the doctrine of sovereign immunity protect the State of Delaware from liability for claims brought by an individual filing a lawsuit pursuant to § 1983. *See, id.*

A suit against a state official in his official capacity is treated as a suit against the State. *Hafer v. Melo*, 502 U.S. 21, 25 (1991). Thus an immunity that is available to the State is also available to a state official in his official capacity. *Id.* Under federal law, the State Defendants in their official capacities, like the State of Delaware, are not "persons" for the purposes of 42 U.S.C. § 1983. *Will*, 491 U.S. at 71. Because the State

Defendants are not "persons" for purposes of § 1983, the Eleventh Amendment and the doctrine of sovereign immunity protect the State Defendants from liability. As a result, this Court lacks jurisdiction over the State Defendants in their official capacities, and the State Defendants are outside the class of persons subject to liability under § 1983. Therefore Price cannot maintain his claims against the State Defendants in their official capacities and all claims against them in their official capacities should be dismissed.

**II.    Price's Failure To Exhaust All Available Administrative Remedies Prior To Filing His Lawsuit Is Fatal To His Claims Under The Prison Litigation Reform Act.**

In addition to the State Defendants' immunity preventing liability for his claims, Price is prohibited from bringing his claims by the Prison Litigation Reform Act ("PLRA") of 1995 because he failed to exhaust the administrative remedies available to him prior to filing his lawsuit.

The PLRA amended a variety of statutory provisions governing litigation by prisoners, including provisions under 42 *U.S.C.* § 1983. *Porter v. Nussle*, 534 U.S. 516, 524 (2002). As a result, incarcerated individuals challenging the conditions under which they are confined must meet the statutory provisions governing exhaustion as outlined by the PLRA. *Id.*

Title 42, Section 1997e(a) of the United States Code, as amended by the PLRA, states that, "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 *U.S.C.* § 1997e(a). Section 1997e(a) in its current form is drastically

different from its predecessor.  The preceding statute made exhaustion discretionary.  The PLRA, however, changed the statute so that exhaustion is now mandatory.  *Porter*, 534 U.S. at 524.  Thus, "exhaustion is now <u>required</u> for all action[s] brought with respect to prison conditions."  *Id.* (emphasis added).

The exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Id.* at 532.  Congress's purpose in enacting the mandatory exhaustion requirement was to "eliminate unwarranted federal-court interference with the administration of prisons, ...."  *Woodford v. Ngo*, -- U.S. --, 126 S.Ct. 2378, 2387 (2006).  Thus the exhaustion requirement, "afford[s] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case."  *Porter*, 534 U.S. at 525.

The remedies provided to a prisoner need not meet federal standards nor be speedy and effective.  *Id.* at 524.  But a prisoner must utilize all steps of the procedure.  *Id*.  Even when a prisoner seeks relief not available in grievance proceedings, such as money damages, exhaustion is still a prerequisite to suit.  *Id.*

Price's claims clearly fall within the confines of the PLRA and the exhaustion requirement.  The Complaints challenge the way in which he was restrained during a transport while in the custody of the DDOC.  Such claims challenge the conditions of confinement and thus, clearly fall under the mandates of the PLRA.  As such, Price was required to exhaust all available administrative remedies prior to filing this § 1983 action.

The record reflects that Price failed to exhaust the administrative remedies available to him.  DCC has a grievance process and procedure that is codified at DOC

Procedure Number 4.4 which is entitled "Inmate Grievance Procedure." (Exhibit K). Under Procedure 4.4, an inmate who wishes to grieve a particular issue must first express the grievance in writing. The grievance process is then separated into three steps. First, the grievance is reviewed by the Institutional Grievance Chair ("IGC"). If the grievance is unresolved by the IGC the grievant is then entitled to move to step two – a hearing before the Resident Grievance Committee ("RGC"). The RGC then arrives at a conclusion which is forwarded to the Warden or the Warden's designee for review and concurrence. If the RGC fails to obtain the concurrence of the Warden, the grievant is entitled to review of his grievance by the Bureau Grievance Officer ("BGO"). It is only when all of these steps are completed that an inmate at DCC has exhausted every step of the available administrative process.

Price did not follow every step of DCC's grievance procedure. Price filed his first grievance regarding the September 21 transfer on September 27, 2005. (Exhibit G). He filed a second grievance on September 28, 2005. (Exhibit H). Both grievances were denied. (Exhibits G and H). Despite receiving the denials Price never followed through with the next step of the process – he never requested a hearing before the RGC. By failing to follow all three steps of the Inmate Grievance Procedure, Price failed to exhaust the administrative remedies available to him. According to the PLRA, Price's failure to exhaust all available administrative remedies is fatal to his lawsuit. Therefore this Court should dismiss Price's claims for failure to follow the requirements of the PLRA.

### III. State Defendants Carroll And Burris Cannot Be Held Liable For Price's Claims Based Solely On Their Supervisory Responsibilities.

Assuming, *arguendo*, that Price is able to satisfactorily establish that he met the mandatory exhaustion requirement of the PLRA, his claims against State Defendants Carroll and Burris should fail because he cannot maintain a claim against them solely on the basis of respondeat superior.

In a § 1983 action a supervisory official cannot be held liable solely under the theory of respondeat superior. *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). Rather, to establish supervisory responsibility a plaintiff must show that the defendant was the moving force behind the alleged constitutional violation. *Sample v. Diecks*, 885 F.2d 1099, 1116-17 (3d Cir. 1989). "[A] 'person' is not the 'moving force [behind] the constitutional violation' of a subordinate, unless that 'person' … has exhibited deliberate indifference to the plight of the person deprived." *Id.* at 1118.

Price admits that only three individuals accompanied him on the transport from Pennsylvania to Delaware – Lt. Scott Taylor and State Defendants Forbes and Durnan. At the time of Price's transfer, State Defendant Carroll was the Warden of DCC and State Defendant Burris was the Deputy Warden. Neither State Defendant Carroll nor State Defendant Burris had any involvement in the transport of Price to Delaware. Moreover, neither Carroll nor Burris handcuffed Price during the transport or administered medical care and treatment to Price after he arrived at DCC.

When asked the reason why he named Carroll as a defendant, Price replied, "Because he's the warden, like one of the first people that I wrote to in 2005 after I got here." (Price Dep. at 17:7-8). Price gave a similar reason for naming Burris as a defendant:

> Q (DAG):       Why is Ms. Burris a defendant in your lawsuit?
>
> A (Price):       Because Ms. Burris is someone else that -- Ms. Burris is someone else that I wrote to.  And she oversees not just the correctional staff.  I wasn't -- she doesn't -- she oversees like the grievance -- the grievances go through her.

(*Id.* at 21:20 – 22:1).

Further, in papers filed with this Court Price states that, although State Defendants Carroll and Burris, "did not commit the Eighth Amendment violations directly they did become responsible for them when they failed to intervene and correct them in the course of their supervisory responsibilities."  (D.I. 72 at 34).  Clearly, Price's reasons for naming Carroll and Burris as defendants relate to their supervisory responsibilities.  Price, however, never asserts that either defendant participated in handcuffing him during the transport.  Further Price never contends that either State Defendant was deliberately indifferent to his plight.

Price cannot support a claim against State Defendants Carroll and Burris based solely on their supervisory responsibilities.  Further Price cannot prove that either State Defendant was deliberately indifferent to his plight.  Therefore the claims against State Defendants Carroll and Burris should be dismissed.


**IV.    State Defendants Ramon Taylor, Carroll and Burris Cannot Be Held Liable Where They Had No Personal Involvement In The Handcuffing And Transport Of Price Or In The Medical Care He Received At DCC.**

Price's claims against State Defendants Ramon Taylor, Carroll and Burris should be dismissed because these State Defendants had no personal involvement in the alleged deprivation of Price's constitutional rights.

To support a claim for a civil rights violation under § 1983 a plaintiff must show that the accused defendant had personal involvement in the alleged wrongs. *Rode*, 845 F.2d at 1207. A plaintiff must prove that the official "played an affirmative role in the deprivation of the plaintiffs' rights, i.e., there must be a causal link between the actions of the responsible officials named and the challenged misconduct." *Pennsylvania v. Porter*, 659 F.2d 306, 336 (3d Cir. 1981) (Garth, J. concurring in part, dissenting in part). In addition, this Court has held that, "Grievances are not enough to impute knowledge to [a] defendant." *Brookins v. Williams*, 402 F.Supp.2d 508, 512 (D. Del. 2005) (quoting *Rode*, 845 F.2d at 1208)). Rather to establish liability, a plaintiff must prove that a defendant personally directed, had actual knowledge of, or acquiesced in the alleged deprivation of his constitutional rights. *Rode*, 845 F.2d at 1207. Without such proof the defendant cannot be held liable. *See Gay v. Petsock*, 917 F.2d 768, 771 (3d Cir. 1990).

Price admits in papers filed with this Court and in his deposition that Ramon Taylor was not the lieutenant transporting him from Pennsylvania to Delaware. (*See* D.I. 105 – Plaintiff's Motion to Amend the Caption to amend "Lt. Taylor" to read "Lt. Scott Taylor"; Price Dep. at 76:21-77:11). Therefore Ramon Taylor had no involvement in the allegations in Price's Complaints and should be dismissed from this lawsuit.

Price also cannot show personal involvement on the part of either Carroll or Burris. Price claims that because he wrote Carroll and Burris they should be liable for his claims. But, "[g]rievances are not enough to impute knowledge to [a] defendant." *Brookins*, 402 F.Supp.2d at 512 (quoting *Rode*, 845 F.2d at 1208)). Price must show that Carroll and Burris personally directed or had actual knowledge of the alleged deprivation of his rights.

In this case neither State Defendant Carroll nor State Defendant Burris participated in the transport of Price to Delaware, personally directed the placement of the handcuffs, or directed the medical care Price received once he arrived in Delaware. Therefore neither of these State Defendants had personal involvement in the alleged deprivation of Price's rights and the claims against them should be dismissed.

**V.      The Facts Of This Case Do Not Support Price's Bald And Unsubstantiated Allegations Of Excessive Force, Failure To Protect And Deliberate Indifference.**

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, …" which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 323-25 (1986). An issue is "genuine" only if there is sufficient evidentiary basis on which a reasonable jury could find for the non-moving party. *Anderson*, 477 U.S. at 249. A factual dispute is "material" only if it might affect the outcome of the suit under governing law. *Id.* at 248.

In deciding a motion for summary judgment "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Id.* at 252. Further, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, -- U.S. --, 127 S.Ct. 1769, 1776 (2007). In this case, the facts

clearly show that there is no genuine issue of material fact as to Price's claims of excessive force, failure to protect and deliberate indifference against the State Defendants. Therefore this Court should grant the State Defendants' Motion for Summary Judgment.

### A. State Defendants Durnan and Forbes did not commit excessive force on Price when he was handcuffed during the transport from Pennsylvania to Delaware.

Price asserts that the handcuffs used during his transport were applied with excessive force. Specifically Price contends that the handcuffs were tight and caused him injury.

To establish a claim for violation of the Eighth Amendment, a plaintiff must prove the existence of an "objective" element – that he was subjected to the unnecessary and wanton infliction of pain – and a "subjective" element – that the defendant had a culpable state of mind at the time of the alleged deprivation. *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). "A plaintiff can only recover on a § 1983 claim if he can show 'intentional conduct….'" *Wilson v. Reinhart*, 2003 WL 21756393, at *3 (D. Del. July 29, 2003) (quoting *Davidson v. Dixon*, 386 F.Supp. 482, 487 (D. Del. 1974)) (Exhibit L). The record reveals that Price cannot support his claims against State Defendants Forbes and Durnan because he cannot prove they intentionally subjected him to the unnecessary and wanton infliction of pain.

### 1. *Durnan and Forbes did not subject Price to the unnecessary and wanton infliction of pain.*

Price cannot establish that State Defendants Durnan and Forbes subjected him to the unnecessary and wanton infliction of pain. Price admits that Lt. Scott Taylor placed the handcuffs on his wrists. (Original Complaint, D.I. 2 at "Statement of Claim"; Price

Dep. at 78:23 – 79:1).  Durnan and Forbes did not apply the handcuffs to Price's wrists. Therefore they had no involvement in the infliction of the alleged pain.

Further, Price cannot prove that any pain the handcuffs may have caused was unnecessary.  In this case the record is clear that the transporting officers were required to use handcuffs.  The temporary transfer information sheet supplied by PA DOC stated that Price had verified problems with alcohol, drugs, assault, escape and psych issues. (Exhibit D).  In addition, PA DOC recommended that the Delaware transporting officers use "tight security".  (*Id.*).  Clearly the handcuffs were necessary to ensure the safety of the officers, Price and the public.  To the extent the handcuffs may have exacerbated Price's pre-existing condition, that does not mean that the handcuffs were incorrectly applied or applied with excessive force.

Moreover, any alleged pain the handcuffs caused was not wanton.  Price states that Taylor explained the restraints he was using.  (Price Dep. at 78:1-6).  He also states that Taylor double locked the restraints because that was the "humane thing to do".  (*Id.* at 88:10-14).  Therefore, to the extent the handcuffs caused pain that pain was likely the result of Price's previous condition and not the result of the wanton use of the handcuffs.

Finally, aside from the fact that the handcuffs were necessary and the application was not wanton, Price's claim that the handcuffs were tight is questionable considering his actions.  First, Price claims that he had concerns about being handcuffed on the ride from Pennsylvania to Delaware, yet he never told his doctor about the concerns.  (Price Dep. at 72:21 – 73:19).  Second, Price states that just prior to leaving the PA DOC prison he saw a nurse, yet he never mentions to the nurse that he is in pain or that the handcuffs are too tight.  (*Id.* at 90:7-17).  Third, Price claims there were ligatures and marks on his

arm, but he signed an intake sheet stating that he had no bruising and did not need to go to the infirmary for a pre-booking injury.  (Exhibit E).  Finally, in the very first sick call slip he filed Price never mentions that the handcuffs were put on tightly during his transfer.  Rather, Price states that the surgery he received was "botched."  (Exhibit F).  Clearly Price's actions demonstrate that the handcuffs were not too tight.

Price's allegations against Scott Taylor, Durnan and Forbes appear to stem from his dissatisfaction with the type of restraints used.  Price's testimony is filled with comments about the type of restraints the Delaware transporting officers should have used and how the Pennsylvania prisons have many different types of restraints.  (Price Dep. at 70:15-20; 87:2-4; 95:15-96:13; 99:8-100:6).  In fact, when asked what he would have liked the officers to have done differently, Price never mentions that he would have liked the officers to loosen the handcuffs.  Rather, Price states that he would have wanted the officers to use a different method of restraint.  (*Id.* at 95:15-19).  Price's allegations are focused not on the tightness of the handcuffs but instead on the type of wrist restraints used.

Durnan and Forbes did not handcuff Price.  Further, the record and Price's testimony do not support his allegation that the handcuffs were unnecessarily and wantonly applied to cause pain.  Therefore Price cannot establish that he was intentionally subjected to the unnecessary and wanton infliction of pain by State Defendants Durnan and Forbes and his claim of excessive force should be dismissed.

### 2. *Durnan and Forbes did not have a culpable state of mind.*

Price also cannot establish that Durnan and Forbes intended to cause him pain. As previously mentioned, neither Durnan nor Forbes placed the handcuffs on Price's wrists. Therefore they could not have intended to cause him pain.

Moreover, Price cannot demonstrate that Durnan and Forbes had a culpable state of mind. When asked why he believed the handcuffs were deliberately put on tight Price responded, "I don't know. … [I] say that they deliberately put it because I told them it was tight." (Price Dep. at 85:19-21). The fact that Price may have told the officers that the handcuffs were tight does not establish that Durnan and Forbes had the culpable state of mind needed to prove a claim of excessive force. Therefore, Price cannot establish the requisite intent for a claim of excessive force and his claim should be dismissed.

### B. State Defendants Durnan and Forbes did not fail to protect Price.

Price contends that he told the transporting officers throughout the entire ride to Delaware that the handcuffs were tight but the officers failed to help him. It appears Price is alleging that the officers failed to protect him from his pain and alleged resulting hand damage.

To prevail on an Eighth Amendment failure to protect claim a plaintiff must prove two factors. "First, the prisoner must demonstrate 'that he is incarcerated under conditions posing a substantial risk of serious harm.'" *Hamilton v. Leavy*, 117 F.3d 742, 746 (3d Cir. 1997) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). "Second, the prison officials involved must have a sufficiently culpable state of mind." *Id.* "Specifically, the inmate must show that the official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from

which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Id.* (quoting *Farmer*, 511 U.S. at 838). The facts of this case show that the officers did not fail to protect Price.

**1. *The use of handcuffs did not pose a substantial risk of serious harm to Price.***

Price cannot prove that the use of handcuffs posed a substantial risk of serious harm. Price admits that he told his surgeon that he was in pain and that he had to be transferred to Delaware. (Price Dep. at 48:2-6). Armed with this knowledge, however, the doctor did not require a medical hold to keep Price in Pennsylvania. (*Id.* at 51:9-14; Exhibits B and C). Moreover the doctor did not state that Price could not be handcuffed. (*Id.* at 48:7-15; 52:17-19). In fact the doctor's orders specifically state that Price may resume his normal activities. (Exhibits B and C). In addition, by Price's own admission, the PA DOC officers at Camp Hill did not tell the transporting officers that they could not use handcuffs. (Price Dep. at 99:1-6). Rather, PA DOC specifically recommended that the transporting officers use tight security. (Exhibit D). Given the facts of this case it is clear that there was no reason for the transporting officers to believe that using handcuffs on Price would pose a substantial risk of serious harm. Therefore, this Court should dismiss Price's failure to protect claim.

**2. *Durnan and Forbes did not have a sufficiently culpable state of mind.***

Price also cannot show that Durnan and Forbes had the requisite culpable state of mind for a failure to protect claim. The officers had no intention of harming Price. The handcuffs were needed and used for the safety and security of the officers, Price and the public. Moreover the officers knew that the handcuffs had been appropriately applied and double locked. (Price Dep. at 88:10-14).

The evidence clearly demonstrates that the handcuffs did not pose a substantial risk to Price's health and that the transporting officers did not have a sufficiently culpable state of mind. Therefore, Price cannot meet his burden of proof for a failure to protect claim and his claim should be dismissed.

### C. The State Defendants provided Price access to medical attention and treatment and were not deliberately indifferent to his medical needs.

Price alleges that the State Defendants were deliberately indifferent to his medical needs. The evidence, however, demonstrates that the State Defendants afforded Price access to medical care.

Prison systems must provide prisoners with adequate medical care. *Durmer v. O'Carroll*, 991 F.2d 64, 67 (3d Cir. 1993). "In order to succeed in an action claiming inadequate medical treatment, a prisoner must show more than negligence; he must show 'deliberate indifference' to a serious medical need." *Id.*

To demonstrate a cognizable claim of deliberate indifference under the Eighth Amendment a prisoner must prove that, (1) the defendant was deliberately indifferent to his medical needs; and (2) his medical needs were serious. *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999).

In this case, the State Defendants were not deliberately indifferent to Price's medical needs. As stated, the handcuffs were appropriately applied to Price's wrists and double locked. (Price Dep. at 88:10-14). In addition, although Taylor took the splint in order to properly secure the handcuffs, he did not take Price's ace bandage which protected the injury. Clearly then the officers were not deliberately indifferent to Price's medical condition.

Further, as soon as the officers arrived at DCC, they turned Price over to intake. Within 30 minutes, a nurse assessed and examined Price. (Price Dep. at 102:24 – 103:2). Price never states that the transporting officers denied him access to medical care or interfered in his medical examination. Therefore the record does not support Price's claim of deliberate indifference of a serious medical need against the transporting officers.

Further, the record shows that after Price arrived at DCC he had access to sick call slips and to medical staff. (*Id.* at 192:4-8). Price never alleges that any of the State Defendants denied him access to medical care, prevented him from seeking treatment or interfered with his receipt of medical care. Therefore Price cannot maintain a claim of deliberate indifference against the State Defendants and this Court should dismiss his claim.

**VI.  The Record In This Case, And Price's Statements To The Court, Reveal That There Is No Causal Link Between Price's Alleged Hand Damage And The Handcuffs Used During The Transport To Delaware.**

The State Defendants cannot be held liable for Price's claims because he cannot establish that the allegedly tight handcuffs caused his injuries.

Prior to the transfer to DDOC, Pennsylvania doctors diagnosed Price with carpal tunnel syndrome. (Price Dep. at 26:20-23). Price received surgery to relieve his condition on August 25, 2005. (Exhibit B). Against medical advice Price chose to return to his cell for "baseball season" instead of staying in the infirmary. (Price Dep. at 33:16-22). Price admits that he was in pain following the surgery and that doctors told him that the pain could last for months. (*Id.* at 34:5-12). Moreover doctors informed Price that it

was possible that his carpal tunnel could return.  (*Id.* at 32:3-5).  Therefore Price cannot establish a causal link between his alleged hand damage and the handcuffs used on September 21.

In addition, Price's own writings and testimony indicate that he believed the surgery caused his hand damage.  In the first sick call slip he filed after his arrival at DCC Price states that the surgery caused his pain.  (Exhibit F).  He never states that the handcuffs used in the transport caused him any pain.  Moreover, in his Original Complaint, Price states that he believed the surgery "only damaged him further".  (D.I. 2 at "Statement of Claim").  In fact, Price's requested relief was, *inter alia*, that the Court order PA DOC to redo the carpal tunnel release surgery.  (*Id.* at "Requested Relief").  Finally, in his testimony Price also states that he believes the surgery was "botched".  (Price Dep. at 118:8-9).

Clearly the record in this case and Price's testimony, prove that he cannot establish a causal connection between his alleged wrist damage and the handcuffs used on September 21.  Therefore Price's Complaints should be dismissed.


**VII.    State Defendants Are Immune From Liability In Their Individual Capacities Pursuant To The Doctrine Of Qualified Immunity.**

The State Defendants are protected from liability for Price's claims in their individual capacities by the doctrine of qualified immunity.  The doctrine of qualified immunity holds that government officials performing discretionary functions are immune from liability for damages, provided that their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  A right is clearly established

when, "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Furthermore, state officials are entitled to qualified immunity where they acted in good faith, without gross or wanton negligence, in the performance of discretionary duties. *Vick v. Haller*, 512 A.2d 249 (1986) (*aff'd in part and rev'd in part on procedural grounds*).

"Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.'" *Saucier v. Katz*, 533 U.S. 194, 200 (2001). Thus a determination by the district court of whether qualified immunity applies should be made at the earliest possible stage "so that the costs and expenses of trial are avoided where the defense is dispositive." *Id.* at 200-01.

In deciding a question of qualified immunity a district court is required to consider an initial inquiry: "Taken in the light most favorable to the party asserting the injury do the facts alleged show the officer's conduct violated a constitutional right?" *Id.* at 201. "If and only if, the court finds a violation of a constitutional right, 'the next, sequential step is to ask whether the right was clearly established … in light of the specific context of the case.'" *Scott*, -- U.S. --, 127 S.Ct. at 1774. In other words, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Creighton*, 483 U.S. at 640. In this case, the evidence presented shows that the State Defendants performed their jobs in good faith without gross or wanton negligence and are entitled to qualified immunity.

**A. The facts clearly demonstrate that the State Defendants' conduct did not violate Price's constitutional rights.**

The facts of this case clearly demonstrate that the State Defendants' conduct did not violate Price's constitutional rights. State Defendants Carroll, Burris, and Ramon Taylor had no involvement in the transport of Price to Delaware. Moreover they had no involvement in the medical treatment Price received once he arrived at DCC. Therefore they did not violate Price's constitutional rights and are entitled to qualified immunity on his claims.

State Defendants Durnan and Forbes also did not violate Price's constitutional rights. Durnan and Forbes did not handcuff Price and, therefore, could not have committed excessive force against him. (Original Complaint, D.I. 2 at "Statement of Claim"). Further, to the extent Price contends that Durnan and Forbes failed to protect him, the record demonstrates that Durnan and Forbes had no reason to believe that Price was being subjected to excessive force as the handcuffs were appropriately applied and double locked. (Price Dep. at 88:10-14). Therefore State Defendants Durnan and Forbes did not violate Price's constitutional rights and are entitled to qualified immunity.

**B. Price's rights were not clearly established such that the State Defendants understood that their conduct violated his rights.**

Assuming, *arguendo*, that Price is able to establish the first factor, he must also prove that his rights were clearly established at the time of the alleged violation. In deciding the second issue a district court must ask "whether a reasonable public official would know his or her *specific conduct* violated clearly established rights." *Grant v. City of Pittsburgh*, 98 F.3d 116, 121 (3d Cir. 1996).

32

In this case the State Defendants' specific conduct did not violate clearly established rights. Again the handcuffs were appropriately applied to Price's wrists and double locked. (Price Dep. at 88:10-14). Although Price did have a right to be free from excessive force, no such force was used in this case. Moreover Price did not have a clearly established right to have some other form of wrists restraint used when no one informed the officers that they could not use handcuffs on Price, his medical records indicated that he was free to resume normal activities, and the transfer information clearly stated that Price was dangerous and tight security was recommended.

The evidence shows that the State Defendants did not violate Price's clearly established rights. Therefore the State Defendants are protected from liability in their individual capacities by the doctrine of qualified immunity.

## **<u>CONCLUSION</u>**

The evidence clearly demonstrates that Scott Taylor properly restrained Price on September 21, 2005.  Although Price would have preferred that the officers not use handcuffs, the handcuffs were appropriately applied in a good faith effort to protect the officers and the public from an inmate who was considered to have alcohol, drugs, escape, assault and psych issues.

Further, the record demonstrates that State Defendants Carroll, Burris and Ramon Taylor had no involvement in the transfer of Price on September 21 and cannot be held liable for his allegations.

Finally the facts show that all of the State Defendants properly performed their jobs in good faith without gross or wanton negligence.  Therefore all State Defendants are entitled to immunity from Price's claims in their official and individual capacities.

To the extent Price has any hand damage that damage was the result of his carpal tunnel syndrome and the surgery he had in an effort to relieve his pain.  Price cannot link the actions of the State Defendants with his alleged hand damage.  Therefore the Court should grant the State Defendants Motion for Summary Judgment and dismiss the claims against the State Defendants with prejudice.

# CERTIFICATE OF SERVICE

I, Erika Y. Tross, Esq., hereby certify that on November 8, 2007, I caused a true and correct copy of the attached *State Defendants Tom Carroll, Betty Burris, Ramon Taylor, Mark Forbes And Robert Durnan's Opening Brief In Support Of Their Motion For Summary Judgment* to be served on the following individuals in the form and manner indicated:

**VIA FIRST CLASS MAIL:**
Inmate Lou Garden Price, Sr.
SBI #00454309
Delaware Correctional Center
1181 Paddock Road
Smyrna, DE 19977

**VIA ELECTRONIC DELIVERY**
**& FIRST CLASS MAIL:**
Kevin J. Connors, Esq.
Marshall, Dennehey, Warner,
  Coleman & Goggin
1220 N. Market St.
5th Floor
P.O. Box 8888
Wilmington, DE 19899-8888

/s/ Erika Y. Tross
Erika Y. Tross (#4506)
Deputy Attorney General
Delaware Department of Justice
Carvel State Office Building
820 N. French Street, 6th Floor
Wilmington, DE 19801
302-577-8400