In The United States District Court For
The District of Delaware

Lou G. Price, Sr.
   Plaintiff,

    V.

CMS, Inc., Taylor
et al.
    Defendants.

C.A. No 05-871-SLR

Jury Trial Requested

```
FILED

DEC 21 2007

U.S. DISTRICT COURT
DISTRICT OF DELAWARE
```

Plaintiff's Reply Brief To CMS/And State
Defendant's Motions For Summary Judgment

The Plaintiff, Lou G. Price, Sr., pro se,
respectfully moves this Honorable Court to enter
its Order Denying CMS; The State Defendants'
motions for Summary Judgment. The Plaintiff
(or "Price") in support of this motion to
deny avers the following:

# I. Statement of Historical Facts

On 12/15/05 Mr. Price Filed a Section 1983 Complaint against Correctional Medical Services ("CMS") and several of its employees (Christine Mulaney, Nurse Carol Kozak and a Nurse Kera)(later identified as Nurse Kira Hargen). For reasons unknown to Plaintiff the (3) CMS employees mentioned above no longer work at DCC or For CMS. Plaintiff will however state that it is a well known fact that CMS employees come and go at a high turnover ratio. This practice has made it increasingly and extremely difficult For the Plaintiff to successfully perfect service of process upon these defendants and, Further, Plaintiff emphasizes For the record that if he were in fact granted his earlier motions For Counsel, these employees of CMS could have been successfully tracked and made Party to this Action.(NOTE: all (3) USM 285 Forms were signed as unable to serve due to the three employees not working For CMS anymore). However, Plaintiff

has made strides to attempt successful service upon Nurse Kira, (Nurse Horgan) and Christine Malaney (Counsel Mrs. Wolhar provided the Court with Nurse Caroli's last known address and Plaintiff filed new USM 285 forms with the Court to try having her served; Plaintiff also filed Nurse Kira's full name and a USM 285 form; and Plaintiff just came aware that Ms. Malaney no longer works here either... It is not advertised to prisoners who comes or who goes and/or why).

CMS, Inc. has provided medical care to Delaware prisoners since 7/1/05 and before that from 7/1/00 to 6/30/02.

Not only was CMS, Inc. awarded an illegal no-bid contract with Delaware DOC but they (CMS) has a long history of providing bad/poor [inadequate] medical care to prisoners in multiple states. Plaintiff adds that his case is not isolated, CMS Inc.'s a corporation with a known

pattern of incorrigible, inhumane, medical care. (The Plaintiff is attaching as Exhibit "A" the following:

1). Memorandum of Agreement between the United States Department of Justice and the State of Delaware regarding the Delores J. Baylor Women's Correctional Institution, the Delaware Correctional Center, the Howard R. Young Correctional Institution and the Sussex Correctional Institution.

2). Letter, dated December 29, 2006, to the Honorable Ruth Ann Minner, Governor of Delaware, from Wan J. Kim, Assistant Attorney General, Civil Rights Division re: Investigation of the Delaware Correctional Center, Smyrna, Delaware; Howard R. Young Correctional Institution, Wilmington Delaware; Sussex Correctional Institution, Georgetown, Delaware; John L. Webb Correctional Facility Wilmington, Delaware; and Baylor Women's Correctional Institution, New Castle Delaware.)

★ NOTE: Both documents were provided by the Freedom of Information/Privacy Acts

Branch at the U.S. DOJ/Civil Rights Division Pursuant to 5 U.S.C. §552(b)(7)(A), Signed by Chief Hermilla and dated August 20, 2007. *

On 2/6/06 the Plaintiff amended his complaint, briefly informing the court that an EMG was performed by an outside MRI center which diagnosed him with bilateral median neuropathy in his right wrist.

On 3/1/06 this Court issued a Memorandum Order dismissing his claims without prejudice (NOTE: at the time Plaintiff filed the claim he had just arrived to DCC, he knew very little about the law/research and §1983 so naturally he was unable to present his claims properly which proved fatal to the original complaint; BUT with help from a couple of jailhouse lawyers he was able to provide this Court with a proper or acceptable presentation of his claims).

And so... on 4/12/06 the Plaintiff Filed his 2nd Amended Complaint (D.I. 13) which this Honorable Court Found acceptable and opined that CMS had to stay party to. In summary the Plaintiff listed CMS, nurses Carol, and nurse Kira, and who he (Price) "believed" to be the Supervisor of these nurses — Chris Malaney — as defendants in his Complaint (NOTE: Plaintiff starkly remembers all of his numerous attempts to procure the names/Full names of all the defendants of CMS From State staff and CMS staff but that was Futile due to the Fact that CMS staff are not mandated to wear nametags like, say, medical staff in a hospital or clinic setting AND all of the nurses and doctors make it their solid practice not to provide the names of their esteemed colleagues, especially For reasons such as an inmate writing a grievance or some sort of other complaint against them). The Plaintiff alleged in his Complaint

that upon arrival at Dcc on 9/21/05, Nurse Kozak
and Nurse Hargon denied and delayed medical treatment.
Nurse Carol Kozak, who did Price's Intake Screening
intentionally failed and denied his doctor-prescribed
pain killers which were set with him from
Camp Hill, Prison (Pa. DOC), meds which were being
given due to a recent carpal tunnel release
surgery D.I. 13 at 35. Both CMS nurses — Kozak
and Hargon — refused and continued to refuse
Price meds, medical treatment, and would not
see him or cause him to be seen by
a qualifying physician at sick-call. In fact
Price alleges/alleged that both nurses who were
aware of his pain and suffering, refused him
medical treatment and he was not seen by
a doctor until 10/6/05 — apprx. 2 weeks after
his arrival to Dcc. As a matter of fact
the woman who Plaintiff thought was a
doctor was no doctor at all but a
NP or Nurse Practitioner (due to his condition
Price actually qualified for Specialty Care which
NP Ott wrote a "consult" for and he was
seen by Dr. Islam at CN MRI in Dover
more than 2½ months later). NP Ott only

had to do a brief examination of Plaintiff's hand/wrist and instantly prescribed the powerful narcotic painkiller Ultram (which contains a strong addictive opiate). Dr. Islam at Dover CN&MRI performed an EMG which showed permanent damage to Plaintiff's right wrist. Ms. Ott echoed the findings of permanent bilateral median neuropathy to his right wrist and told Plaintiff that the damage was irreversible. Plaintiff does contend that Kozak refused immediate meds and medical care by saying that she was unauthorized to give him meds until he was seen by a doctor and that he'll have to put in a sick call request. The Plaintiff has asserted in his Complaint that CMS, and both nurses Kozak and Hargan's actions and inactions constitutes cruel and unusual punishment and that the sick-call policy/custom followed by CMS and DCC also, in some instances, constitutes cruel and unusual punishment under the Eighth Amendment. Plaintiff concedes

that he has "said" that the emergency sick call procedure provides emergency service in cases where a prisoner is bleeding, having a heart attack or cannot breath properly. Plaintiff, to clear up the terms, must state that the "Housing Rules" do not "say" the above. They do however allude to the instruction that if inmates have a medical emergency to tell the housing unit staff. BUT, it is the general practice and/or custom, a medical emergency is if one is bleeding, having a heart attack or cannot breath properly. Truth is, Plaintiff swears, is there has been numerous cases where he has witnessed prisoners bleeding, or complaining of chest pains or asthmatic problems and nurses still refused to see them. So, in all actuality, prisoners may just have to bleed out profusely, hyperventilating and clutching their heart/chest in order to really be seen in an emergency sick call situation. No "list" of emergencies is provided anywhere but this is the synopsis told or interpreted to prisoners re: emergency sick-call requests. A trial will fully allow Plaintiff to call witnesses about this.

Plaintiff does also contend that the sick call
Policy at that time resulted in his pain
and suffering without him being able to
be seen by a qualifying physician. However,
Plaintiff states that the sick-call policy
is practiced (used) by both DCC and CMS—
this is what prisoners are told, the Inmate
Housing Rules are what prisoners are given,
so that's the custom or policy followed.
This sick-call policy in place (9/21/05) is a
part of what caused Nurse Kozak to deny
the Plaintiff any pain relief and amounts
to a custom of deliberate indifference to
serious medical needs. Last, the same sick-
call policy is an enormous issue inside
of the attached U.S. DOJ Findings and
The Memorandum of Agreement. (The U.S. DOJ
has DE—DOC and CMS under active
investigation due to a litany of constitutional
violations, inmate deaths, diseases, etc... The
sick-call policy is a focal point of the

U.S. DOJ scrutiny likely due to it being in violation of the 8th Amendment). This is a reasonable inference drawn from what is now public record.

## II. Legal Argument

CMS Defendants argue (III)(A)(1) the following: "The crux of Plaintiff's Complaint against CMS is that ['it instituted'] policies and procedures which impeded plaintiff's ability to receive appropriate medical treatment..." And further argued by CMS Defendants is: "There's no evidence that the Inmate Housing Rules, or anything contained therein, were in fact the policy or procedure enacted by CMS to address emergency sick call rights. Moreover, CMS has provided the Court with its policy under seal..."

The Plaintiff contends that Defendant CMS' analogy is at best misconstrued and at worst a subtle attempt to mislead the

Cont. Please examine:

★ "Instituted", according to Webster II's Third Edition (2005), means: "To establish", or "Found"; or (2) "To begin: initiate."

★ "Enacted", according to Webster II Third Edition (2005) means: "To make into law."

The language in the highly precedented (and used) Monell v. New York City Dept. of Soc. Svcs. 436 U.S. 658, 691 (1978), is clear: "[CMS] cannot be held liable/responsible for the acts of its employees under a theory of respondeat superior or vicarious liability." The plaintiff never tried to contest that, yet he was able to establish to the Court "a policy or custom" used by CMS and/or followed by CMS employees that amounted to the denial and delay of prompt medical treatment and that was the policy or custom inside of the Inmate Housing Rules (see D.I. 88/Bates stamped 285-336). The plaintiff is a prisoner. He has no rule or policy-making authority. This means a prisoner is bound or is forced to follow

whatever rules he or she is ordered to follow with no questions asked. Nurse Carol Kozak, an employee of CMS, used the Inmate Housing Rules (Sick-Call Procedure) to deny the Plaintiff prompt medical care, to deny him his doctor-prescribed meds and so forth, resulting in the Plaintiff's undue suffering and likely permanent injury. So the point Defendants make about the Plaintiff's " only basis for Plaintiff's belief that the Inmate Housing Rules were a CMS policy was that it was entitled Medical Services or MS," is incredulous. The issue at bar is whether CMS, Inc. must remain a party to this ACTION because a CMS employee(s) used a relevant policy or custom that caused the constitutional violation alleged by the Plaintiff. That answer is yes. Plus Plaintiff established in his Answering Brief to CMS' Motion To Dismiss For Failure To State A Claim the necessary burdens or elements needed to sustain or survive a summary dismissal/summary judgment. Further,

CMS is contending that they did not "institute" or "enact" the sick-call policy in place at DCC and they state: "In Fact, the CMS policy and procedure addressing care for an acute illness or an unexpected health need, consistent with national guidelines, is filed under seal." (D.1. 114).

CMS is grasping outside of reality and attempting to bifurcate or make themselves appear to the court to be totally independent of DCC-DOC Policies/Inmate Housing Rules... and separate themselves from the same — when the reality is CMS never handed to Plaintiff or any other DCC prisoner a set of their own Rules (or Policies). So in effect, when their contract commenced with De. DOC/DCC the Sick-Call Policy in place became CMS custom and that policy/custom, in this case, constitutes the cruel and unusual punishment in violation of the Eighth Amendment and a custom of deliberate indifference to serious medical needs. Nurse Kozak never

Pulled out a "CMS Policy Manual" when she told the Plaintiff he had to sign up for sick call or when she denied him his medication/medical treatment. The policy/procedure to a prisoner is the policy/procedure he or she is given and told to follow by the prison official (C.O./nurse/whomever). There's no difference. Additionally, a C.O. can write a prisoner up for misconduct just like a nurse can write a prisoner up for the same. The Disciplinary Report is the same no matter who writes it. Moreover, even the sick-call slip says "Delaware Department of Corrections Request for Medical/Dental Sick Call Services Facility: Delaware Correctional Center." CMS did not introduce a new sick call form. They adopted DCC's sick-call form just like they adopted their sick-call policy so what they have under seal is really immaterial to say the least. To put it

short, the Plaintiff has tried to obtain all possible discovery from the parties in this case but he was met with considerable resistance re: CMS' Contract with DOC/DCC as well as the actual/true CMS Policy. Apparently both are being heavily-guarded secrets and the Plaintiff only wishes to be prepared before trial or reasonable settlement attempts.

For example, the Plaintiff filed a discovery request regarding the U.S. Dept. of Justice Findings and the Memorandum Agreement between the U.S. DOJ and De. DOC. The Delaware Dept. of Justice/State Defendants responded to that request on August 6, 2007, saying — in part — that "State Defendants state that no such documents exist" in either context (see attached Exhibit identified as Exhibit "A" as well as attached State Defendants' Responses To Plaintiff's Combined Second Set of Interrogatories And Requests For Production of Documents Directed To The Defendants of DCC/DOC Re: D.I. 78). That

8/6/07 Response under File with the Court was a deliberate falsification by the State to circumvent Plaintiff's ability to prepare his case. It wasn't a typo because the State Defendants specifically said that no such documents exist in Response #3 and #4.

In response to CMS' current motion, Plaintiff has established already (responded to) the same claims in CMS' Motion To Dismiss For Failure To State a Claim in which this Court issued a Memorandum Opinion on July 3, 2007. The same elements Plaintiff met to survive the CMS Motion To Dismiss then are pretty much the same elements now (because nothing about Plaintiff's Complaint has changed; if anything his medical condition and the pain associated with the permanent damage has worsened). Plaintiff established adequate basis to show deliberate indifference and how that conduct by CMS caused it. He

has also shown independent verification by an outside doctor who's EMG exam proved permanent damage to his wrist. Plaintiff has demonstrated prongs of ESTELLE ad nauseam regarding deliberate indifference standard. The current motion before the court is repetitive and meritless and therefore should be denied.

As to the claim by CMS that Plaintiff failed to exhaust his administrative remedies, the Plaintiff has established and respectfully demonstrated ad nauseam that he did follow the remedies available at that time. In Case No. 07-380-SLR Plaintiff set out in detail the <u>conspiracy</u> in place at DCC - by its Administration — is set up for grievances to fail. The IGC process is futile. For example when a grievance is sent back to prisoner dismissed/unprocessed by Captain McCreanor then there is no further it can go. No appeal, nothing. CMS Defendants argue that "Plaintiff claims that on 10/11/05 a Medical Grievance was sent to Warden Tom Carroll

'but it was ignored." And..." it is clear that Plaintiff has not pursued his admin-istrative remedies to a Final decision." When your grievance is dismissed/unprocessed then that is the Final decision. There's no Further you can go. So Plaintiff did not Fail to exhaust his remedies prior to this 1983 Complaint. The IGC Procedure is so deeply Flawed and Futile, that it cannot keep up with its own policy that grievances will be Finalized within 180 days. Plaintiff has demonstrated before this Court that its taken in excess of a year For IGC Final outcome In his complaints and others (which will be an issue he'll have inmates testify on at trial in this case). So this is just not a concrete platform CMS Defendants can safely stand on.

Based upon the Foregoing, the CMS/State Defs Motion For Summary Judgment should be DENIED.

12/19/07                                    Jon G. Price, Sr.

# EXHIBIT "A"

US Department of Justice Findings of Dec. 2006;

Memorandum Agreement between US Dept. of Justice and State of Delaware re: Inmate Medical Care.

December 29, 2006

The Honorable Ruth Ann Minner
Governor of Delaware
Tatnall Building
William Penn Street, 2nd Fl.
Dover, DE   19901

     RE:   Investigation of Delaware Correctional Center, Symrna,
            Delaware; Howard R. Young Correctional Institution,
            Wilmington, Delaware; Sussex Correctional Institution,
            Georgetown, Delaware; John L. Webb Correctional
            Facility, Wilmington, Delaware; and Delores J. Baylor
            Women's Correctional Institution, New Castle, Delaware

Dear Governor Minner:

     I am writing to report the findings of the Civil Rights
Division's investigation of conditions and practices at the
following five Delaware Department of Correction ("DOC")
facilities:  the Delaware Correctional Center ("DCC"), the
Howard R. Young Correctional Institution ("HRYCI"), the Sussex
Correctional Institution ("SCI"), the John L. Webb Correctional
Facility ("Webb"), and the Delores J. Baylor Women's Correctional
Institution ("BWCI").

     On March 7, 2006, we notified you of our intent to conduct
an investigation of these facilities pursuant to the Civil Rights
of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997,
which gives the Department of Justice authority to seek remedies
for any pattern and practice of conduct that violates the
constitutional or federal rights of incarcerated persons.  We
informed you that our investigation would focus on medical and
mental health care.

     We note that the State has cooperated thoroughly with our
investigation and, under the leadership of DOC Commissioner
Stanley W. Taylor, Jr., has unequivocally indicated its clear
desire to improve medical and mental health care services at the
facilities.  From the outset of our investigation, the State has
been proactive in evaluating the conditions at the facilities.

Indeed, the State retained its own expert consultants, Dr. Ronald
Shansky and Dr. Roberta Stellman, to evaluate medical and mental
health care services, respectively, at DCC, HRYCI, SCI, Webb, and
BWCI in July and September 2006. Following these evaluations,
the State shared the results of its internal evaluations with us.

The State's experts identified systemic deficiencies in
medical and mental health care at four of the five facilities:
DCC, HRYCI, SCI, and BWCI (hereinafter, "the facilities"). These
findings were presented to the Department of Justice in oral and
written presentations by Fried, Frank, Harris, Shriver &
Jacobson, outside counsel for the State. To facilitate our
investigation, the State agreed to stipulate to the accuracy of
these factual findings. Given the State's complete cooperation
with our investigation, the unsolicited disclosure of its
comprehensive internal audit of medical and mental health care
services, and the State's stipulation, we elected to limit our
expert tours to a representative subset of the facilities.

Department of Justice staff toured the five facilities on
June 22, 2006, July 17-19, 2006 and August 14-16, 2006. We
conducted additional tours of HRYCI, Webb and BWCI, accompanied
by expert consultants in the fields of medicine, mental health
care, and suicide prevention on October 4-6, 2006, October 23-25,
2006, and November 15-17, 2006. During these tours, we reviewed
a wide variety of State and facility documents, including
policies, procedures, and medical and mental health records
relating to the care and treatment of inmates. We interviewed
prison administrators, professionals, staff and inmates at each
facility. In keeping with our pledge of transparency and to
provide technical assistance where appropriate regarding our
investigatory findings, we conveyed our preliminary findings to
certain State and facility administrators and staff during verbal
exit presentations at the close of each of our on-site visits.
As detailed below, our investigative findings mirrored those of
the State's experts.

We commend the administrators and staff of the five
facilities we toured for their helpful and professional conduct
throughout the course of the investigation. In particular,
facility personnel cooperated fully and expeditiously with our
document requests.

We are confident that our work with the State will continue
in the same cooperative manner we have enjoyed throughout our
investigation. However, consistent with our statutory obligation
under CRIPA, we set forth below the findings of our
investigation, the facts supporting them, including those facts

stipulated to by the State, and the minimum remedial steps that
are necessary to address the deficiencies we have identified.   As
described below, we conclude that inmates confined at the
facilities suffer harm or are placed at the risk of harm from
constitutional deficiencies in certain aspects of the medical and
mental health care services, including suicide prevention.
Notwithstanding the foregoing, we are pleased to report that we
find no constitutional deficiencies at Webb.

## I.   BACKGROUND

Delaware is one of six states that house both pre-trial
detainees and sentenced prisoners in a single unified system,
although detainees and prisoners are not housed together.
Medical and mental health care services at the facilities are
provided through a contract with a private vendor.   DCC is
located in Smyrna, Delaware, and houses approximately 2,500 male
inmates, including both pre-trial detainees and sentenced
prisoners.   DCC also contains the Security Housing Unit ("SHU"),
which houses inmates with disciplinary problems or who otherwise
require the maximum level of security.   DCC also contains the
State's death row.   HRYCI is located in Wilmington, Delaware.
The facility houses approximately 1800 males, both pre-trial
detainees and sentenced inmates.   SCI is located in Georgetown,
Delaware, and houses approximately 1200 male inmates, including a
100-bed boot camp.   BWCI is located in New Castle, Delaware, and
houses approximately 400 female pre-trial detainees and sentenced
inmates at all security levels.   Webb is located in Wilmington,
Delaware, and houses approximately 80 minimum security male
inmates.

## II.   FINDINGS

### A.   MEDICAL CARE

Under CRIPA, the Department of Justice has authority to
investigate violations of the constitutional rights of inmates in
prisons, and pre-trial detainees in jails.   The rights of
sentenced inmates fall under the Eighth Amendment, which
prohibits the imposition of cruel and unusual punishment.   Under
the Eighth Amendment, jails must provide humane conditions of
confinement, which include adequate medical care.   Farmer v.
Brennan, 511 U.S. 825, 832 (1994).   Failure to provide adequate
care to address the serious medical needs of inmates can
constitute deliberate indifference, a violation of the Eighth
Amendment prohibition against cruel and unusual punishment.
Estelle v. Gamble, 429 U.S. 27 (1976).   The responsibility to
provide adequate medical care includes mental health care.

- 4 -

Tillery v. Owens, 907 F.2d 418 (3d Cir. 1990). Failure to
protect a suicidal prisoner from self-harm can also amount to a
constitutional violation. Inmates of Allegheny County v. Pierce,
612 F.2d 754, 763 (3d Cir. 1979); Colburn v. Upper Darby
Township, 838 F.2d 663 (3d Cir. 1988). The responsibility to
protect inmates from harm includes the possibility of future harm
as well as present harm. Helling v. McKinney, 509 U.S. 25, 33
(1993); Tillery, 907 F.2d at 426.

With regard to pre-trial detainees, the Fourteenth Amendment
prohibits imposing conditions or practices on detainees not
reasonably related to the legitimate governmental objectives of
safety, order, and security. Bell v. Wolfish, 441 U.S. 420
(1979). The Third Circuit has opined that the protections
afforded to pre-trial detainees are at least as great as those
afforded to sentenced prisoners. Hubbard v. Taylor, 399 F.3d
150, 166-167 (3d Cir. 2005) (pre-trial detainees claims of
constitutional violations to be analyzed under Fourteenth
Amendment).

Our investigation revealed that the medical care provided at
the facilities falls below the standard of care constitutionally
required in the following areas, all of which were also
identified by the State as deficient: intake; medication
administration and management; nursing sick call; provider sick
call; scheduling, tracking, and follow-up on outside consults;
monitoring and treatment of communicable diseases; monitoring and
treatment of chronic diseases; medical records documentation;
scheduling; infirmary care; continuity of care following
hospitalizations; grievances; and patient confidentiality. In
addition, we found that care for patients with acute medical
urgencies was also constitutionally inadequate.

**1. Sick Call**

The State's expert found that sick call is not being
regularly conducted at the facilities and that sick call
"no-shows" (inmates who do not appear for their scheduled medical
appointments) are not tracked. Our investigation confirmed that
there are inadequate sick call systems in place which directly
interferes with inmates' access to care for their serious medical
needs. Specifically, the systems are deficient in scheduling
appointments, and tracking no-shows. For example, the inadequate
scheduling system at HRYCI resulted in only seven of the
representative sample of 14 patients scheduled for sick call on
one day being seen. In addition, we found that inmates who
missed sick call were not tracked and, as a consequence, often
not rescheduled. The sick call process for inmates' requiring

mental health care suffers from similar inadequacies in
scheduling and follow-up.  During our tours of BWCI and HRYCI, we
found that the sick call process is not functioning properly and
that there were significant delays for inmates who had requested
to see the psychiatrist.  Overall, these conditions place inmates
at serious risk of harm.

## 2.  Acute Care

Our investigation revealed that patients with life-
threatening conditions are not receiving timely care.  We
reviewed the records of ten patients sent to the local emergency
room; six of these patients were admitted.  One patient, known to
be infected with HIV, was admitted from HRYCI with pneumocystis
carinii pneumonia ("PCP"), a potentially fatal infection in
people with AIDS.  We determined that this inmate's care had been
mismanaged at HRYCI for one month before the inmate was finally
sent to the hospital.  In addition, this inmate was never tested
for active tuberculosis; a likely diagnosis for patients with HIV
and pneumonia.  The failure to properly diagnose and treat this
inmate could have put other inmates and staff at risk of
contracting tuberculosis.

## 3.  Chronic Care

The State's expert found that there are consistent backlogs
with respect to the treatment of chronic care inmates as
evidenced by infrequent scheduled appointments.  When
appointments are scheduled, they are subject to cancellation
without explanation or follow-up.  The State's expert also found
that the chronic care rosters are not adequately maintained.

Our investigation confirmed that there is no functioning
chronic disease registry at HRYCI.  The absence of a chronic
disease registry means that patients with chronic diseases, such
as diabetes, hypertension, asthma, HIV, and Hepatitis C are not
being followed and treated according to generally accepted
medical standards for chronic care.  As a result, inmates with
chronic disease are at risk for deterioration in function,
including blindness, kidney disease, heart disease, liver
failure, and death.

We found that care was especially poor for inmates with
diabetes, asthma, and HIV.  Of nine inmates with diabetes whose
charts we reviewed, only four had received tests deemed necessary
pursuant to generally accepted professional standards for care of
persons with these serious, chronic diseases.  In addition, only
two inmates had been immunized against pneumococcus, a bacterium

that is the leading cause of bacterial pneumonia.  The failure to immunize chronically ill inmates against pneumococcus places them at serious risk of harm, including death from pneumococcal pneumonia, and constitutes a substantial departure from generally accepted standards of care.  Another diabetic inmate whose chart we reviewed went without insulin for three days, despite severely elevated blood sugar levels that were known to staff, placing him at risk of death.

Similarly, for inmates with asthma, the chronic care practices also fall below a minimally acceptable standard of care.  For example, of nine asthmatic inmates who should have been seen in the chronic care clinic over a three month period, only three were seen.  Only two had documented measurement of peak expiratory flow, which is a departure from the generally accepted standard of care for asthmatic patients.

Finally, with respect to HIV-infected inmates, we found that chronic care practices also fall below a minimally acceptable standard of care.  Only two of five patients whose records our medical consultant reviewed had documented laboratory measurements of their CD4 cells[1] and their viral load, both of which are necessary to gauge response to medication.

## 4.  Specialty Care

The State's expert found that outside consultations are delayed by days or even weeks in non-emergency situations because of bureaucratic obstacles within the private vendor's system for obtaining authorization.  The State's expert also found that shortages of security staff available to transport inmates to outside medical appointments contributes to the inadequacy of care.  In addition, the State's expert determined that, even when outside consults are scheduled, post-consult follow-up does not consistently occur.

Similarly, our investigation found that access to specialty care is untimely, and that tracking of outside care is deficient, creating an unacceptable barrier to adequate medical care ordered by physicians.  For example, of 10 patients who were referred by facility doctors for outside care, three received no care at all. All three patients had serious medical issues:  two had upper gastrointestinal symptoms, including one patient who had

---

[1]     CD4 cells are white blood cells that identify, attack and destroy infections.  A normal CD4 cell count measures the strength of a person's immune system.

- 7 -

documented possibly cancerous polyps with a biopsy ordered and
performed, but no results in his file.  A third patient had no
documented follow-up with an orthopedist following serious trauma
to his finger.

And, in the most extreme example, specialty care may have
been denied altogether:  in March, 2002, an SCI inmate died from
a malignant brain tumor that had grown so large that it distorted
his facial features, and was so noticeable that other inmates
referred to him as "the brother with two heads." Fourteen months
before he died, SCI medical staff allegedly misdiagnosed the
cancerous growth as a cyst or an ingrown hair, and allegedly made
no specialty care referral nor provided any specialty care to the
inmate before he died.

### 5.  Skin Infections

It is well-documented that, across the country, the
incidence of skin infections among inmates is rising.  These skin
infections can include methicillin-resistant staphylococcus
aureus ("MRSA"), a potentially dangerous drug-resistant bacteria
that can cause serious systemic illness, permanent disfigurement,
and death.  MRSA transmission can be prevented by environmental
controls, scrupulous laundry practices, early identification,
effective treatment, wound care, and follow-up.

The State's expert found that, until recently, the medical
staff were generally unfamiliar with the diagnosis and treatment
of MRSA, and that the medical staff did not culture potential
MRSA infections or educate inmates on proper precautions against
the spread of MRSA until Fall 2005.

Our investigation revealed that proper diagnosis of and care
for skin infections falls below the minimally acceptable level of
care.  We also found that medical staff routinely failed to
culture skin infections; in addition, we found that wound care
and follow-up were inadequate.  For example, we reviewed the
charts of eight inmates with skin infections at HRYCI; only two
of these inmates received adequate care.  One had a deep skin
infection of the neck, but had no follow-up to see if his
infection was spreading.  Another inmate had inappropriate
treatment for an infection that was accompanied by fever and
chills, indicative of a systemic infection that could have led to
pneumonia, brain infection, and death.  Both of these patients
were treated with the antibiotics that are ineffective in
treating MRSA.  With respect to wound care, we found another
inmate at BWCI who was inappropriately treated with a topical
cream for an infection on her face, but who did not see the

- 8 -

doctor for six days, by which time she had developed cellulitis,
a deep skin infection that ultimately required hospitalization.
Our investigative findings and the State's stipulation are also
consistent with reports that DCC staff failed to properly
diagnose and treat an MRSA infection in an inmate for four months
in 2005. This failure to recognize and treat MRSA allegedly
caused the inmate to be hospitalized for five weeks, lose the
skin on his scrotum, and undergo painful skin grafts, resulting
in permanent deformity.

Our investigation confirmed that the existence of the above
inadequacies place inmates and staff at risk of acquiring the
infection and passing it to others in the community beyond the
prison walls. We also found that identification and treatment of
skin infections at the facilities is inadequate, including
failure to culture and treat wounds. We found that facility
staff does not keep adequate logs of skin infections, which
prevents staff from being able to analyze data and identify
potential sources of transmission. Notably, in many cases
physicians were prescribing the antibiotic Keflex, which not only
is rarely effective for skin infections, including MRSA, but
actually leads to prolonged infection and increased opportunities
for the infection to spread. Finally, we found that laundry
practices at the Facilities are inadequate to prevent the spread
of skin infections, including MRSA.

## 6. Medication Administration and Management

The State's expert found that prescribed medications are
routinely discontinued or delayed and that the current vendor has
no systems in place for ensuring that medications do not run out,
for notifying inmates when their medications have arrived, or for
verifying that the vendor is providing inmates with the correct
medications.

Our investigation confirmed these deficiencies which put
inmates at risk of harm, particularly those with chronic
conditions such as HIV. We observed significant lapses in
medication, due either to lack of availability of medications or
the failure to administer medications consistently. For example,
one inmate had missed 20 consecutive days of his anti-viral
medication used to treat the HIV, a potentially life-threatening
situation; another inmate with HIV had a one month lag in
receiving his HIV medications.

We also found that serial refusals to take medications were
not monitored. Numerous inmates missed three or more doses of
medications on three consecutive days, without any evidence of

- 9 -

follow-up by the prescribing practitioner, or evidence that the
inmate was sought out or counseled.

    The State's expert found that numerous systemic problems
with medication administration and management exist at the
facilities, including:  failure to distribute medications at the
proper time intervals, leading to over- or under-prescribing
medications; failure to provide necessary food at night to
diabetic inmates; failure to properly monitor whether inmates are
actually swallowing their medications; and pre-pouring
medications.

    Our investigation found similar deficiencies.  Our review of
medication administration records at HRYCI revealed that
approximately ten percent of the entries were left blank,
indicating that inmates had not received their medication, or
that the medication administration was undocumented.  We also
found that the State routinely prescribes Keflex, an antibiotic,
for skin infections, despite the fact that Keflex is rarely
effective when used to treat skin infections.  We also learned
that the State plans to administer each dose of medication from
stock bottles, instead of filling prescriptions for each patient,
a practice which we believe will lead to poor inventory control,
diversion, error, and lack of accountability.

## B.  MENTAL HEALTH CARE

    The responsibility to provide adequate medical care includes
mental health care.  Inmates of Allegheny County Jail v. Pierce,
612 F.2d 754, 763 (3d Cir. 1979); Tillery v. Owens, 907 F.2d 418
(3d Cir. 1990).  The State is constitutionally required to
provide adequate mental health care to inmates with serious
mental or emotional disturbances.  The failure to provide
necessary psychological or psychiatric treatment to such
individuals will result in the "infliction of pain and suffering
just as real as would result from the failure to treat serious
physical ailments."  Inmates of Allegheny County Jail, 612 F.2d
at 763.  The key to determining whether the State has provided
constitutionally adequate mental health care depends on whether
inmates have reasonable access to "medical personnel qualified to
diagnose and treat such illnesses or disturbances."  Id.

    The State's mental health expert found substantial
deficiencies with the mental health care provided at the
facilities.  The State's expert conducted a number of on-site
visits and determined that there is a "continuing need for
substantial remedial efforts, training and auditing of mental
health services provided by [the State's medical care provider]."

The State identified the following deficiencies:  poor responses
to sick call requests, particularly in cases involving
potentially suicidal inmates; inadequate group and individualized
therapy; staffing inadequacies, lack of privacy for inmate mental
health counseling, insufficient discharge planning, inadequate
administration and management of psychotropic medications,
failure to properly develop treatment plans that are regularly
updated, failure to develop site-specific policies and procedures
for mental health care, failure to properly document
medical/mental health records, and failure to obtain consent
forms.  Our investigation confirmed the serious systemic
deficiencies in psychiatric staffing, treatment and counseling,
medication administration and management, and intake and
screening identified by the State's mental health expert.  We
conclude that these deficiencies violate inmates' constitutional
right to adequate care for serious mental illness.

### 1.  Psychiatric Staffing Deficiencies

The State's expert found that low psychiatric staffing at
the facilities have caused a backlog of inmates requiring
psychiatric care.  Although the facilities do have psychiatrists
who are available to provide care on-site, their hours at the
various facilities are limited.

Our investigation confirmed that psychiatric staffing is
inadequate to provide for inmates' serious mental health needs.
For example, during our tour of HRYCI, the State informed us that
there are two part-time psychiatrists who provide care at HRYCI,
but our investigation revealed that their combined time on-site
totals less than twenty hours, and there is no on-site
psychiatric coverage provided for two days out of the week.
Psychiatric coverage at BWCI is even more limited.  Our
investigation revealed that a psychiatrist is on site only four
hours per week, and the "on-call psychiatrist" generally provides
guidance only via telephone.  Further, we understand that
included in the four hours is time that the psychiatrist spends
at the Violation of Probation Center attached to BWCI for two
hours every other week.  Such limited psychiatric staffing is not
constitutionally adequate care because inmates do not have
reasonable access to psychiatrists.  See Inmates of Allegheny
County Jail v. Pierce, 487 F. Supp. 638, 643 (W.D. Pa. 1980).

As a result of inadequate psychiatric staffing, we found
numerous instances in which the mental health clinical staff are
providing care that they are not licensed to provide (e.g.,
diagnosis of mental health disorders, treatment development
without proper psychiatric consultation, decisions regarding

suicide watch step-downs, etc.). We found that psychiatrists are
routinely unavailable for treatment team and staff meetings, and
often are not involved in crucial decision-making, and are not
adequately involved in monitoring and supervision of staff. In
addition, we found that the psychiatrist who provides most of the
care at HRYCI was not familiar with the procedures utilized for
making decisions about which medications to prescribe for
patients with psychotic disorders. Generally accepted standards
of care dictate that a psychiatrist be responsible for providing
mental health treatment to seriously mentally ill patients should
lead treatment teams, direct medication procedures, and be
meaningfully involved in treatment decisions.

## 2.    **Treatment Planning and Counseling Deficiencies**

The State's expert found that treatment plans for inmates
need to be developed more regularly so that psychologists do not
unnecessarily change diagnoses and so that patients are put on
the appropriate problem list. Treatment plan development is an
integral part of mental health care. One aspect of treatment
planning consists of psychiatric and clinical staff providing
consistent notations in medical records to ensure that important
information regarding an inmate's care is documented. The
State's expert, Dr. Stellman, concluded that there is a continued
need for remedial efforts and training in the area of medical
records documentation at DOC facilities. Dr. Stellman also found
that many medical records do not contain consent forms, and
contain improperly completed mental health forms.

Likewise, we found that the poor documentation impacts
treatment because it is virtually impossible for a qualified
mental health professional to review patient medical records and
determine how basic clinical decisions are being made (e.g., why
an inmate was admitted to the infirmary; why medications are
prescribed; why and how psychiatric close observation levels are
changed; what are the bases for diagnostic conclusions). During
our tour of BWCI, we reviewed the medical record of an inmate who
had recently attempted suicide and found the psychiatric notes
were deficient and difficult to interpret. Both the on-site and
"on-call" psychiatrists made adjustments to this inmate's
medication without any explanation. Also, despite the fact that
this inmate had been on suicide watch on three occasions within a
four-month period and was obviously in distress, there were
sparse psychiatric notes in her file.

Generally accepted standards of care dictate that discharge
treatment planning be provided for inmates who have serious
mental illness to ensure continuity of care. The State's expert

- 12 -

found that its inmate treatment plans fail to address how the patient's care will continue once he or she is released from the DOC facility.[2]

The State's expert also found deficiencies in the individual and group counseling services provided at DOC correctional facilities. There appears to be a limited ability to provide individual counseling sessions to inmates because of a lack of privacy. The State's expert found that when inmates are housed in the infirmary, psychiatrists and mental health staff do their interviews through the cell door and that, because cells typically have at least one other occupant when these interviews are being conducted, the encounters are not confidential. This is a wholly inadequate practice evidencing a denial of reasonable access to psychiatric diagnosis and care. See Inmates of Allegheny County Jail, 612 F.2d at 763.

Group counseling services at the facilities fall below accepted standards, as well. The State's expert found that there was a need for remedial measures and training with respect to the provision of group and individualized therapy.

Similarly, we found the counseling services to be constitutionally inadequate. Because the facilities are substantially understaffed with respect to psychiatrists, physicians generally do not participate in the treatment team or staff meetings. For example, during our tour of BWCI we found that the master's level clinicians who run the group psychotherapy program (e.g., depression group, anger management group, and addiction group) in the Harbor House Unit do not receive any oversight from a psychiatrist. Generally accepted professional standards dictate that the psychiatrist be the treatment team leader and be meaningfully involved in key treatment decisions. However, clinicians are making important treatment decisions that should be left to the professional judgment of a psychiatrist, or at least made with the consultation of a psychiatrist. Our review of the medical records at BWCI and HRYCI revealed that clinicians are recording

---

[2] NCCHC standards J-E-13 and P-E-13 require jurisdictions to develop discharge planning for inmates with serious mental illness (e.g., medication for a short period of time following release and referrals to community health providers). Also see, Foster v. Fulton County, 223 F. Supp 2d 1301, 1310 (N.D. Ga. 2002) (holding that a jurisdiction was required to develop meaningful discharge planning for physically and mentally ill prisoners).

psychiatric diagnoses and making observation status decisions
about patients in the infirmary, including which inmates should
be removed from suicide watch, and at what pace.  Psychiatrists
should be performing these tasks because psychiatric diagnoses
drive treatment decisions.

The State's practice of allowing clinicians to make
important decisions regarding the care and treatment of inmates
with serious mental illness puts patients at risk.  There were
three suicides at HRYCI in 2006.  A clinician's decision, in May
2006, to downgrade an inmate's observation status may have aided
the inmate's ability to commit suicide a few days after he
entered the facility.  The State took custody of this inmate
after his release from a local hospital for treatment related to
a suicide attempt.  Apparently he was initially placed on one-to-
one observation status, but he was later downgraded to a less-
restrictive suicide watch despite warnings from a mental health
advocate about his vulnerable mental state and need for a mental
health evaluation.

### 3.  Psychotropic Medication Administration and Management

The State's expert found that there is a continuing need for
substantial remedial efforts, training, and auditing with respect
to the management of psychotropic medications.

Our investigation revealed that the medication
administration and management of psychotropics at DOC facilities
is constitutionally inadequate.  We observed during our tours at
BWCI and HRYCI that there are systemic problems with initiating
drug therapy for newly admitted inmates.  It appears that this
problem may be partially the result of a deficient intake and
screening process.  Because the intake process is deficient there
is rarely an attempt to obtain psychiatric records from community
providers which would identify any psychotropic medications that
were previously prescribed.  If outside records were routinely
obtained the delay that we observed with regard to initiating
drug therapy for newly admitted inmates might be eradicated or at
least greatly diminished.

We also found that the psychotropic medications that newly
admitted inmates are often prescribed by community providers were
substituted with other medications which may not be as
therapeutically effective.  We encountered inmates at HRYCI who
appeared to have diminished symptom control and decreased
functional ability as a result of the substitution of
psychotropic medications.  Another deficiency that we found with
psychotropic medication administration is a lack of consistent

- 14 -

and timely distribution of medications.  Because the medication
inventory does not appear to be properly controlled, medication
shortages have resulted in interrupted drug therapy.

Finally, we found that monitoring of medication is deficient
at the facilities.  The use of certain psychotropic medications
may cause metabolic effects, such as weight gain, hyperlipidemia,
and type II diabetes mellitus.  As such, generally accepted
standards of care require prescribing physicians to monitor
weight, body mass index, and abdominal girth on a regular basis.
Our review of medical records at BWCI and HRYCI indicate that the
State is not following this practice.  Another side effect of
certain psychotropic drugs is tardive dyskinesia (involuntary
movement disorder).  Psychiatrists generally monitor this side
effect by performing the Abnormal Involuntary Movement Scale
("AIMS") on a regular bases.  The State's expert found that AIMS
tests are not being done once every six months as required.

## 4. Intake and Screening

We found the intake and screening process with respect to
the identification of seriously mentally ill inmates to be
constitutionally inadequate.  The intake and screening process
for medical and mental health is combined and performed by
nursing staff members who do not appear to have received adequate
mental health training or have a sufficient background in mental
health.  Accordingly, they are unable to appropriately identify
symptoms of mental illness.

During our tour of HRYCI, we found that the staff's lack of
experience with mental health issues is exacerbated by the high
volume of newly admitted inmates that are processed per shift.
These deficiencies have resulted in the failure to identify
inmates with serious mental illness which causes delays in
treatment.  Another impact of failing to identify inmates with
mental illness is that disciplinary sanctions may be
inappropriately imposed on mentally ill inmates, because of
behavior that could be more appropriately addressed by mental
health care and treatment instead of discipline.  For example,
during our tour of BWCI, we observed inmates in isolation who had
not been properly identified has having mental illness, or who
had not received adequate treatment for their diagnosed mental
illness.  For such inmates, care should be taken to ensure that
they are not unfairly disciplined for "acting out" when mental
health intervention is a more appropriate response.

We also found that intake and screening for juveniles was
constitutionally inadequate at HRYCI.  During our tour, we

reviewed a number of juvenile medical records to determine
whether this special needs population was receiving comprehensive
mental health evaluations subsequent to their initial intake
survey.  However, it appeared that such evaluations were not
being routinely performed.

## C.  Suicide Prevention

Our investigation revealed that the State's practices
regarding suicide prevention substantially depart from generally
accepted professional standards and expose inmates to significant
risk of harm.  Our investigation uncovered a system in which
inmates at risk for suicide are not adequately identified, housed
and supervised.

The State fails to adequately assess and identify inmates at
risk for suicide.  While the form used to conduct intake
assessments is good, the personnel conducting the assessment lack
appropriate training and experience with issues related to mental
health and suicide prevention.  Assessments are often performed
by contract or agency LPN's who have not been trained adequately
in suicide prevention techniques.  Additionally, while the
State's medical provider conducts training of its employees on
suicide prevention, it has not implemented its training curricula
as policy or standard operating procedure.  Similarly,
correctional staff receive insufficient training in the area of
suicide prevention.  Training at the academy is only two or three
hours, and annual refresher training methods are not adequate.

The intake process also fails to ensure that appropriate
action is taken when an inmate reports a history of suicidal
thoughts or actions.  In these instances, the inmate signs a
release, but outside confirmations of their medical and mental
health records/histories are not consistently obtained and
verified.  Furthermore, post-intake follow-up of new inmates,
which should be conducted within 14 days, is not done.  Instead,
follow-up is rolled into the initial intake process, increasing
the possibility that at-risk inmates will not be identified.

The State fails to ensure that inmates identified as being
at risk for suicide are housed in cells which are sufficient to
ensure their safety.  Protrusions from walls and ceilings, window
frames and grates, and even the design of bunk beds in some cells
provide potential anchors strong enough to support an inmate's
weight in an attempt at hanging.  For example, in August 2006, an
HRYCI inmate who hanged himself at HRYCI was housed in an
infirmary cell following his admission because he was recovering
from a gunshot wound sustained during his arrest.  It is not

- 16 -

clear what fixture the inmate used to hang himself, but it is
apparent that the cells in the infirmary, like those in the other
areas of the facility, are not sufficient to ensure the safety of
inmates with suicidal ideations.  Hanging was the means used in
the May 2006 and February 2005 suicides at HRYCI.  Additionally,
unsafe light fixtures in some cells, if broken, provide a
potential source of sharp-edged pieces of plastic or glass that
could be used for self-harm.

        The State fails to ensure that appropriate levels of
observation are maintained.  Documentation of 15- and 30-minute
checks does not indicate that these checks are being done.  Staff
at one facility reported conflicting requirements for checks at
lesser levels of observation, highlighting confusion about which
interval was the actual policy.  Rounds by mental health staff
for inmates in isolation and on special units are not regularly
done.  Additionally, staff at some facilities incorrectly
suggested that the various undocumented incidental contacts with
at-risk inmates throughout the day, such as dispensing medication
or picking up sick call slips, sufficed as a periodic check for
inmates' safety.

### III.  MINIMUM REMEDIAL MEASURES

        In order to address the constitutional deficiencies
identified above and to protect the constitutional rights of
inmates, we recommend the following measures:

(1)     The State should ensure that appropriate access to medical
        care, including development and implementation of a
        functional sick call system that appropriately schedules
        medical appointments, and properly tracks and reschedules
        "no shows."

2.      The State should ensure that chronic disease registries are
        implemented and maintained at DOC facilities.

3.      The State should provide appropriate continuing care for
        patients with chronic diseases and ensure that backlogs are
        eliminated and do not redevelop.

4.      The State should ensure that outside consultations are not
        unnecessarily delayed and that appropriate post-consult
        follow-up care is provided.  The State should ensure that
        security staffing levels do not negatively impact the
        provision of outside consultations.

- 17 -

5.   The State should implement appropriate measures to identify, track, and treat skin infections, including culturing and treating wounds and prescribing effective antibiotics.

6.   The State should ensure the distribution of medication to patients at proper time intervals.  The State should implement a system to ensure that proper medications are being received and that sufficient stocks of medications are maintained to avoid interruptions or delays in their delivery.

7.   The State should track serial refusals of medication by patients and ensure that prescribing physicians are notified of such occurrences and that appropriate follow-up with patients takes place.

8.   The State should ensure that there is adequate psychiatric coverage provided at DOC facilities.

9.   The State should ensure that psychiatrists are actively involved in inmate care, including:  functioning as the treatment team leader; making psychiatric diagnoses; providing necessary monitoring and supervision of staff; and promoting quality mental health care.

10.  The State should provide appropriate medication distribution and management systems to ensure that psychotropic medications are available, distributed in a timely manner, and adequately monitored.

11.  The State should ensure that psychiatrists prescribe therapeutically effective medications.  If a decision is made to adjust or substitute the medications that an inmate was on prior to their detention or incarceration at a DOC facility, the psychiatrist should provide a clear justification for making the adjustment or substitution in the inmate's medical record.

12.  The State should ensure that appropriately trained staff perform a mental health screening at intake.

13.  The State should provide appropriate counseling space for qualified mental health professionals to provide mental health treatment to inmates with serious mental illness.

14.  The State should ensure that the mental health staff is appropriately documenting the care provided to inmates with serious mental illness.

- 18 -

15.    The State should provide appropriate treatment plans for
       inmates with serious mental illness.  The treatment plans
       will be reviewed on a routine bases to ensure quality of
       care.

16.    The State should develop site specific mental health
       policies for HRYCI and DCC.

17.    The State should develop a comprehensive policy regarding
       suicide prevention for DOC facilities.

18.    The State should ensure that all medical, mental health and
       correctional staff are appropriately trained regarding
       issues of suicide prevention, and that the content of their
       training is reflective of that State's suicide prevention
       policy.

19.    The State should ensure that intake staff are sufficiently
       experienced and qualified to identify inmates that pose a
       risk for suicide, and that follow mental health staff
       conduct appropriate follow-up evaluations of new inmates
       within 14 days of intake.

20.    The State should ensure that inmates identified as at risk
       for suicide are housed in safe cells, free from fixtures and
       design features that could facilitate a suicide attempt.

21.    The State should ensure that 15- and 30-minute checks of
       inmates under observation for risk of suicide are timely
       performed and appropriately documented.

                            *  *  *

        Please note that this findings letter is a public document.
It will be posted on the Civil Rights Division's website and we
will provide a copy of this letter to any individual or entity
upon request.

- 19 -

As stated above, we appreciate the cooperation we have received throughout this investigation from State officials and staff at the facilities. We appreciate the State's proactive measures to respond to its own internal audit and our feedback to date to improve the quality of services at the facilities. We hope to be able to continue working with the State in an amicable and cooperative fashion to resolve the deficiencies we found at the facilities. Provided that our cooperative relationship continues, we will forward our expert consultants' reports under separate cover. Although their report are their work – and do not necessarily represent the official conclusions of the Department of Justice – their observations, analyses and recommendations provide further elaboration of the relevant concerns, and offer practical assistance in addressing them. We hope that you will give this information careful consideration and that it will assist in your efforts at prompt remediation.

We are obligated to advise you that, in the unexpected event that we are unable to reach a resolution regarding our concerns, within 49 days after your receipt of this letter, the Attorney General is authorized to initiate a lawsuit pursuant to CRIPA, to correct deficiencies of the kind identified in this letter. See 42 U.S.C. § 1997b(a)(1). We would very much prefer, however, to resolve this matter by working cooperatively with you. Accordingly, we will soon contact State officials and counsel to discuss this matter in further detail.

If you have any questions regarding this letter, please call Shanetta Y. Cutlar, Chief of the Civil Rights Division's Special Litigation Section, at (202) 514-0195.

Sincerely,

/s/ Wan J. Kim
Wan J. Kim
Assistant Attorney General

cc:  Carl C. Danberg
     Attorney General

     Stanley W. Taylor, Jr.
     Department of Correction Commissioner

     Thomas L. Carroll, Warden
     Delaware Correctional Center

- 20 -

Raphael Williams, Warden
Howard R. Young Correctional Institution

Rick Kearney, Warden
Sussex Correctional Institution

Robert Young, Acting Warden
John L. Webb Correctional Facility

Patrick Ryan, Warden
Delores J. Baylor Women's Correctional Institution

Colm Connelly
United States Attorney
District of Delaware

Michael R. Bromwich, Esq.
Beth C. McClain, Esq.
Fried, Frank, Harris, Shriver & Jacobson LLP

**MEMORANDUM OF AGREEMENT BETWEEN THE UNITED STATES DEPARTMENT OF JUSTICE AND THE STATE OF DELAWARE REGARDING THE DELORES J. BAYLOR WOMEN'S CORRECTIONAL INSTITUTION, THE DELAWARE CORRECTIONAL CENTER, THE HOWARD R. YOUNG CORRECTIONAL INSTITUTION, AND THE SUSSEX CORRECTIONAL INSTITUTION**

## TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3 |
| II. | DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . | 4 |
| III. | MEDICAL AND MENTAL HEALTH CARE . . . . . . . . . . . . . . . . . . . | 6 |
| IV. | SUICIDE PREVENTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14 |
| V. | QUALITY ASSURANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 17 |
| VI. | IMPLEMENTATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 18 |
| VII. | MONITORING, ENFORCEMENT, AND TERMINATION . . . . . . . . . . | 18 |

2

## I.    **INTRODUCTION**

A.    On March 7, 2006, the United States Department of Justice ("DOJ"), notified the State of Delaware ("the State") of DOJ's intent to investigate the adequacy of medical and mental health care services in five facilities operated by the State's Department of Correction pursuant to the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997 to determine whether those services violated inmates' constitutional rights.  The facilities investigated were:

1. Delores J. Baylor Women's Correctional Institution ("Baylor");

2. Howard R. Young Correctional Institution, ("Howard Young");

3. John L. Webb Correctional Facility ("Webb");

4. Delaware Correctional Center ("DCC"); and

5. Sussex Correctional Institution ("Sussex").

B.    DOJ staff toured the five facilities on June 22, 2006, July 17-19, 2006 and August 14-16, 2006.  In addition, DOJ staff, accompanied by consultants in medical care, mental health care and suicide prevention, toured Howard Young on October 4-6, 2006, Baylor and Webb on October 23-25, 2006 and Baylor again on November 15-17, 2006.

C.    On December 29, 2006, the DOJ issued a findings letter pursuant to 42 U.S.C. § 1997b(a)(1) which alleged that certain conditions at Baylor, DCC, Howard Young, and Sussex violated the constitutional rights of Delaware inmates.  It is the position of the DOJ that deficiencies in medical care, mental health care and suicide prevention at these four facilities [collectively referred to herein as "the Facilities"; see Definitions, paragraph A] were inconsistent with constitutional standards of care.  The DOJ made no findings with respect to Webb.

D.    Before the investigation began, the State had initiated its own efforts to improve conditions at the Facilities.  During the investigation, the State also commissioned an extensive internal review of the Facilities with the assistance of medical, mental health, and legal consultants, the detailed results of which they subsequently shared with DOJ and DOJ's consultants.  Throughout the course of the investigation, the State of Delaware and the staff at each Facility cooperated thoroughly and indicated a willingness to proactively and voluntarily undertake measures to improve conditions throughout the system.  Consequently, the Parties enter into this Memorandum of Agreement ("Agreement") for the purpose of utilizing their resources in support of improving medical and mental health care at

3

the Facilities, rather than allocating such resources to the risks and burdens of litigation.

E.    The Parties to this Agreement do not intend to create in any non-party the status of third party beneficiary. This Agreement shall not be construed so as to create a private right of action to any non-party against the State or the United States. The rights, duties and obligations contained in this Agreement shall bind only the Parties to this Agreement.

F.    In entering into this Agreement, the State does not admit any violations of the constitutional rights of inmates confined at the Facilities nor does it admit any violation of state or federal law. This Agreement may not be used as evidence of liability in any other legal proceeding. However, the State remains firmly committed to improving medical and mental health care at the Facilities.

G.    The Parties acknowledge that Correctional Medical Services ("CMS") currently provides medical and mental health care to inmates at the Facilities and that such care is provided pursuant to a contract with CMS that sets forth the terms and conditions of the relationship between the State and CMS. The State shall be responsible for ensuring that CMS (or any successor contractor) complies with the terms of this Agreement. Nothing in this paragraph shall abrogate the State's responsibility to comply fully with the terms of this Agreement.

H.    It is expressly understood and acknowledged that, while this Agreement makes no distinctions between those issues concerning inmate medical and mental health care that were previously modified and improved prior to the issuance of the findings letter and those that shall be modified and/or improved by virtue of the terms of this Agreement, the Parties acknowledge that a number of the policies and/or procedures which this Agreement addresses were implemented or in the process of being implemented prior to the issuance of the findings letter.

## II.  DEFINITIONS

In this Agreement, the following definitions apply:

A.    "The Facilities" means Baylor, DCC, Howard Young, and Sussex, collectively, as well as any facility that is built to replace or supplement any one of them.

B.    "Effective date" means the date the Agreement is executed by the Parties.

C.    "Generally accepted professional standards" means those industry standards accepted by a significant majority of professionals in the relevant field, and reflected in the standards of care such as those published by the National

4

Commission on Correctional Health Care (NCCHC) . DOJ acknowledges that NCCHC has established different standards for jail and prison populations, and that the relevant standard that applies under this Agreement may differ for pre-trial and sentenced inmates. As used in this Agreement, the terms "adequate," "appropriate," and "sufficient" refer to standards established by clinical guidelines in the relevant field. The Parties shall consider clinical guidelines promulgated by professional organizations in assessing whether generally accepted professional standards have been met.

D.     "Include" or "including" means "include, but not be limited to" or "including, but not limited to."

E.     "Inmates" means individuals sentenced to, incarcerated in, detained at, or otherwise confined at any of the Facilities.

F.     "Inmates with special needs" means inmates who are identified as suicidal, mentally ill, developmentally disabled, seriously or chronically ill, who are physically disabled, who have trouble performing activities of daily living, or who are a danger to themselves.

G.     "Isolation" means the placement of an inmate alone in a locked room or cell, except that it does not refer to adults single celled in general population.

H.     "Juveniles" means individuals detained at a facility who are under the age of eighteen (18).

I.     "Medical staff" means medical professionals, nursing staff, and certified medical assistants.

J.     "Medical professional" means a licensed physician, licensed physician assistant, or a licensed nurse practitioner providing services at a facility and currently licensed to the extent required by the State of Delaware to deliver those health services he or she has undertaken to provide.

K.     "Mental health professional" means an individual with a minimum of masters-level education and training in psychiatry, psychology, counseling, psychiatric social work, activity therapy, recreational therapy or psychiatric nursing, currently licensed to the extent required by the State of Delaware to deliver those mental health services he or she has undertaken to provide.

L.     "Monitor" as used in this Agreement means the Monitor established by Section VII of this Agreement, and all persons or entities associated by the Monitor to assist in performing the monitoring tasks.

5

M.    "Nursing staff" means registered nurses, licensed practical nurses, and licensed vocational nurses providing services at a facility and currently licensed to the extent required by the State of Delaware to deliver those health services they have undertaken to provide.

N.    "The Parties" means the State and the DOJ.

O.    "Security staff" means all employees, irrespective of job title, whose regular duties include the supervision of inmates at the Facilities.

P.    "The State" means officials of the State of Delaware, including officials of the Department of Correction and its Bureau of Prisons, and their successors, contractors and agents.

Q.    "Train," when the term is used in remedial provisions of this Agreement, means to adequately instruct in the skills addressed, including assessment of mastery of instructional material.

## III.    MEDICAL AND MENTAL HEALTH CARE

### GENERAL PROVISIONS

(1)    Standard  The State shall ensure that services to address the serious medical and mental health needs of all inmates meet generally accepted professional standards.

(2)    Policies and Procedures  The State shall develop and revise its policies and procedures including those involving intake, communicable disease screening, sick call, chronic disease management, acute care, infection control, infirmary care, and dental care to ensure that staff provide adequate ongoing care to inmates determined to need such care. Medical and mental health policies and procedures shall be readily available to relevant staff.

(3)    Record keeping  The State shall develop and implement a unitary record-keeping system to ensure adequate and timely documentation of assessments and treatment and adequate and timely access by medical and mental health care staff to documents that are relevant to the care and treatment of inmates. A unitary record-keeping system consists of a system in which all clinically appropriate documents for the inmate's treatment are readily available to each clinician. The State shall maintain a unified medical and mental health file for each inmate and all medical records, including laboratory reports, shall be timely filed in the medical file. The medical records unit shall be adequately staffed to prevent significant lags in filing records in an inmate's medical record. The State shall maintain the medical records such that persons providing medical or mental health

6

treatment may gain access to the record as needed. The medical record should be complete, and should include information from prior incarcerations. The State shall implement an adequate system for medical records management.

(4)    Medication and Laboratory Orders  The State shall develop and implement policies, procedures, and practices consistent with generally accepted professional standards to ensure timely responses to orders for medications and laboratory tests. Such policies, procedures, and practices shall be periodically evaluated to ensure that delays in inmates' timely receipt of medications and laboratory tests are prevented.

## Staffing and Training

(5)    Job Descriptions and Licensure  The State shall ensure that all persons providing medical or mental health treatment meet applicable state licensure and/or certification requirements, and practice only within the scope of their training and licensure. The State shall establish a credentialing program that meets generally accepted professional standards, such as those required for accreditation by the National Committee for Quality Assurance.

(6)    Staffing  The State shall maintain sufficient staffing levels of qualified medical staff and mental health professionals to provide care for inmates' serious medical and mental health needs that meets generally accepted professional standards.

(7)    Medical and Mental Health Staff Management  The State shall ensure that a full-time medical director is responsible for the management of the medical program. The State shall also provide a director of nursing and adequate administrative medical and mental health management. In addition, the State shall ensure that a designated clinical director shall supervise inmates' mental health treatment at the Facilities. These positions may be filled either by State employees, by independent contractors retained by the State, or pursuant to the State's contract with a correctional health care vendor.

(8)    Medical and Mental Health Staff Training  The State shall continue to ensure that all medical staff and mental health professionals are adequately trained to meet the serious medical and mental health needs of inmates. All such staff shall continue to receive documented orientation and in-service training in accordance with their job classifications, and training topics shall include suicide prevention and the identification and care of inmates with mental disorders.

(9)    Security Staff Training  The State shall ensure that security staff are adequately trained in the identification, timely referral, and proper supervision of inmates with serious medical or mental health needs. The State shall ensure that security staff assigned to mental health units receive additional training related to the proper supervision of inmates suffering from mental illness.

7

## Screening and Treatment

(10)  Medical Screening  The State shall ensure that all inmates receive an appropriate and timely medical screening by a medical staff member upon arrival at a facility.  The State shall ensure that such screening enables staff to identify individuals with serious medical or mental health conditions, including acute medical needs, infectious diseases, chronic conditions, physical disabilities, mental illness, suicide risk, and drug and/or alcohol withdrawal.  Separate mental health screening shall be provided as described in Paragraph 34.

(11)  Privacy  The State shall make reasonable efforts to ensure inmate privacy when conducting medical and mental health screening, assessments, and treatment.  However, maintaining inmate privacy shall be subject to legitimate security concerns and emergency situations.

(12)  Health Assessments  The State shall ensure that all inmates receive timely medical and mental health assessments.  Upon intake, the State shall ensure that a medical professional identifies those persons who have chronic illness.  Those persons with chronic illness shall receive a full health assessment between one (1) and seven (7) days of intake, depending on their physical condition.  Persons without chronic illness should receive full health assessment within fourteen (14) days of intake.  The State will ensure that inmates with chronic illnesses will be tracked in a standardized fashion.  A re-admitted inmate or an inmate transferred from another facility who has received a documented full health assessment within the previous twelve (12) months, and whose receiving screening shows no change in health status, need not receive a new full medical and mental health assessment.  For such inmates, medical staff and mental health professionals shall review prior records and update tests and examinations as needed.

(13)  Referrals for Specialty Care  The State shall ensure that:  a) inmates whose serious medical or mental health needs exceed the services available at their facility shall be referred in a timely manner to appropriate medical or mental health care professionals; b) the findings and recommendations of such professionals are tracked and documented in inmates' medical files; and c) treatment recommendations are followed as clinically indicated.

(14)  Treatment or Accommodation Plans  Inmates with special needs shall have special needs plans.  For inmates with special needs who have been at the facility for thirty (30) days, this shall include appropriate discharge planning.  The DOJ acknowledges that for sentenced inmates with special needs, such discharge planning shall be developed in relation to the anticipated date of release.

8

(15)    Drug and Alcohol Withdrawal  The State shall develop and implement appropriate
        written policies, protocols, and practices, consistent with standards of appropriate medical
        care, to identify, monitor, and treat inmates at risk for, or who are experiencing, drug or
        alcohol withdrawal.  The State shall implement appropriate withdrawal and detoxification
        programs.  Methadone maintenance programs shall be offered for pregnant inmates who
        were addicted to opiates and/or participating in a legitimate methadone maintenance
        program when they entered the Facilities.

(16)    Pregnant Inmates  The State shall develop and implement appropriate written policies and
        protocols for the treatment of pregnant inmates, including appropriate screening,
        treatment, and management of high risk pregnancies.

(17)    Communicable and Infectious Disease Management  The State shall adequately maintain
        statistical information regarding contagious disease screening programs and other
        relevant statistical data necessary to adequately identify, treat, and control infectious
        diseases.

(18)    Clinic Space and Equipment  The State shall ensure that all face-to-face nursing and
        physician examinations occur in settings that provide appropriate privacy and permit a
        proper clinical evaluation including an adequately-sized examination room that contains
        an examination table, an operable sink for hand-washing, adequate lighting, and adequate
        equipment, including an adequate microscope for diagnostic evaluations.  The State shall
        submit a comprehensive action plan as described in Paragraph 65 of this Agreement
        identifying the specific measures the State intends to take in order to bring the Facilities
        into compliance with this paragraph.

### Access to Care

(19)    Access to Medical and Mental Health Services  The State shall ensure that all inmates
        have adequate opportunity to request and receive medical and mental health care.
        Appropriate medical staff shall screen all written requests for medical and/or mental
        health care within twenty-four (24) hours of submission, and see patients within the next
        72 hours, or sooner if medically appropriate.  The State shall maintain sufficient security
        staff to ensure that inmates requiring treatment are escorted in a timely manner to
        treatment areas.  The State shall develop and implement a sick call policy and procedure
        which includes an explanation of the order in which to schedule patients, a procedure for
        scheduling patients, where patients should be treated, the requirements for clinical
        evaluations, and the maintenance of a sick call log.  Treatment of inmates in response to a
        sick call slip should occur in a clinical setting.

(20)    Isolation Rounds  The State shall ensure that medical staff make daily sick call rounds in
        the isolation areas, and that nursing staff make rounds at least three times a week, to give
        inmates in isolation adequate opportunities to contact and discuss health and mental

9

health concerns with medical staff and mental health professionals in a setting that affords as much privacy as security will allow.

(21)    Grievances  The State shall develop and implement a system to ensure that medical grievances are processed and addressed in a timely manner. The State shall ensure that medical grievances and written responses thereto are included in inmates' files, and that grievances and their outcomes are logged, reviewed , and analyzed on a regular basis to identify systemic issues in need of redress. The State shall develop and implement a procedure for discovering and addressing all systemic problems raised through the grievance system.

## Chronic Disease Care

(22)    Chronic Disease Management Program  The State shall develop and implement a written chronic care disease management program, consistent with generally accepted professional standards, which provides inmates suffering from chronic illnesses with appropriate diagnosis, treatment, monitoring, and continuity of care. As part of this program, the State shall maintain a registry of inmates with chronic diseases.

(23)    Immunizations  The State shall make reasonable efforts to obtain immunization records for all juveniles who are detained at the Facilities for more than one (1) month. The State shall ensure that medical staff update immunizations for such juveniles in accordance with nationally recognized guidelines and state school admission requirements. The physicians who determine that the vaccination of a juvenile or adult inmate is medically inappropriate shall properly record such determination in the inmate's medical record. The State shall develop policies and procedures to ensure that inmates for whom influenza, pneumonia and Hepatitis A and B vaccines are medically indicated are offered these vaccines.

## Medication

(24)    Medication Administration  The State shall ensure that all medications, including psychotropic medications, are prescribed appropriately and administered in a timely manner to adequately address the serious medical and mental health needs of inmates. The State shall ensure that inmates who are prescribed medications for chronic illnesses that are not used on a routine schedule, including inhalers for the treatment of asthma, have access to those medications as medically appropriate. The State shall develop and implement adequate policies and procedures for medication administration and adherence.  The State shall ensure that the prescribing practitioner is notified if a patient misses a medication dose on three consecutive days, and shall document that notice. The State's formulary shall not unduly restrict medications. The State shall review its medication administration policies and procedures and make any appropriate revisions.

10

The State shall ensure that medication administration records ("MARs") are appropriately completed and maintained in each inmate's medical record.

(25)    Continuity of Medication  The State shall ensure that arriving inmates who report that they have been prescribed medications shall receive the same or comparable medication as soon as is reasonably possible, unless a medical professional determines such medication is inconsistent with generally accepted professional standards. If the inmate's reported medication is ordered discontinued or changed by a medical professional, a medical professional shall conduct a face-to-face evaluation of the inmate as medically appropriate.

(26)    Medication Management  The State shall develop and implement guidelines and controls regarding the access to, and storage of, medication as well as the safe and appropriate disposal of medication and medical waste.

## Emergency Care

(27)    Access to Emergency Care  The State shall train medical, mental health and security staff to recognize and respond appropriately to medical and mental health emergencies. Furthermore, the State shall ensure that inmates with emergency medical or mental health needs receive timely and appropriate care, including prompt referrals and transports for outside care when medically necessary.

(28)    First Responder Assistance  The State shall train all security staff to provide first responder assistance (including cardiopulmonary resuscitation ("CPR") and addressing serious bleeding) in an emergency situation. The State shall provide all security staff with the necessary protective gear, including masks and gloves, to provide first line emergency response.

## Mental Health Care

(29)    Treatment  The State shall ensure that qualified mental health professionals provide timely, adequate, and appropriate screening, assessment, evaluation, treatment and structured therapeutic activities to inmates requesting mental health services, inmates who become suicidal, and inmates who enter with serious mental health needs or develop serious mental health needs while incarcerated.

(30)    Psychiatrist Staffing  The State shall retain sufficient psychiatrists to enable the Facilities to address the serious mental health needs of all inmates with timely and appropriate mental health care consistent with generally accepted professional standards. This shall include retaining appropriately licensed and qualified psychiatrists for a sufficient number of hours per week to see patients, prescribe and adequately monitor psychotropic medications, participate in the development of individualized treatment plans for inmates

11

with serious mental health needs, review charts in the context of rendering appropriate mental health care, review and respond to the results of diagnostic and laboratory tests, and be familiar with and follow policies, procedures, and protocols. The psychiatrist shall collaborate with the chief psychologist in mental health services management as well as clinical treatment, shall communicate problems and resource needs to the Warden and chief psychologist, and shall have medically appropriate autonomy for clinical decisions at the facility. The psychiatrist shall supervise and oversee the treatment team.

(31) Administration of Mental Health Medications The State shall develop and implement policies, procedures, and practices consistent with generally accepted professional standards to ensure that psychotropic medications are prescribed, distributed, and monitored properly and safely and consistent with generally accepted professional standards. The State shall ensure that all psychotropic medications are administered by qualified medical professionals or other health care personnel qualified under Delaware state law to administer medications, who consistently implement adequate policies and procedures to monitor for adverse reactions and potential side effects and to adequately document the administration of such medications in the MARs. Documentation in the MARs shall include a clear and consistent indication of whether the inmate refused or otherwise missed any doses of medication, as well as doses consumed. As part of the quality assurance program set forth in Section V of this Agreement, a qualified medical professional or registered nurse supervisor shall review MARs on a regular and periodic basis to determine whether policies and procedures are being followed.

(32) Mental Illness Training The State shall conduct initial and periodic training for all security staff on how to recognize symptoms of mental illness and respond appropriately. Such training shall be conducted by a qualified mental health professional, registered psychiatric nurse, or other appropriately trained and qualified individual, and shall include instruction on how to recognize and respond to mental health emergencies.

(33) Mental Health Screening The State shall develop and implement adequate policies, procedures, and practices consistent with generally accepted correctional mental health care standards to ensure that all inmates receive an adequate initial mental health screening by appropriately trained staff within twenty-four (24) hours after intake. Such screening shall include an individual private (consistent with security limitations) interview of each incoming inmate, including whether the inmate has a history of mental illness, is currently receiving or has received psychotropic medications, has attempted suicide, or has suicidal propensities. Documentation of the screening shall be maintained in the appropriate medical record. Inmates who have been on psychotropic medications prior to intake will be assessed by a psychiatrist as to the need to continue those medications, in a timely manner, no later than 7-10 days after intake or sooner if clinically appropriate. These inmates shall remain on previously prescribed psychotropic medications pending psychiatrist assessment. Incoming inmates who are in need of emergency mental health services shall receive such care immediately after intake.

12

Incoming inmates who require resumption of psychotropic medications shall be seen by a psychiatrist as soon as clinically appropriate.

(34)   Mental Health Assessment and Referral  The State shall develop and implement adequate policies, procedures, and practices consistent with generally accepted professional standards to ensure timely and appropriate mental health assessments by qualified mental health professionals for those inmates whose mental health histories, or whose responses to initial screening questions, indicate a need for such an assessment. Such assessments shall occur within seventy-two (72) hours of the inmate's mental health screening or the identification of the need for such assessment, whichever is later. The State shall also ensure that inmates have access to a confidential self-referral system by which they may request mental health care without revealing the substance of their request to security staff. Written requests for mental health services shall be forwarded to a qualified mental health professional and timely evaluated by him or her. The State shall ensure adequate and timely treatment for inmates whose assessments reveal serious mental illness, including timely and appropriate referrals for specialty care and regularly scheduled visits with qualified mental health professionals.

(35)   Mental Health Treatment Plans  The State shall ensure that a qualified mental health professional prepares in a timely manner and regularly updates an individual mental health treatment plan for each inmate who requires mental health services. The State shall also ensure that the plan is timely and consistently implemented. Implementation of and any changes to the plan shall be documented in the inmate's medical/mental health record.

(36)   Crisis Services  The State shall ensure an adequate array of crisis services to appropriately manage psychiatric emergencies. Crisis services shall not be limited to administrative/disciplinary isolation or observation status. Inmates shall have access to appropriate in-patient psychiatric care when clinically appropriate.

(37)   Treatment for Seriously Mentally Ill Inmates  The State shall ensure timely and appropriate therapy, counseling, and other mental health programs for all inmates with serious mental illness. This includes adequate space for treatment, adequate staff to provide treatment, and an adequate array of therapeutic programming. The State shall ensure that inmates who are being treated with psychotropic medications are seen regularly by a physician to monitor responses and potential reactions to those medications, in accordance with generally accepted correctional mental health care standards.

(38)   Review of Disciplinary Charges for Mental Illness Symptoms  The State shall ensure that disciplinary charges against inmates with serious mental illness who are placed in Isolation are reviewed by a qualified mental health professional to determine the extent to which the charge may have been related to serious mental illness, and to determine

13

whether an inmate's serious mental illness should be considered by the State as a mitigating factor when punishment is imposed on inmates with a serious mental illness.

(39)   Procedures for Mentally Ill Inmates in Isolation or Observation Status  The State shall implement policies, procedures, and practices consistent with generally accepted professional standards to ensure that all mentally ill inmates on the facility's mental health caseload and who are housed in Isolation receive timely and appropriate treatment, including completion and documentation of regular rounds in the Isolation units at least once per week by qualified mental health professionals in order to assess the serious mental health needs of those inmates. Inmates with serious mental illness who are placed in Isolation shall be evaluated by a qualified mental health professional within twenty-four hours and regularly thereafter to determine the inmate's mental health status, which shall include an assessment of the potential effect of the Isolation on the inmate's mental health. During these regular evaluations, the State shall evaluate whether continued Isolation is appropriate for that inmate, considering the assessment of the qualified mental health professional, or whether the inmate would be appropriate for graduated alternatives. The State shall adequately document all admissions to, and discharges from, Isolation, including a review of treatment by a psychiatrist. The State shall provide adequate facilities for observation, with no more than two inmates per room.

(40)   Mental Health Services Logs and Documentation  The State shall ensure that the State maintains an updated log of inmates receiving mental health services, which shall include both those inmates who receive counseling and those who receive medication. The log shall include each inmate's name, diagnosis or complaint, and next scheduled appointment. Each clinician shall have ready access to a current log listing any prescribed medication(s) and dosages for inmates on psychotropic medications. In addition, inmate's files shall contain current and accurate information regarding any medication changes ordered in at least the past year.

## IV.   SUICIDE PREVENTION

(41)   Suicide Prevention Policy  The State shall review and, to the extent necessary, revise its suicide prevention policy to ensure that it includes the following provisions: 1) training; 2) intake screening/assessment; 3) communication; 4) housing; 5) observation; 6) intervention; and 7) mortality and morbidity review.

(42)   Suicide Prevention Training Curriculum  The State shall review and, to the extent necessary, revise its suicide prevention training curriculum, which shall include the following topics: 1) the suicide prevention policy as revised consistent with this Agreement; 2) why facility environments may contribute to suicidal behavior; 3) potential predisposing factors to suicide; 4) high risk suicide periods; 5) warning signs and symptoms of suicidal behavior; 6) case studies of recent suicides and serious suicide

14

attempts; 7) mock demonstrations regarding the proper response to a suicide attempt; and 8) the proper use of emergency equipment.

(43)   Staff Training  Within twelve months of the effective date of this Agreement, the State shall ensure that all existing and newly hired correctional, medical, and mental health staff receive an initial eight-hour training on suicide prevention curriculum described above. Following completion of the initial training, the State shall ensure that a minimum of two hours of refresher training on the curriculum are completed by all correctional care, medical, and mental health staff each year.

(44)   Intake Screening/Assessment  The State shall develop and implement policies and procedures pertaining to intake screening in order to identify newly arrived inmates who may be at risk for suicide. The screening process shall include inquiry regarding: 1) past suicidal ideation and/or attempts; 2) current ideation, threat, plan; 3) prior mental health treatment/hospitalization; 4) recent significant loss (job, relationship, death of family member/close friend, etc.); 5) history of suicidal behavior by family member/close friend; 6) suicide risk during prior confinement in a state facility; and 7) arresting/transporting officer(s) belief that the inmate is currently at risk.

(45)   Mental Health Records  Upon admission, the State shall immediately request all pertinent mental health records regarding the inmate's prior hospitalization, court-ordered evaluations, medication, and other treatment.  DOJ acknowledges that the State's ability to obtain such records depends on the inmate's consent to the release of such records.

(46)   Identification of Inmates at Risk of Suicide  Inmates at risk for suicide shall be placed on suicide precautions until they can be assessed by qualified mental health personnel. Inmates at risk of suicide include those who are actively suicidal, either threatening or engaging in self-injurious behavior; inmates who are not actively suicidal, but express suicidal ideation (e.g., expressing a wish to die without a specific threat or plan) and/or have a recent prior history of self-destructive behavior; and inmates who deny suicidal ideation or do not threaten suicide, but demonstrate other concerning behavior (through actions, current circumstances, or recent history) indicating the potential for self-injury.

(47)   Suicide Risk Assessment  The State shall ensure that a formalized suicide risk assessment by a qualified mental health professional is performed within an appropriate time not to exceed 24 hours of the initiation of suicide precautions. The assessment of suicide risk by qualified mental health professionals shall include, but not be limited to, the following: description of the antecedent events and precipitating factors; suicidal indicators; mental status examination; previous psychiatric and suicide risk history; level of lethality; current medication and diagnosis; and recommendations/treatment plan. Findings from the assessment shall be documented on both the assessment form and health care record.

15

(48)    Communication  The State shall ensure that any staff member who places an inmate on
suicide precautions shall document the initiation of the precautions, level of observation,
housing location, and conditions of the precautions. The State shall develop and
implement policies and procedures to ensure that the documentation described above is
provided to mental health staff and that in-person contact is made with mental health staff
to alert them of the placement of an inmate on suicide precautions. The State shall ensure
that mental health staff thoroughly review an inmate's health care record for
documentation of any prior suicidal behavior. The State shall promulgate a policy
requiring mental health to utilize progress notes to document each interaction and/or
assessment of a suicidal inmate. The decision to upgrade, downgrade, discharge, or
maintain an inmate on suicide precautions shall be fully justified in each progress note.
An inmate shall not be downgraded or discharged from suicide precautions until the
responsible mental health staff has thoroughly reviewed the inmate's health care record,
as well as conferred with correctional personnel regarding the inmate's stability.
Multidisciplinary case management team meetings (to include facility officials and
available medical and mental health personnel) shall occur on a weekly basis to discuss
the status of inmates on suicide precautions.

(49)    Housing  The State shall ensure that all inmates placed on suicide precautions are housed
in suicide-resistant cells (i.e., cells without protrusions that would enable inmates to
hang themselves). The location of the cells shall provide full visibility to staff. At the
time of placement on suicide precautions, medical or mental health staff shall write orders
setting forth the conditions of the observation, including but not limited to allowable
clothing, property, and utensils, and orders addressing continuation of privileges, such as
showers, telephone, visiting, recreation, etc., commensurate with the inmate's security
level. Removal of an inmate's prison jumpsuit (excluding belts and shoelaces) and the
use of any restraints shall be avoided whenever possible, and used only as a last resort
when the inmate is engaging in self-destructive behavior. The Parties recognize that
security and mental health staff are working towards the common goal of protecting
inmates from self-injury and from harm inflicted by other inmates. Such orders must
therefore take into account all relevant security concerns, which can include issues
relating to the commingling of certain prison populations and the smuggling of
contraband. Mental health staff shall give due consideration to such factors when setting
forth the conditions of the observation, and any disputes over the privileges that are
appropriate shall be resolved by the Warden or his or her designee. Scheduled court
hearings shall not be cancelled because an inmate is on suicide precautions.

(50)    Observation  The State shall develop and implement policies and procedures pertaining to
observation of suicidal inmates, whereby an inmate who is not actively suicidal, but
expresses suicidal ideation (e.g., expressing a wish to die without a specific threat or
plan) and/or has a recent prior history of self-destructive behavior, or an inmate who
denies suicidal ideation or does not threaten suicide, but demonstrates other concerning
behavior (through actions, current circumstances, or recent history) indicating the

16

potential for self-injury, shall be placed under close observation status and observed by staff at staggered intervals not to exceed every 15 minutes (e.g., 5, 10, 7 minutes). An inmate who is actively suicidal, either threatening or engaging in self-injurious behavior, shall be placed on constant observation status and observed by staff on a continuous, uninterrupted basis. Mental health staff shall assess and interact with (not just observe) inmates on suicide precautions on a daily basis.

(51)    "Step-Down Observation"  The State shall develop and implement a "step-down" level of observation whereby inmates on suicide precaution are released gradually from more restrictive levels of supervision to less restrictive levels for an appropriate period of time prior to their discharge from suicide precautions. The State shall ensure that all inmates discharged from suicide precautions continue to receive follow-up assessment in accordance with a treatment plan developed by a qualified mental health professional.

(52)    Intervention  The State shall develop and implement an intervention policy to ensure that all staff who come into contact with inmates are trained in standard first aid and cardiopulmonary resuscitation; all staff who come into contact with inmates participate in annual "mock drill" training to ensure a prompt emergency response to all suicide attempts; and shall ensure that an emergency response bag that includes appropriate equipment, including a first aid kit and emergency rescue tool, shall be in close proximity to all housing units. All staff who come into regular contact with inmates shall know the location of this emergency response bag and be trained in its use.

(53)    Mortality and Morbidity Review  The State shall develop and implement policies, procedures, and practices to ensure that a multidisciplinary review is established to review all suicides and serious suicide attempts (e.g., those incidents requiring hospitalization for medical treatment). At a minimum, the review shall comprise an inquiry of: a) circumstances surrounding the incident; b) facility procedures relevant to the incident; c) all relevant training received by involved staff; d) pertinent medical and mental health services/reports involving the victim; e) possible precipitating factors leading to the suicide; and f) recommendations, if any, for changes in policy, training, physical plant, medical or mental health services, and operational procedures. When appropriate, the review team shall develop a written plan (and timetable) to address areas that require corrective action.

## V.    QUALITY ASSURANCE

(54)    Policies and Procedures  The State shall develop and implement written quality assurance policies and procedures to regularly assess and ensure compliance with the terms of this Agreement. These policies and procedures should include, at a minimum:  provisions requiring an annual quality management plan and annual evaluation; quantitative performance measurement with tools to be approved in advance by DOJ; tracking and trending of data; creation of a multidisciplinary team; morbidity and mortality reviews

17

with self-critical analysis, and periodic review of emergency room visits and hospitalizations for ambulatory-sensitive conditions.

(55)    Corrective Action Plans  The State shall develop and implement policies and procedures to address problems that are uncovered during the course of quality assurance activities. The State shall develop and implement corrective action plans to address these problems in such a manner as to prevent them from occurring again in the future.

## VI.    IMPLEMENTATION

(56)    Revision of Activities and Documents  The State shall revise and/or develop as necessary its current policies, procedures, protocols, training, staffing and practices to ensure that they are consistent with, incorporate, address and implement all provisions of this Agreement. The State shall revise and/or develop as necessary other written documents such as screening tools, logs, handbooks, manuals, and forms, to effectuate the provisions of this Agreement.

(57)    Dissemination of Agreement  Within thirty (30) days of the effective date of this Agreement, the State shall distribute copies of the Agreement to all relevant staff, including all medical, mental health and security staff at the Facilities and explain it as appropriate.

(58)    In Service Training  Training academy staff shall develop, on an on-going basis, scripts for in service training directed at issues related to effective implementation of the Agreement. In service training shall be provided regularly and shall be documented. In service training scripts shall be provided to DOJ for its review in accordance with the time frames for compliance set forth below.

## VII.    MONITORING, ENFORCEMENT AND TERMINATION

(59)    Termination  This Agreement shall terminate three (3) years after its effective date.

(60)    Satisfaction of the Agreement and Early Termination  This Agreement may be terminated prior to the conclusion of the three (3) year period described in Paragraph 59 if the State reaches substantial compliance with all provisions of this Agreement and sustains it for one (1) year. "Substantial Compliance" with each and every term of this Agreement for a period of one (1) year shall fully satisfy the Agreement. Noncompliance with mere technicalities, or temporary failure to comply during a period of otherwise sustained compliance, shall not constitute failure to maintain substantial compliance. At the same time, temporary compliance during a period of otherwise sustained noncompliance shall not constitute substantial compliance. The State may submit a written request for early termination of the Agreement based upon an assertion of one (1) year of substantial compliance with all substantive paragraphs set forth in Sections III

18

through VIII of this Agreement. The DOJ, in its good faith discretion, will determine whether the State has maintained substantial compliance for the one (1) year period.

(61)    Review and Approval  All policies, procedures, plans and protocols required by, or referenced in, this Agreement shall be consistent with the substantive terms of this Agreement. All policies, procedures, plans and protocols required by, or referenced in, this Agreement shall be submitted to the DOJ for its review and approval within sixty (60) calendar days after approval of the Action Plan described in Paragraph 65 of this Agreement. Any such plans, policies, procedures and protocols for which this Agreement requires review and approval by DOJ shall be expeditiously reviewed by the DOJ. The DOJ shall not unreasonably withhold any such approval. Absent unforeseen circumstances beyond the Parties' control, if DOJ does not provide a written objection to said materials within sixty (60) days of receipt of same, the materials will be deemed approved by DOJ.

(62)    State Response to DOJ Questions  Within thirty (30) days of receipt of written questions from the DOJ concerning the State's compliance with this Agreement, the State shall provide the DOJ with written answers and any requested documents regarding the State's compliance with the requirements of this Agreement.

(63)    State Documentation of Compliance  The State shall maintain sufficient records to document its compliance with all of the requirements of this Agreement. The State shall also maintain (so long as this Agreement remains in effect) any and all records required by or developed under this Agreement.

(64)    Implementation  The State shall implement policies, procedures, plans, and protocols consistent with the Action Plan referred to in Paragraph 65 of this Agreement.

(65)    Action Plan  Within one hundred and twenty (120) days after the effective date of this Agreement, the State shall prepare and submit to the DOJ a comprehensive action plan ("Action Plan") identifying the specific measures the State intends to take in order to bring the Facilities into compliance with each paragraph containing substantive requirements in Sections III through V of this Agreement ("Substantive Provisions"), including a timeline for completion of each of the measures.

(66)    Compliance Reporting  The State shall prepare and submit reports regarding compliance ("Compliance Reports") with each of the Substantive Provisions of this Agreement. The State shall submit its first Compliance Report within ninety (90) days after submitting the Action Plan described in Paragraph 65 of this Agreement, and then every six (6) months. The Compliance Reports shall identify the State's progress in implementing the Action Plan, any revisions to the Action Plan, and shall include a summary of steps taken to implement this Agreement, along with supporting documentation and certifications. Upon achieving substantial compliance as determined by DOJ with any substantive

19

paragraph(s) of this Agreement for one (1) year, no further reporting shall be required on that paragraph.

(67)    Selection of Monitor Within ninety (90) days after entry of this Agreement, the State and DOJ shall together select a Monitor. If the Parties are unable to agree on a Monitor, each Party shall submit two names of persons who have experience in corrections and who may have served as a correctional practices expert or monitor, or as a Federal, state, or county prosecutor or judge along with resumes or curricula vitae and cost proposals to a third party neutral, selected with the assistance of the Federal Mediation and Conciliation Service, and the third party neutral shall appoint the Monitor from among the names of qualified persons submitted. The selection of the Monitor shall be conducted solely pursuant to the procedures set forth in this Agreement, and will not be governed by any formal or legal procurement requirements.

(68)    Limitations on Public Disclosures by Monitor The Monitor shall not be retained by any current or future litigant or claimant in a claim or suit against the State, its agents or employees. The Monitor shall not issue statements or make findings with regard to any act or omission of the State, or their agents or representatives, except as required by the terms of this Agreement. The Monitor may testify in any case brought by any Party to this Agreement regarding any matter relating to the implementation, enforcement, or dissolution of this Agreement.

(69)    Monitoring Resources The Monitor, at any time, may associate such additional persons or entities as are reasonably necessary to perform the monitoring tasks specified by this Agreement. The Monitor shall notify in writing DOJ and the State if and when such additional persons or entities are selected for association by the Monitor. The notice shall identify and describe the qualifications of the person or entity to be associated and the monitoring task to be performed.

(70)    Monitor's Fees The State shall bear all reasonable fees and costs of the Monitor. In selecting the Monitor, DOJ and the State recognize the importance of ensuring that the fees and costs borne by the State are reasonable, and accordingly fees and costs shall be one factor considered in selecting the Monitor. In the event that any dispute arises regarding the payment of the Monitor's fees and costs, the State, DOJ, and the Monitor shall attempt to resolve such dispute cooperatively.

(71)    Monitor's Duties and Responsibilities The Monitor shall review and report on the State's implementation of, and assist with the State's compliance with, this Agreement. The Monitor shall only have the duties, responsibilities and authority conferred by this Agreement. The Monitor shall not, and is not intended to, replace or take over the role and duties of the State or the Commissioner of the Delaware Department of Corrections. The Monitor may testify in any action brought to enforce this Agreement regarding any matter relating to the implementation or enforcement of the Agreement. The Monitor

20

shall not testify in any other litigation or proceeding with regard to any act or omission of the State, or any of their agents, representatives, or employees related to this Agreement or regarding any matter or subject that the Monitor may have received knowledge of as a result of his or her performance under this Agreement. Unless such conflict is waived by the Parties, the Monitor shall not accept employment or provide consulting services that would present a conflict of interest with the Monitor's responsibilities under this Agreement, including being retained (on a paid or unpaid basis) by any current or future litigant or claimant, or such litigant's or claimant's attorney, in connection with a claim or suit against the State or its departments, officers, agents or employees. The Monitor is not a state or local agency, or an agent thereof, and accordingly the records maintained by the Monitor shall not be deemed public records. The Monitor shall not be liable for any claim, lawsuit, or demand arising out of the Monitor's performance pursuant to this Agreement. Provided, however, that this paragraph does not apply to any proceeding before a court related to performance of contracts or subcontracts for monitoring this Agreement.

(72)    Technical Assistance by the Monitor  The Monitor shall offer the State technical assistance regarding compliance with this Agreement. The Monitor may not modify, amend, diminish, or expand this Agreement.

(73)    Monitor's Access  The State shall provide the Monitor with full and unrestricted access to all of the Facilities, relevant State and facility staff and employees, and any documents (including databases) necessary to carry out the duties assigned to the State by this Agreement. The Monitor's right of access includes, but is not limited to, all documents regarding medical care, mental health care, suicide prevention, or protocols or analyses involving one of those subject areas. The Monitor shall retain any non-public information in a confidential manner and shall not disclose any non-public information to any person or entity, other than a Court or DOJ, absent written notice to the State and either written consent by the State or a court order authorizing disclosure.

(74)    Monitor's Communication with the Parties  In monitoring the implementation of this Agreement, the Monitor shall maintain regular contact with the State and DOJ. The Monitor shall be permitted to initiate and receive ex parte communications with the Parties and the Parties' consultants.

(75)    Compliance Monitoring  In order to monitor and report on the State's implementation of each substantive provision of this Agreement, the Monitor shall conduct periodic reviews as the Monitor deems appropriate, but no less than quarterly at each of the Facilities. The Monitor may make recommendations to the Parties regarding measures necessary to ensure full and timely implementation of this Agreement.

(76)    Compliance Coordinator  The Parties agree that the State shall hire and retain, or reassign a current State employee, for the duration of this Agreement, a Compliance Coordinator.

21

The Compliance Coordinator shall serve as a liaison between the State, the Monitor and DOJ, and shall assist with the State's compliance with this Agreement. At a minimum, the Compliance Coordinator shall: (a) coordinate the State's compliance and implementation of activities required by this Agreement; (b) facilitate the provision of data, documents and other access to State employees and material to the Monitor and DOJ as needed; (c) ensure that all documents and records are maintained as provided in this Agreement; (d) assist in assigning compliance tasks to State personnel, as directed by the Commissioner of the Delaware Department of Corrections or his designee; take primary responsibility for collecting information to provide the State's status reports specified in paragraph 61.

(77) <u>DOJ Access</u>  DOJ shall continue to have full and unrestricted access to all documents (including databases), staff, inmates and the Facilities that are relevant to evaluate compliance with this Agreement, except any documents protected by the attorney-client privilege or applicable self-evaluative privileges (e.g., 24 Del. C·§ 1768). Should the State decline to provide DOJ with access to a document based on attorney-client privilege, the State shall provide the Monitor and DOJ with a log describing the document. DOJ's right of access includes, but is not limited to, all documents regarding medical care, mental health care, suicide prevention and any protocols or analyses involving those subject areas. This Agreement does not authorize, nor shall it be construed to authorize, access to any State documents, except as expressly provided by this Agreement, by persons or entities other than DOJ, the State, and the Monitor.  DOJ shall retain any non-public information in a confidential manner and shall not disclose any non-public information to any person or entity, other than a Court or the Monitor, absent written notice to the State and either written consent by the State or a court order authorizing disclosure. Throughout the duration of this Settlement Agreement, letters between counsel for the DOJ and counsel for the State shall be confidential and subject to the Confidentiality Agreement between the DOJ and the State entered into on May 3, 2006 and supplemented by the Non-Waiver Agreement dated September 28, 2006.

(78) <u>Timeliness of DOJ Review of Documents and Information</u>  DOJ shall review documents and information provided by the State and the Monitor and shall provide its analysis and comments to the State and the Monitor at appropriate times and in an appropriate manner, consistent with the purpose of this Agreement to promote cooperative efforts.

(79) <u>Monitor Reports</u>  The Monitor shall issue semi-annual public reports detailing the State's compliance with and implementation of this Agreement. The first report shall issue six months from the effective date of this Agreement. The Monitor may issue reports more frequently if the Monitor determines it appropriate to do so.  At least ten business days prior to issuing a report, the Monitor shall provide a draft to the Parties for review and comment to determine if any factual errors have been made. The Monitor shall consider the Parties' responses and then promptly issue the report.

22

(80)   Noncompliance  If DOJ believes that the State has failed to substantially comply with any
       obligation under this Agreement, DOJ will, prior to seeking judicial action to enforce the
       terms of this Agreement, give written notice of the failure to the State. The Parties shall
       conduct good-faith discussions to resolve the dispute. If the Parties are unable to reach
       agreement within 15 days of the DOJ's written notice, the Parties shall submit the dispute
       to mediation. Michael Bromwich, Esq., shall serve as the mediator unless the Parties
       expressly agree to an alternative selection. The Parties shall split the cost of the mediator.
       The Parties shall attempt in good faith to mediate the dispute for a minimum of 30 days
       prior to initiating any court action. DOJ commits to work in good faith with the State to
       avoid enforcement actions. However, in case of an emergency posing an immediate
       threat to the health or safety of inmates, the DOJ may omit the notice and cure
       requirements herein (including the provision regarding mediation), before seeing judicial
       action. Non-action by the DOJ shall not constitute a waiver of the right to seek judicial
       action.

(81)   Successors  This Agreement shall be binding on all successors, assignees, employees, and
       all those working for or on behalf of the State.

(82)   Defense of Agreement  The Parties agree to defend the provisions of this Agreement.
       The Parties shall notify each other of any court challenge to this Agreement. In the event
       any provision of this Agreement is challenged in any local or state court, the Parties shall
       seek to remove the matter to a federal court.

(83)   Enforcement  Failure by either Party to enforce this entire Agreement or any provision
       thereof with respect to any deadline or any other provision herein shall not be construed
       as a waiver of its right to enforce other deadlines or provisions of this Agreement.

(84)   Non-Retaliation  The State agrees that it shall not retaliate against any person because that
       person has filed or may file a complaint, provided information or assistance, or
       participated in any other manner in an investigation or proceeding relating to this
       Agreement.

(85)   Severability  In the event any provision of this Agreement is declared invalid for any
       reason by a court of competent jurisdiction, said finding shall not affect the remaining
       provisions of this Agreement.

(86)   Notice  "Notice" under this Agreement shall be provided via overnight delivery and shall
       be provided to the Governor of the State of Delaware and to the Attorney General of the
       State of Delaware.

23

(87)  <u>Subheadings</u> All subheadings in this Agreement are written for convenience of locating individual provisions. If questions arise as to the meanings of individual provisions, the parties shall follow the text of each provision.

For the DOJ:

WAN J. KIM
Assistant Attorney General
Civil Rights Division

SHANETTA Y. CUTLAR
Chief
Special Litigation Section

DANIEL H. WEISS
Deputy Chief

CATHLEEN S. TRAINOR
LASHANDA BRANCH CHIRUNGA
Senior Trial Attorneys
U.S. Department of Justice
Civil Rights Division
Special Litigation Section
950 Pennsylvania Avenue, NW
PHB Room 5908
Washington, D.C. 20530
(202) 514-6255

24

For the State of Delaware:    *December 29, 2006*

CARL C. DANBERG
Attorney General of Delaware

STANLEY W. TAYLOR, Jr.
Commissioner
Delaware Department of Correction
245 McKee Road
Dover, DE 19904

MICHAEL R. BROMWICH
Fried, Frank, Harris, Shriver & Jacobson LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004

25

Exhibit "B"

State Defendants' Responses To Plaintiff's
Combined Second Set of Interrogatories
And Requests For Production of Documents.

**Discovery Documents**

1:05-cv-00871-SLR Price v. Taylor et al

PaperDocuments

## U.S. District Court

## District of Delaware

## Notice of Electronic Filing

The following transaction was entered by Tross, Erika on 8/6/2007 at 3:01 PM EDT and filed on 8/6/2007

| | |
|---|---|
| **Case Name:** | Price v. Taylor et al |
| **Case Number:** | 1:05-cv-871 |
| **Filer:** | Betty Burris |
| | Tom Carroll |
| | Taylor |

**Document Number:** 85

**Docket Text:**
RESPONSE to Discovery Request from Lou Garden Price, Sr. by Taylor, Betty Burris, Tom Carroll. (Tross, Erika)

**1:05-cv-871 Notice has been electronically mailed to:**

Erika Yvonne Tross    Erika.Tross@state.de.us

Lorenza Anna Wolhar    lawolhar@mdwcg.com, dtwalsh@mdwcg.com, plbates@mdwcg.com, vvnicotra@mdwcg.com

**1:05-cv-871 Notice has been delivered by other means to:**

Lou Garden Price, Sr
SBI# 454309
Delaware Correctional Center
1181 Paddock Rd.
Smynra, DE 19977

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=8/6/2007] [FileNumber=425435-0]
[a804feeb9b17c2eb2ae6c97cc152a9d9bcdebcb2795f257ade87c4dbfa00420461034
14ee43ce31cb0c6e68b5d5ee04785b89fec86a5165b308d0494bacdc284]]

**PRODUCTION REQUEST NO. 3:**        Release the U.S. Department of Justice investigation findings (12/29/06) regarding the constitutional violations stemming from the poor medical care of CMS, Inc. during their tenure in DCC and all Delaware prisons.

**RESPONSE:**        State Defendants incorporate by reference the foregoing general objections and further object to this request on grounds that it is overly broad. State Defendants also object to this request on grounds that the documents requested are neither relevant to the issues raised in the Complaint nor reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiver of the foregoing general and specific objections, State Defendants state that no such documents exist.

**PRODUCTION REQUEST NO. 4:**        Release any and all DDOC "memorandum agreements" made with the U.S. Dept. of Justice regarding DCC-prisoner medical care

**RESPONSE:**        State Defendants incorporate by reference the foregoing general objections and further object to this request on grounds that it is overly broad. State Defendants also object to this request on grounds that the documents requested are neither relevant to the issues raised in the Complaint nor reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiver of the foregoing general and specific objections, State Defendants state that no such documents exist.

Exhibit  C

July 3, 2007   Judge Sue L. Robinson
Memorandum  Opinion  re  C.A. # 05-871-SLR

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

LOU GARDEN PRICE, SR.,                    )
                                          )
            Plaintiff,                    )
                                          )
      v.                                  )  Civ. No. 05-871-SLR
                                          )
CORRECTIONAL MEDICAL                      )
SERVICES, DCC WARDEN                      )
TOM CARROLL, C.O.                         )
LIEUTENANT TAYLOR,                        )
CAROLE KOZAK, MARK                        )
FORBES, ROBERT DURNAN,                    )
CHRIS MALANEY, BETTY                      )
BURRIS                                    )
                                          )
            Defendants.                   )

## ORDER

At Wilmington this 3rd day of July, 2007,

IT IS ORDERED that:

1. Defendant CMS's motion to dismiss for failure to state a claim (D.I. 27) is denied.

2. Plaintiff's motions to appoint counsel (D.I. 37, 50) are denied without prejudice to renew.

3. Plaintiff's state law tort claims are bifurcated and stayed until further order of the court.

United States District Judge

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| LOU GARDEN PRICE, SR., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 05-871-SLR |
| | ) |
| CORRECTIONAL MEDICAL | ) |
| SERVICES, DCC WARDEN | ) |
| TOM CARROLL, C.O. | ) |
| LIEUTENANT TAYLOR, | ) |
| CAROLE KOZAK, MARK | ) |
| FORBES, ROBERT DURNAN, | ) |
| CHRIS MALANEY, BETTY | ) |
| BURRIS | ) |
| | ) |
| Defendants. | ) |

---

Lou Garden Price, Sr., Delaware Correctional Center, Smyrna, Delaware, Pro se
Plaintiff.

Lorenza Anna Wohlar, Esquire, of Marshall, Dennehey, Warner, Coleman & Goggin,
Wilmington, Delaware.  Counsel for Defendant Correctional Medical Services.

---

## MEMORANDUM OPINION

Dated:  July 3, 2007
Wilmington, Delaware

ROBINSON, Judge

## I. INTRODUCTION

On April 12, 2006, Lou Price, Sr. ("plaintiff"), a pro se plaintiff proceeding in

forma pauperis, filed the present action against Correctional Medical Services ("CMS");

Tom Carroll ("Carroll"), the Warden of Delaware Correctional Center ("DCC"); C.O.

Lieutenant Taylor ("Taylor"); "Nurse Carol[e]" and "Nurse Kera," who worked for CMS;

and unidentified "State Detectives at [Department] of Justice (Delaware)." (D.I. 2)

Plaintiff amended his complaint on February 6, 2006 (D.I. 11); subsequently, on March

2, 2006, the court dismissed without prejudice plaintiff's claim against CMS. (D.I. 12)

Plaintiff filed a second amended complaint on April 12, 2006, adding the

following defendants: CMS-DCC Medical Administrator Chris Malaney ("Malaney");

DCC Operational Manager Betty Burris ("Burris"); C.O. Staff Lieutenant Profaci

("Profaci"); Major Holman ("Holman"); and two "Unknown/John Doe Department of

Justice (DE) State Detective[s]" ("the John Doe Detectives"), presumably the same

individuals originally identified as "State Detectives at [Department] of Justice

(Delaware)." (D.I. 13) On June 6, 2006, the court issued a memorandum order

dismissing plaintiff's claims against Holman and Profaci. (D.I. 15 at 5) On May 11,

2007, the complaint was amended to reflect the following name changes: Nurse Carole

was identified as Carole Kozak ("Kozak"), and the John Doe Detectives were identified

as Mark Forbes ("Forbes") and Robert Durnan ("Durnan"). (D.I. 13) Therefore, at

present, CMS, Carroll, Taylor, Kozak, Nurse Kera, Melaney, Burris, Forbes, and Durnan

(hereinafter, "defendants") are the remaining defendants in the action at bar.[1]

---

[1] Plaintiff is suing defendants in both their individual and official capacities.

Plaintiff's amended complaint alleges excessive use of force in violation of the Eighth Amendment to the United States Constitution and 42 U.S.C. § 1983; plaintiff also alleges, under the laws of the State of Delaware, the torts of negligence, assault, and battery. Regarding the constitutional claims, plaintiff contends that Taylor, Forbes, and Durnan unnecessarily aggravated his post-surgical wrist injuries during a transfer from Pennsylvania Department of Corrections ("PDOC") custody into Delaware DOC ("DDOC") custody. (Id. at 12) In addition, plaintiff contends that Kozak and Nurse Kera, both employed by CMS: (1) intentionally failed to administer doctor-prescribed pain-killer medications upon plaintiff's arrival at DCC; and (2) failed to provide plaintiff prompt medical treatment at DCC, despite their knowledge that he was suffering. (Id.) Plaintiff requests injunctive relief in the form of the timely reexamination of his wrist, including any necessary surgery or physical treatment. (Id. at 16) Plaintiff also requests an injunction compelling a mandatory DCC policy requiring CMS to examine any prisoner with a sickness or injury by the morning after the prisoner submits his or her sick call request. (Id.) Finally, plaintiff requests compensatory and punitive damages from multiple defendants totaling $410,000. (Id.) The court has jurisdiction over the suit at bar pursuant to 42 U.S.C. §§ 1331(a) and 1343. The court has supplemental jurisdiction over the plaintiff's state law tort claims pursuant to 28 U.S.C. § 1367. Presently before the court is CMS's motion to dismiss for failure to state a claim upon which relief may be granted (D.I. 27) and plaintiff's motions to appoint counsel (D.I. 37, 50). For the reasons that follow, the court denies the motions.

2

## II. BACKGROUND

On August 25, 2005, while under PDOC custody, plaintiff had carpal tunnel surgery on his wrists. (D.I. 13 at 5) Plaintiff contends that on September 21, 2005, his wrists were permanently damaged as a result of being tightly handcuffed during his transfer from PDOC custody to DDOC custody at DCC. (Id.) Despite plaintiff's protests, the transport officers removed a protective brace that plaintiff had received after surgery and proceeded to lock the handcuffs "extremely tight." (Id.) A "black box" was placed over/around the handcuff chain, which applied an "agonizing amount of pressure" directly on top of plaintiff's healing wrists. (Id.)

Plaintiff alleges that upon arrival at DCC, Kozak and Nurse Kera intentionally failed to administer doctor-prescribed painkiller medication which plaintiff had received after his carpal tunnel surgery. (Id. at 12) Plaintiff also claims that the two CMS nurses, knowing that he was suffering, refused him prompt medical treatment from September 21, 2005 (when he arrived at DCC) until October 6, 2005, when he finally saw a doctor. (Id.) When defendant did see a doctor, painkillers were again prescribed for him. (Id.) In December of 2005, plaintiff was brought to an outside specialist and given an EMG which showed permanent damage to his wrists. (Id. at 7) Kozak justified the lack of immediate care by asserting that she was following the Medical Services and Sick-Call Policy ("sick-call policy") in part VIII (A)-(D) of the Inmate Housing Rules for Medium High Security ("Inmate Housing Code"). (D.I. 51 at 18) According to plaintiff, the Inmate Housing Code provides emergency sick call rights only if an inmate is bleeding, having a heart attack, or cannot breathe properly. (Id. at 19-20)

Plaintiff contends that the sick-call policy promulgates frequent cruel and unusual

3

punishment by denying multiple prisoners immediate medical care simply because they
are not bleeding, having a heart attack, or having trouble breathing. (Id.) More
specifically, plaintiff points out that this policy resulted in his suffering excruciating pain
for weeks without a physician's care. (Id.) Plaintiff also asserts that the Inmate
Housing Code, and specifically the sick-call policy within, constitute both a CMS policy
that amounts to cruel and unusual punishment in violation of the Eighth Amendment
and a custom of deliberate indifference to serious medical needs.[2]  (Id. at 17-22)

      Plaintiff states that he filed a grievance on September 27, 2005, which was
"mistakenly" dismissed due to not having been filed before a seven-day expiration
period. (Id. at 24) On October 1, 2005, plaintiff sent an appeal to Mr. Paul Howard,
Bureau Chief of DOCS; plaintiff claims his appeal was ignored. (Id.) A separate
medical grievance was also allegedly sent to Warden Carroll and was also ignored.
(Id.) Despite CMS's allegations that plaintiff did not properly exhaust the internal
grievance procedures within DCC, plaintiff contends both that he followed all available
administrative remedies available to him and that the entire internal DCC grievance
procedure is corrupt. (Id. at 22-26)

## III. STANDARD OF REVIEW

      In analyzing a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the court
must accept as true all material allegations of the complaint and it must construe the
complaint in favor of the plaintiff. See Trump Hotels & Casino Resorts, Inc. v. Mirage

---

      [2]The entire policy does not appear before the court. Rather, plaintiff quotes
relevant portions of the Inmate Housing Code within his amended complaint and
answering brief.

4

Resorts, Inc., 140 F.3d 478, 483 (3d Cir. 1998). "A complaint should be dismissed only

if, after accepting as true all of the facts alleged in the complaint, and drawing all

reasonable inferences in the plaintiff's favor, no relief could be granted under any set of

facts consistent with the allegations of the complaint." Id. Claims may be dismissed

pursuant to a Rule 12(b)(6) motion only if the plaintiff cannot demonstrate any set of

facts that would entitle him to relief. See Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

"[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more

than labels and conclusions, [however,] and a formulaic recitation of the elements of a

cause of action will not do." Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1964-65

(2007) (citations omitted). Because plaintiff proceeds pro se, his pleading is liberally

construed and his complaint, "however inartfully pleaded, must be held to less stringent

standards than formal pleadings drafted by lawyers." Erickson v. Pardus, 127 S. Ct.

2197, 2200 (2007) (citations omitted).

## IV. DISCUSSION

CMS asserts that plaintiff has no valid constitutional claims against it because

plaintiff has failed to show deliberate indifference to a serious medical need or to

provide a specific policy or custom that would render CMS liable. (D.I. 28 at 5-9) CMS

also claims that plaintiff has failed to exhaust his administrative remedies as required by

42 U.S.C. §1997e(a). (Id. at 10) Finally, CMS argues that plaintiff's state tort claims

must be dismissed because plaintiff did not include an expert's signed affidavit with his

amended complaint, as Delaware law requires. (Id. at 4); 18 Del. C. § 6854.

To state a violation of the Eighth Amendment right to adequate medical care,

plaintiff "must allege acts or omissions sufficiently harmful to evidence deliberate

5

indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106 (1976); accord White v. Napoleon, 897 F.2d 103, 109 (3d Cir. 1990). Plaintiff must demonstrate that: (1) he had a serious medical need; and (2) the defendant was aware of this need and was deliberately indifferent to it. See West v. Keve, 571 F.2d 158, 161 (3d Cir. 1978); see also Boring v. Kozakiewicz, 833 F.2d 468, 473 (3d Cir. 1987). Either actual intent or recklessness will afford an adequate basis to show deliberate indifference. See Estelle, 429 U.S. at 105.

The seriousness of a medical need may be demonstrated by showing that the need is "'one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention.'" Monmouth County Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987) (quoting Pace v. Fauver, 479 F. Supp. 456, 458 (D.N.J. 1979)). Moreover, "where denial or delay causes an inmate to suffer a life-long handicap or permanent loss, the medical need is considered serious." Id. Plaintiff alleges that the refusal of prompt medical care by CMS employees following CMS policy was, or could have been, partially responsible for the permanent damage to his wrists that was independently verified by an outside doctor administering an EMG. (D.I. 13 at 12) Furthermore, plaintiff alleges that the seriousness of his medical need was so obvious, from the condition he arrived in, his description of the events to the CMS nurses, and from the obvious pain he was under for a period of weeks, that any lay person would recognize the need for a doctor. (Id.)

As to the second requirement, an official's denial of an inmate's reasonable requests for medical treatment constitutes deliberate indifference if such denial subjects

6

the inmate to undue suffering or a threat of tangible residual injury. See Monmouth,

834 F.2d at 346. Deliberate indifference may also be present if necessary medical

treatment is delayed for non-medical reasons, or if an official bars access to a physician

capable of evaluating a prisoner's need for medical treatment. See Id. at 347.

However, an official's conduct does not constitute deliberate indifference unless it is

accompanied by the requisite mental state. Specifically, "the official [must] know ... of

and disregard . . . an excessive risk to inmate health and safety; the official must be

both aware of facts from which the inference can be drawn that a substantial risk of

serious harm exists, and he must also draw the inference." Farmer v. Brennan, 511

U.S. 825, 837 (1994). While a plaintiff must allege that the official was subjectively

aware of the requisite risk, he may demonstrate that the official had knowledge of the

risk through circumstantial evidence and "a fact finder may conclude that a[n] ... official

knew of a substantial risk from the very fact that the risk was obvious." Id. at 842.

Plaintiff alleges that, even if the substantial risk was not obvious from sight alone, he

repeatedly pleaded to the nurses, who deliberately denied him care. (D.I. 13 at 12) The

court concludes that plaintiff has met the requirements necessary to withstand

dismissal under Fed. R. Civ. P. 12(b)(6).

CMS contests whether, for § 1983 purposes, the actions of CMS employees can

be attributed to CMS itself. CMS cannot be held responsible for the acts of its

employees under a theory of respondeat superior or vicarious liability. Monell v. New

York City Dept. of Soc. Servs., 436 U.S. 658, 691 (1978). In order for CMS to be liable,

plaintiff must provide evidence that there was a relevant CMS policy or custom, and that

the policy caused the constitutional violation they allege. See Bd. of County Comm'rs

7

of Bryan County, Okla. v. Brown, 520 U.S. 397, 404 (1997). Plaintiff has pointed to a
specific CMS policy, namely the Inmate Housing Code, which the nurses were following
when they initially denied plaintiff care, causing the alleged constitutional violation and
two weeks of intense suffering. (D.I. 51 at 18) At this early stage of the proceedings,
plaintiff has successfully stated a claim that requires CMS to remain a party.

        The court is unpersuaded by CMS's assertion that plaintiff did not sufficiently
exhaust internal administrative remedies before bringing suit. Before filing a civil action,
a plaintiff-inmate must exhaust his administrative remedies, even if the ultimate relief
sought is not available through the administrative process. See Booth v. Churner, 206
F.3d 289, 300 (3d Cir. 2000), aff'd, 121 S. Ct. 1819 (2001). See also Nyhuis v. Reno,
204 F.3d 65, 73 (3d Cir. 2000) (stating that § 1997 "specifically mandates that
inmate-plaintiffs exhaust their available administrative remedies"). Plaintiff filed
separate grievance forms with three different parties, which convinces the court that
plaintiff has either exhausted administrative remedies or done so to the best of his
ability. (D.I. 51 at 14) Defendants have not presented evidence showing any response
to any of the grievance forms, as mandated by the grievance procedure itself. On this
record, the court declines to find that plaintiff failed to exhaust his administrative
remedies.

        The court denies without prejudice the plaintiff's motion for counsel at this time.
A pro se litigant proceeding in forma pauperis has no constitutional or statutory right to
representation by counsel. See Ray v.Robinson, 640 F.2d 474, 477 (3d Cir. 1981);
Parham v. Johnson, 126 F.3d 454, 456-57 (3d Cir. 1997). It is within the court's
discretion, however, to seek representation by counsel for plaintiff, but this effort is

                                    8

made only "upon a showing of special circumstances indicating the likelihood of

substantial prejudice to [plaintiff] resulting ... from [plaintiff's] probable inability without

such assistance to present the facts and legal issues to the court in a complex but

arguably meritorious case." Smith-Bey v. Petsock, 741 F.2d 22, 26 (3d Cir. 1984);

accord Tabron v. Grace, 6 F.3d 147, 155 (3d Cir. 1993) (representation by counsel may

be appropriate under certain circumstances, after a finding that a plaintiff's claim has

arguable merit in fact and law). At this time, the court believes that plaintiff has been

capably representing himself, and sees no special circumstances requiring the

appointment of counsel.

## V. CONCLUSION

The court denies CMS's 12(b)(6) motion for failure to state a claim.[3] The court

denies without prejudice plaintiff's motion for counsel. An appropriate order shall issue.

---

[3]Plaintiff's state law tort claims are bifurcated and stayed until further order of the
court.

9

## Certificate of Service

I, Lou Price , hereby certify that I have served a true

and correct cop(ies) of the attached: Plaintiff's Response To The

CMS/States Motion For Sum Judgment upon the following

parties/person (s):

TO: US Dist Ct-De.
Court Clerk
844 N. King St
Lockbox 18
Wilm De 19801

TO: Sika Tross, Esq
820 N. French St
Dept Justice
Wilm De
19801
OR:

K. Connors, Esq.
TO: L. Wolhar, Esq
1220 N. Market St
Box 88886
Wilm De 15899-
8888

TO: R. Durstein
820 N. French St
Dept Justice
Wilm De
19801

**BY PLACING SAME IN A SEALED ENVELOPE** and depositing same in the United States Mail at the Delaware Correctional Center, Smyrna, DE 19977.

On this 19 day of December , 2007

Lou G. Price, Sr.

Lou G. Press. 454304
1161 Paddock Rd.
Smyrna, De 19977

D/F



05-871-SLR
United States Dist. Courthouse
844 King St.
Lockbox K6
Wilmington De.
19801

U.S.M.S.
X-RAY

Legal Mail