IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| LOU GARDEN PRICE, SR., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 05-871-SLR |
| | ) |
| CAROL KOZAK, NURSE KIRA | ) |
| HARGAN, WARDEN TOM CARROLL, | ) |
| CORRECTIONAL MEDICAL | ) |
| SERVICES, MARK FORBES, ROBERT | ) |
| DURNAN, BETTY BURRIS, and CHRIS | ) |
| MALANEY, | ) |
| | ) |
| Defendants. | ) |

Lou Garden Price, Sr., James T. Vaughn Correctional Center, Smyrna, Delaware.  Pro se Plaintiff.

Erika Yvonne Tross, Deputy Attorney General, Delaware Department of Justice, Wilmington, Delaware.  Counsel for Defendants Thomas Carroll, Mark Forbes, Robert Durnan, and Betty Burris.

Kevin J. Connors, Esquire, Marshall, Dennehey, Warner, Coleman & Goggin.  Counsel for Defendant Correctional Medical Services.

**MEMORANDUM OPINION**

Dated: July 2̇8̇, 2008
Wilmington, Delaware

*Sue L. Robon*
**ROBINSON, District Judge**

## I. INTRODUCTION

Plaintiff Lou Garden Price ("plaintiff"), an inmate at the James T. Vaughn Correctional Center, formerly known as the Delaware Correctional Center ("DCC"), filed this civil rights complaint pursuant to 42 U.S.C. § 1983. Presently before the court are motions for summary judgment filed by State defendants Tom Carroll ("Carroll"), Betty Burris ("Burris"), Raymon Taylor ("R. Taylor")[1], Mark Forbes ("Forbes"), and Robert Durnan ("Durnan") (collectively, "State defendants") and defendant Correctional Medical Services, Inc. ("CMS") with supporting memoranda and plaintiff's response thereto. (D.I. 117, 121) Also before the court is plaintiff's motion for extension of time to file a response to the motions. (D.I. 125) For the reasons set forth below, the court will grant in part and deny in part the motions for summary judgment and will deny as moot plaintiff's motion for extension of time.

## II. BACKGROUND

Plaintiff filed his original complaint on December 15, 2005, followed by amended complaints on February 6, 2006 and April 12, 2006, respectively. (D.I. 2, 11, 13) Plaintiff has clarified the names of defendants through various filings. (D.I. 62, 105)

On August 25, 2005, and while in the custody of the Pennsylvania Department of

---

[1]The original complaint named Lieutenant Taylor as a defendant, and service was improperly accepted by R. Taylor. Subsequent to the State defendants filing their motion for summary judgment, the court granted a motion to amend the complaint on January 8, 2008, which corrected the name of Lt. Taylor to Scott Taylor ("S. Taylor"). (D.I. 133) The order notes that R. Taylor is not a party to the case. S. Taylor was recently dismissed from the case when plaintiff failed to timely submit a USM-285 form. (D.I. 135) Plaintiff recently submitted a USM-285 form to effect service upon S. Taylor. (D.I. 136) The court recently reinstated S. Taylor as a defendant in a separate order.

Correction ("PDOC"), plaintiff underwent carpel tunnel release surgery.[2]  On September 21, 2005, plaintiff was transported from the PDOC to the DCC to serve sentences for crimes he had committed in Delaware.  Lieutenant Taylor, ultimately identified as Scott Taylor ("S. Taylor"), and Delaware detectives Forbes and Durnan transported plaintiff to the DCC.  Plaintiff alleges that he was handcuffed too tightly during the three hour transfer to the DCC and this caused him extreme pain and duress.

Plaintiff alleges that upon arrival at DCC he sought, and was refused, medical treatment from nurses Carol Kozak ("Kozak") and Kira Hargan ("Hargan").[3]  He alleges that Chris Malaney ("Malaney"), medical administrator, as well as Burris, operations manager at DCC, failed to provide plaintiff with an immediate examination on September 21, 2005, failed to provide physical therapy, and failed to provide post-operative follow-up.[4]  Additionally, CMS refused to provide plaintiff treatment from September 21, 2005 until October 5, 2005, when he "flagged down" medical personnel who prescribed narcotics and a right hand splint.  In January 2006, plaintiff was taken to an outside specialist who performed an EMG that revealed permanent damage to plaintiff's right hand.[5]  Plaintiff complains of pain shooting through his hand, fingers, wrist, arm, and neck.

---

[2]Carpal tunnel syndrome is defined as chronic pain and paresthesia in the hand in the area of distribution of the median nerve, caused by compression of the median nerve by fibers of the flexor retinaculum and associated with repetitive motion. Stedman's Medical Dictionary 130 (2d ed. 2004).

[3]To date, service has not been effected upon Kozak and Hargan.

[4]To date, service has not been effected upon Malaney.

[5]Electromyogram. Stedman's Medical Dictionary 258 (2d ed. 2004).

According to plaintiff, Kozak justified the lack of immediate medical care because she was following the Medical Services and Sick Call Policy ("sick call policy") found at part VIII (A)-(D) of the Inmate Housing Rules for Medium High Security ("MHU housing rules"). Plaintiff contends that the MHU housing rules, that include the sick-call policy, constitutes a CMS policy that amounts to cruel and unusual punishment in violation of the Eighth Amendment and a custom of deliberate indifference to serious medical needs.

State defendants move for summary judgment on the bases that they are entitled to Eleventh Amendment immunity in their official capacities; plaintiff failed to exhaust his available administrative remedies pursuant to 42 U.S.C. § 1997e; a § 1983 action cannot be maintained against Carroll and Burris under a theory of respondeat superior; Taylor, Carroll, and Burris had no personal involvement in the alleged incidents; there are no genuine issues of material facts as to Forbes and Durnan's alleged excessive force or failure to protect; plaintiff cannot establish a causal connection between the use of handcuffs and his alleged hand damage; and State defendants are entitled to qualified immunity. CMS moves for summary judgment on the bases that its policies did not cause the constitutional violation at issue; plaintiff cannot demonstrate conduct of deliberate indifference to serious medical needs; plaintiff's state law claims fail; and plaintiff has failed to exhaust his administrative remedies.

Plaintiff asks the court to deny the motions on the bases that CMS has a policy of denying medical treatment, he has established CMS' deliberate indifference, and he previously demonstrated exhaustion.

-3-

## III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10 (1986). When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. Wishkin v. Potter, 476 F.3d 180, 184 (3d Cir. 2007). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." Horowitz v. Federal Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted).

If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). However, a party opposing summary judgment "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." Podobnik v. U.S. Postal Serv., 409 F.3d 584, 594 (3d Cir. 2005) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). Indeed, to survive a motion for summary judgment, plaintiff cannot rely merely on the unsupported allegations of the complaint, and must present more than the "mere existence of a

-4-

scintilla of evidence" in his favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

## IV. DISCUSSION

### A. Eleventh Amendment Immunity

State defendants move for summary judgment from liability in their official capacities pursuant to the Eleventh Amendment. The Eleventh Amendment shields states from suits by individuals absent their consent. Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 54 (1996). The Eleventh Amendment, however, permits suits for prospective injunctive relief against state officials acting in violation of federal law. Ex parte Young, 209 U.S. 123 (1908). "This standard allows courts to order prospective relief, as well as measures ancillary to appropriate prospective relief." Frew v. Hawkins, 540 U.S. 431, 437 (2004) (internal citations omitted). "Federal courts may not award retrospective relief, for instance money damages or its equivalent, if the State invokes its immunity." Id. (citations omitted). Accordingly, the court will grant the motion for summary judgment to the extent that plaintiff seeks monetary damages from State defendants in their official capacity.

### B. Exhaustion

All defendants argue that summary judgment is appropriate because plaintiff failed to exhaust his administrative remedies as is required by the Prison Litigation Reform Act ("PLRA"). The PLRA provides that "[n]o action shall be brought with respect

-5-

to prison conditions under section 1983 or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); see Porter v. Nussle, 534 U.S. 516, 532 (2002) ("[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."). Because an inmate's failure to exhaust under PLRA is an affirmative defense, the inmate is not required to specially plead or demonstrate exhaustion in his complaint. Jones v. Bock, 549 U.S. 199 (2007). Failure to exhaust administrative remedies must be pled and proved by the defendant. Ray v. Kertes, 285 F.3d 287, 295 (3d Cir. 2002).

Under § 1997e(a), "an inmate must exhaust [administrative remedies] irrespective of the forms of relief sought and offered through administrative avenues." Booth v. Churner, 532 U.S. 731, 741 n.6 (2001). Under Woodford v. Ngo, 548 U.S. 81, 88 (2006), exhaustion means proper exhaustion, that is, "a prisoner must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a precondition to bringing suit in federal court." Id. at 2384.

CMS makes an identical argument for exhaustion in its current motion for summary judgment as it did in its previously filed motion to dismiss. In denying dismissal on the basis of failure to exhaust administrative remedies, the court was "unpersuaded by CMS's assertion that plaintiff did not sufficiently exhaust internal administrative remedies before bringing suit." (D.I. 66) The court noted that plaintiff filed separate grievance forms with three different parties and this convinced it that plaintiff had either exhausted administrative remedies or done so to the best of his

-6-

ability. (Id.) CMS has not presented any additional evidence in support of its motion for summary judgment. Therefore, the court will deny CMS' motion for summary judgment on the issue of exhaustion.

Plaintiff submitted two grievances. Plaintiff filed his first grievance on September 27, 2005. (D.I. 2, ex.) Inexplicably, it was denied as exceeding the filing period of seven days from the date of the occurrence, even though it is evident that it was filed within six days. Plaintiff filed a second grievance on September 28, 2005 and, it too, was denied as untimely, even though it was not. (D.I. 118, ex. H) The record reflects that plaintiff wrote a letter to the Bureau Chief and explained that he was told that there was no official appeal form for grievances. (D.I. 2, ex.) Plaintiff also wrote to numerous other prison officials, but received no response. In reviewing the documents of record, the court finds that plaintiff had either exhausted administrative remedies or did so to the best of his ability. Accordingly, the court will deny State defendants' motion for summary judgment on the issue of exhaustion.

## C. Respondeat Superior

Defendants Carroll and Burris argue that they are entitled to summary judgment because they were not personally involved in the transport of plaintiff to the DCC or in the administration of medical care and treatment to plaintiff after he arrived at the DCC. Plaintiff did not address the respondeat superior issue in his response to the State defendants' motion.

Liability in a § 1983 action cannot be predicated solely on the operation of respondeat superior. Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1998) (citations omitted). However, a plaintiff may set forth a claim for supervisory liability

-7-

under § 1983 if he "(1) identif[ies] the specific supervisory practice or procedure that the supervisor failed to employ, and show[s] that (2) the existing custom and practice without the identified, absent custom or procedure created an unreasonable risk of the ultimate injury, (3) the supervisor was aware that this unreasonable risk existed, (4) the supervisor was indifferent to the risk; and (5) the underling's violation resulted from the supervisor's failure to employ that supervisory practice or procedure." Brown v. Muhlenberg Twp., 269 F.3d 205, 216 (3d Cir. 2001) (citing Sample v. Diecks, 885 F.2d 1099, 1118 (3d Cir. 1989)). It is not enough for a plaintiff to argue that the alleged injury would not have occurred if the supervisor had "done more." Id. He must identify specific acts or omissions of the supervisor that evidence deliberate indifference and establish a link between the act or omission and the ultimate injury. Id.

Plaintiff testified that he named former Warden Carroll as a defendant because he is the warden, he wrote a complaint to him, and medical grievances go to his office. (D.I. 124 at 17) He named Burris as a defendant because she oversees the correctional staff and grievances go through her. (Id. at 21-22) It is apparent from plaintiff's testimony that Burris and Carroll are named as defendants solely based upon their supervisory positions. The record does not support any other conclusion. Therefore, the court will grant State defendants Burris and Carroll summary judgment on the issue of respondeat superior.[6]

_____

[6]The court will not address State defendants R. Taylor, Carroll, and Burris' motion for summary judgment on the issue of personal involvement inasmuch as R. Taylor is not a defendant in this action and the court will grant Carroll and Burris summary judgment as there is no supervisory liability under § 1983. Moreover, participation in the after-the-fact review of a grievance is not enough to establish personal involvement. See, e.g., Brooks v. Beard, 167 Fed. Appx. 923, 925 (3d Cir. 2006) (allegations that

-8-

## D. Eighth Amendment Claims

### 1. Excessive Force and Failure to Protect

State defendants Durnan and Forbes argue they are entitled to summary judgment as plaintiff cannot prove they intentionally subjected him to the unnecessary and wanton infliction of pain or that they failed to protect him. Plaintiff did not address either issue in his response to the State defendants' motion.

#### a. Relevant Facts

Plaintiff was transported to the DCC approximately three weeks after his carpel tunnel surgery. He dreaded the transport because he knew he would be handcuffed. (D.I. 124 at 83) Medical records indicate that plaintiff was examined on September 14, 2005, that he had a little discomfort in his thumb, but for the most part the tingling had subsided. (D. I. 120, ex. B) On the same day, plaintiff was released to resume full activities and see his physician as needed. (Id.) Plaintiff did not discuss his handcuffing concerns with his physician. (D.I. 124 at 73)

Transfer information recommended tight security as plaintiff is serving two life sentences. (D.I. 120, ex. D) S. Taylor, Durnan, and Forbes were the transporting officers and present at the time of transfer. Plaintiff testified that a PDOC officer told defendants that plaintiff was wearing a brace because he had surgery. (D.I. 124 at 97-

---

prison officials and administrators responded inappropriately to inmate's later-filed grievances do not establish the involvement of those officials and administrators in the underlying deprivation). See also Cole v. Sobina, Civ. No. 04-99J, 2007 WL 4460617 (W.D. Pa. 2007); Ramos v. Pennsylvania Dep't of Corr., Civ. No. 06-1444, 2006 WL 2129148 (M.D. Pa. 2006) and Jefferson v. Wolfe, Civ. No. 04-444 ERIE, 2006 WL 1947721 (W.D. Pa. 2006). Cf. Wilson v. Horn, 971 F. Supp. 943, 947 (E.D. Pa. 1997), aff'd, 142 F.3d 430 (3d Cir. 1998) (prison officials' failure to respond to inmate's grievance does not state a constitutional claim).

98) He did not recall the PDOC officer stating that plaintiff should not be cuffed or restrained. (Id. at 99)

Plaintiff told the three defendants about his surgery, that he was still experiencing discomfort, and that the stun belt was sufficient. (Id. at 80) He was told defendants had no choice about the cuffs because he was being transported to the DCC. (Id. at 81) Plaintiff's brace was removed in preparation for his transport to the DCC. (D.I. 124 at 81) The cuffs were tight and covered with a black box. (Id.) Plaintiff believes that Durnan helped S. Taylor, but it was S. Taylor who placed the stun belt and handcuffs on plaintiff. (D.I. 124 at 78-79)

After he was handcuffed, a nurse handed the officers plaintiff's medical file and medication. (Id. at 90) Plaintiff saw the nurse, but he did not complain that the handcuffs were too tight or that he was in pain. (Id.) During the three hour trip to the DCC plaintiff complained, maybe a dozen times, that the cuffs were too tight, but was told that he would have to "bear it." (Id. at 91) The cuffs were never checked. (Id.)

Plaintiff had been cuffed before during a previous transfer and he testified that the same restraints were used; that it was only different because he had recently had surgery. (Id. at 84) He believed that other methods of restraint should have been used. (Id. at 87)

The cuffs were removed as soon as plaintiff arrived at the receiving room at the DCC. (D.I. 102) He asked for medical attention and approximately one-half hour later was seen by intake nurse Kozak. (Id. at 102-03) Plaintiff testified that his right wrist/hand was "kind of like swollen", his hand was blue, there were deep wedges inside his right wrist, his hand was throbbing, and he was in real pain. (Id. at 103-104)

-10-

Plaintiff's September 27, 2005 grievance states that the transporting officers were aware of the surgery yet kept him handcuffed very tightly for three hours and since that time the pain in his right hand "has been unbearable to the point of not being able to use it, it is numb and the thumb keeps giving out." (D.I. 2, ex.)

## b. Excessive Force

When analyzing an excessive force claim under the Eighth Amendment, the court must determine "whether the force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." Whitley v. Albers, 475 U.S. 312, 320-21 (1986) (citations omitted). Use of force is actionable under § 1983 when it exceeds "that which is reasonable and necessary under the circumstances." Davidson v. O'Lone, 752 F.2d 817, 827 (3d Cir. 1984). The court must determine whether the force was applied in good faith by weighing the following factors: (1) the need for the application of force, (2) the relationship between the need and the amount of force that was used, (3) the extent of the injury inflicted, (4) the threat reasonably perceived by the responsible officials, and (5) the efforts made to temper the severity of a forceful response. Davis v. Carroll, 390 F. Supp. 2d 415, 419 (D. Del. 2005) (citing Hudson v. McMillian, 503 U.S. 1, 7 (1992)).

It cannot be said that Forbes and Durnan used excessive force. Neither Forbes nor Durnan placed plaintiff in handcuffs. For this reason alone, they are entitled to summary judgment as to the excessive force claim.

## c. Failure to Protect

To prevail on an Eighth Amendment failure to protect claim, plaintiff is required to show that (1) he is incarcerated under conditions posing a substantial risk of serious

harm (the objective element), and (2) prison officials  acted with deliberate indifference, i.e., that prison officials knew of and disregarded an excessive risk to inmate health or safety (the subjective element). See Farmer v. Brennan, 511 U.S. 825, 833-34 (1994); see also Griffin v. DeRosa, 153 Fed. Appx. 851 (3d Cir. 2005).  To establish deliberate indifference, a plaintiff must show that the individual was subjectively aware of the risk of harm to the plaintiff's health or safety, and disregarded it.  See id. at 837; Natale v. Camden County Corr. Facility, 318 F.3d 575, 582 (3d Cir. 2003).  "The knowledge element of deliberate indifference is subjective, not objective knowledge, meaning that the official must actually be aware of the existence of the excessive risk; it is not sufficient that the official should have been aware."  Beers-Capitol v. Whetzel, 256 F.3d 120, 133 (3d Cir. 2001).  Knowledge may be shown where the official has actual notice of the risk, Nami v. Fauver, 82 F.3d 63, 67-68 (3d Cir. 1996), or where the risk was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it."  Farmer, 511 U.S. at 842.

With regard to the failure to protect issue, Forbes and Durnan argue that plaintiff cannot prove that the use of handcuffs posed a substantial risk of serious harm.  The record reflects that defendants were aware that plaintiff had surgery, that he complained over a dozen times during the three hour drive that S. Taylor handcuffed him too tightly, but not once were the cuffs checked.  Construing the facts in the light most favorable to plaintiff as the court must, a reasonable person could find that recent surgery coupled with tight handcuffs could pose a substantial risk of serious harm.

Nonetheless, Forbes and Durnan argue that plaintiff cannot show that they had the requisite culpable state of mind for a failure to protect claim. The record reflects that when plaintiff complained about the tight cuffs, defendants responded they had no choice because he was being transported to the DCC. Indeed, the PDOC recommended tight security during the transfer in light of plaintiff's two life sentences. Plaintiff's response fails to address the failure to protect issue, and he presented no evidence in his favor to rebut a finding that defendants' actions were taken, not to harm plaintiff but, rather, to transport plaintiff to the DCC in a manner for the safety of plaintiff, prison employees, and the public. Plaintiff failed to make a sufficient showing on an essential element of the failure to protect issue and, therefore, the court will grant Forbes and Durnan's motion for summary judgment on this issue.

## 2. Medical Needs

CMS argues that its policies did not cause the constitutional violation at issue and, further, that there is no conduct demonstrating deliberate indifference to plaintiff's serious medical needs. State defendants argue that they afforded plaintiff access to medical care and, therefore, they are entitled to summary judgment. Plaintiff relies upon the MHU housing rules, the memorandum of agreement between the United States Department of Justice ("DOJ") and the State of Delaware, and a letter to Delaware governor Ruth Ann Minner regarding the DOJ's investigation to support his position that CMS has a known pattern of "incorrigible, inhumane medical care."[7] (D.I.

_____

[7]The Civil Rights Division of the DOJ conducted an investigation of five Delaware prison facilities pursuant to the Civil Rights of Institutionalized Persons Act, which authorizes the federal government to identify and root out systemic abuses. The investigation found substantial civil rights violations at four of the five facilities: Delores

129)

## a. Relevant Facts

Plaintiff's handcuffs were removed upon his arrival at DCC receiving. (D.I. 124 at 102) He asked to see a doctor and was told by a sergeant that medical would soon be there. (Id.) Plaintiff was examined by nurse Kozak within thirty minutes of his arrival. (Id. at 102-103) He testified that he noticed "ligatures" and marks on his wrists and alerted her to the marks on his wrist. (Id. at 104). The intake sheet notes that plaintiff did not need housing in the infirmary for a pre-booking injury and plaintiff signed the sheet confirming the same. (D.I. 120, ex. E) The physician box is checked. (Id.)

Plaintiff requested pain medication and was told by Kozak, "no," that he would have to be seen by a doctor before she could give him the medication, and he would have to submit a sick call slip. (Id. at 105, 223) Plaintiff testified that he was in obvious pain, but Kozak would not give him medication. (Id. at 224) Plaintiff testified that he submitted a sick call slip on September 21, 2005, but he does not have documentation of the slip. (Id. at 192) This sick call slip referred to his pain and that plaintiff needed to see a doctor. (Id. at 194) He was not seen on September 22, 2005, and put in another sick call slip but, again, does not have documentation of it. (Id.)

As soon as plaintiff was housed in Building 21, he submitted a sick call slip. (Id. at 108-109). The sick call slip, dated September 25, 2005, states, "pain from carpal

---

J. Baylor Women's Correctional Institution, Howard R. Young Correctional Institution, DCC, and Sussex Correctional Institution. The investigation resulted in the entry of a memorandum of agreement on December 29, 2006, between the DOJ and the State of Delaware regarding the four institutions. Paragraph I.F. of the agreement provides that it may not be used as evidence of liability in any other legal proceeding.

tunnel surgery, (need brace from my property). need treatment for toenail fungus infection. prescription for migraines. bottom bunk status until pain heals in hand (cervical neck pain is cured)." (D.I. 123, ex. B) The slip makes no mention that plaintiff is not receiving his pain medication. (D.I. 124 at 196)

Plaintiff testified that he received his blood pressure medication in receiving and that he probably received some pain medication within two days, but that doses were erratic. (D.I. 124 at 110, 178-179). For example, three days would go by without receiving pain medication. (Id. at 184) Plaintiff felt that Kozak and Hogan were punishing him for consistently demanding treatment. (Id. at 183.) The actions of Kozak and Hogan occurred sometime between September 21 to October 5, 2005. (Id. at 239) From the prison medication records it appears that plaintiff received Zantac and Motrin on September 21, 2005, and that plaintiff continued to receive all medication including Tenormin, Zantac, Motrin, Seroquel, and Sinequan on a fairly regular basis in September 2005 and October 2005. (D.I. 123, ex. C)

Plaintiff submitted another sick call slip on September 29, 2005. (D.I. 112) The top of the slip states "have not seen by doctor yet" and the body of the slip states, "post operation pain in right hand (aggravated from handcuffs during transfer); diagnosed w/cervical neck arthritis pain - need bottom bunk status paper; migraine headache treatment; fungus under toenails spreading/need treatment; herpes outbreak prevention/treatment needed; carpal tunnel follow thru treatment needed." (Id.)

Plaintiff complained to nurse practitioner Sheryl Ott ("Ott") that he was not receiving his pain medication and on October 5, 2005, she conducted a quick examination, questioned plaintiff, and plaintiff began receiving his pain medication. (Id.

-15-

at 185, 186) Ott gave him "everything", including his brace which had been confiscated. (Id.)

Plaintiff filed a medical grievance on October 11, 2005, complaining that his previously submitted sick call slips were being ignored. (D.I. 2, ex.) Plaintiff wrote to Ott on October 25, 2005, complaining that he was constantly denied medication and medical treatment. (D.I. 2, ex). He complained that he had suffered and been denied treatment for thirty-three days. (Id.) Plaintiff was seen on October 26, 2005. (D.I. 112) Physician order sheets reflect that plaintiff received medical treatment on October 26, November 4, November 11, November 25, and November 30, 2005. (D.I. 73)

An EMG was performed on January 4, 2006. (D.I. 73) The EMG results concluded "bilateral median neuropathy at the wrist, electrophysiologically moderate. no electrophysiologic evidence of a right cervical radiculopathy." (Id.) Dr. Ott explained the results to plaintiff and told him that he had permanent damage in his wrist. (D.I. 124 at 128-129) No nurse or doctor told plaintiff that the handcuffs caused the neuropathy, but plaintiff believes they did. (D.I. 124 at 131, 134) Additionally, in 2006, plaintiff received treatment on January 10 and 25, February 23, March 14, May 16, June 14, June 27 and 28. (Id.)

The MHU housing rules for DCC, approved by the warden, set forth the procedure for medical services and sick call. (D.I. 88, § VIII) The sick call police, § VIII is, states that sick call slips shall be placed in the secured sick call box, which will be emptied daily by the medical services provider. (Id.) Sick call normally takes place Monday through Friday, including holidays, but inmates with medical emergencies are to immediately notify the housing unit staff. (Id.) Prescribed medication is dispensed at

-16-

designated locations by medical staff. (Id.) CMS' policy and procedures manual for the DCC contains a plan to provide 24-hour emergency medical, mental health and dental care to inmates. (D.I. 116) Emergency care is defined as "care for an acute illness or unexpected health need that cannot be deferred until the next scheduled sick call or clinic. (Id.) It is plaintiff's understanding that the MHU housing rules for medical care are also CMS' policies, based upon the § VIII's title "Medical Services". (D.I. 124 at 163-164) Plaintiff testified that "medical services" stands for "MS"; "it just takes out the C." (Id. at 164)

Plaintiff testified that when he first arrived at the DCC he told the sergeant and Kozak that he was in pain and that she had his medication, but she refused to dispense it. (Id. at 167) He infers that the situation was a medical emergency and did not require a sick call slip, and testified that the inmates are not told what a medical emergency is. (Id. at 167-168) He was told in medical that a medical emergency is "if you're bleeding, if you're having breathing problems, or a heart attack." (Id. at 169) Plaintiff also testified that he had sick call slips in for forty days that had not been answered. (Id. at 168)

### b. Deliberate Indifference

State defendants argue that plaintiff never states that the transporting officers denied him access to medical care and, further, that plaintiff received medical attention upon his arrival at DCC. CMS argues that the MHU housing policies or anything therein were the policy or procedures enacted by CMS to address emergency sick call rights. Additionally, it argues that plaintiff has no evidence that relevant CMS policy caused the alleged constitutional violations and, therefore, it cannot be held liable as a matter of

-17-

law.

Plaintiff argues that the MHU housing policies became CMS' custom and policy when it contracted with the Delaware Department of Correction to provide medical services. Plaintiff argues that, as a prisoner, he is bound or forced to follow prison rules. He contends that when he requested medication and medical treatment on September 21, 2005, Kozak referred to the MHU housing policies for submitting a sick call slip, not to CMS' policies, to deny him prompt medical care and medication. Plaintiff argues that the policy or custom of CMS employees amounted to denial and delay of prompt medical treatment. (D.I. 129) Plaintiff's response to the motions for summary judgment did not address the medical needs issue as to defendants Forbes and Durnan.

The Eighth Amendment proscription against cruel and unusual punishment requires that prison officials provide inmates with adequate medical care. Estelle v. Gamble, 429 U.S. 97, 103-105 (1976). However, in order to set forth a cognizable claim, an inmate must prove (1) a serious medical need and (2) acts or omissions by prison officials that indicate deliberate indifference to that need. Estelle v. Gamble, 429 U.S. at 104; Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999). A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and fails to take reasonable steps to avoid the harm. Farmer v. Brennan, 511 U.S. 825, 837 (1994). A prison official may manifest deliberate indifference by "intentionally denying or delaying access to medical care." Estelle v. Gamble, 429 U.S. at 104-05.

"[A] prisoner has no right to choose a specific form of medical treatment," so long

-18-

as the treatment provided is reasonable. Harrison v. Barkley, 219 F.3d 132, 138-140 (2d Cir. 2000). An inmate's claims against members of a prison medical department are not viable under § 1983 where the inmate receives continuing care, but believes that more should be done by way of diagnosis and treatment and maintains that options available to medical personnel were not pursued on the inmate's behalf. Estelle v. Gamble, 429 U.S. 97, 107 (1976). Moreover, allegations of medical malpractice are not sufficient to establish a Constitutional violation. White v. Napoleon, 897 F.2d 103, 108-09 (3d Cir. 1990) (citations omitted); see also Daniels v. Williams, 474 U.S. 327, 332-34 (1986) (negligence is not compensable as a Constitutional deprivation). Finally, "mere disagreement as to the proper medical treatment" is insufficient to state a constitutional violation. See Spruill v. Gillis, 372 F.3d 218, 235 (3d Cir. 2004) (citations omitted).

When a plaintiff relies on the theory of respondeat superior to hold a corporation liable, he must allege a policy or custom that demonstrates such deliberate indifference. Sample v. Diecks, 885 F.2d 1099, 1110 (3d Cir. 1989); Miller v. Correctional Med. Sys., Inc., 802 F. Supp. 1126, 1132 (D. Del. 1992). In order to establish that CMS is directly liable for the alleged constitutional violations, plaintiff "must provide evidence that there was a relevant [CMS] policy or custom, and that the policy caused the constitutional violation[s] [plaintiff] allege[s]." Natale v. Camden County Corr. Facility, 318 F.3d 575, 584 (3d Cir. 2003) (because respondeat superior or vicarious liability cannot be a basis for liability under 42 U.S.C. § 1983, a corporation under contract with the state cannot be held liable for the acts of its employees and agents under those theories). Assuming the acts of a CMS employee have violated a person's constitutional rights, those acts may be deemed the result of a policy or custom of the entity for whom the employee

works, thereby rendering the entity liable under § 1983, where the inadequacy of existing practice is so likely to result in the violation of constitutional rights that the policymaker can reasonably be said to have been deliberately indifferent to the need. See Natale, 318 F.3d 584 (citations omitted). "'Policy is made when a decisionmaker possess[ing] final authority to establish . . . policy with respect to the action issues an official proclamation, policy or edict.'" Miller v. Corr. Med. Sys., Inc., 802 F. Supp. 1126, 1132 (D. Del. 1992) (alteration in original) (quoting Andrews v. City of Philadelphia, 895 F.2d 1469, 1480 (3d Cir. 1990)). "Custom, on the other hand, can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." Id. (citing Andrews, 895 F.2d at 1480; Fletcher v. O'Donnell, 867 F.2d 791, 793-94 (3d Cir. 1989)).

The medical records indicate that plaintiff was released from medical care by his Pennsylvania physician following his carpel tunnel surgery. Upon his arrival at the DCC he was examined within thirty minutes, complained of pain, but was told he was required to submit a sick call slip in order to see a physician. According to his own testimony, within two days, plaintiff received pain medication as well as all other prescribed medications, and within two weeks was examined by a nurse practitioner. He was examined by a physician approximately five weeks after his arrival at the DCC.

While plaintiff may have believed his medical complaints amounted to an emergency, the court cannot say that they met the definition for emergency care as outlined in CMS policies. Even construing the facts in the light most favorable to plaintiff, the evidence shows that in light of his recent surgery and complaints of pain, at

most, CMS may have been negligent in not dispensing medication and having him examined sooner than it did. Negligence, however, if it exists and is proven, does not rise to the level of a constitutional violation. See Estelle, 429 U.S. at 107; Rouse, 182 F.3d at 197. Plaintiff has failed to make a sufficient showing as to necessary elements of his constitutional claims for deliberate indifference to a serious medical need. Accordingly, the court will grant State defendants' and CMS' motion for summary judgment as to this issue.[8]

## E. State Law Claims

CMS moves for summary judgment to the extent that plaintiff attempts to allege a state claim for medical malpractice. In Delaware, medical malpractice is governed by the Delaware Health Care Negligence Insurance and Litigation Act. 18 Del. C. § 6801(7). When a party alleges medical negligence, Delaware law requires the party to produce expert medical testimony detailing: (1) the applicable standard of care, (2) the alleged deviation from that standard, and (3) the causal link between the deviation and the alleged injury." Bonesmo v. Nemours Found., 253 F. Supp. 2d 801, 804 (D. Del. 2003) (quoting Green v. Weiner, 766 A.2d 492, 494-95 (Del. 2001)) (internal quotations omitted); 18 Del. C. § 6853.

Plaintiff did not submit expert testimony to support a medical negligence claim. Accordingly, the court will grant CMS' motion for summary judgment to the extent that plaintiff alleges a medical negligence claim under Delaware law.

---

[8]The court will not address the other issues raised in State defendants' motion for summary judgment.

## V. CONCLUSION

Based upon the foregoing analysis, the court will deny the motions for summary judgment as to the exhaustion issue and grant them in all other respects. The court will deny as moot plaintiff's motion for extension of time. An appropriate order will issue.